**FILED**

DEC 2 0 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**DAVID M. PETROU,**
2810 R Street, NW
Washington, DC 20007               )
                                   )
          **Plaintiff,**
     v.

**CARROLTON BANK,**
344 N. Charles St., Suite 300
Baltimore, MD 21201

          and

**EISNER COMMUNICATIONS, INC.,**
509 South Exeter St.
Baltimore, MD 21201

          and

**EISNER PETROU & ASSOCIATES, INC.,**
509 South Exeter St.
Baltimore, MD 21201

          and

**STEVEN C. EISNER,**
207 Longwood Road
Baltimore, MD 21210

          and

**SARA EISNER,**
207 Longwood Road
Baltimore, MD 21210

          **Defendants.**

CASE NUMBER 1:06CV02159

JUDGE: Gladys Kessler

DECK TYPE: General Civil

DATE STAMP: 12/20/2006

**COMPLAINT**
**FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff David M. Petrou ("Petrou") brings this action, through his undersigned

attorneys, against defendants Carrolton Bank, Eisner Communications ("EC"), Eisner Petrou &

Associates ("EPA"), Steven C. Eisner, and Sarah Eisner, seeking recovery of contract damages,

contribution, and an accounting from certain defendants and declaratory, injunctive, and

equitable relief against Carrolton Bank ("the Bank"). The case involves the wrongful diversion

of revenues from EPA to EC by the Eisner defendants, in breach of contract obligations owed to

Petrou, as well as in breach of Steven Eisner's fiduciary duties owed to EPA and the stockholders

of EPA, including Petrou, and the negligence and wrongdoing of the Bank. The Bank failed

properly to document, administer or monitor its loans to both EC and EPA, thus prejudicing the

personal guarantee of plaintiff Petrou, and also failed to follow District of Columbia law and

federally mandated procedures with respect to a home equity loan extended to Petrou and with

respect to a deed of trust on Petrou's residence in the District of Columbia. Without relief from

the Court, plaintiff Petrou would be left in the unfortunate position of being solely liable for the

negligence, breach of contract, and breach of fiduciary duty of the Eisner defendants, and the

negligence and failures of the Bank with respect to its $350,000 loan to EPA and a home

mortgage on Petrou's residence. Plaintiff Petrou brings this action to recover damages from the

Eisner defendants and to prevent Carrolton Bank from pursuing a double recovery of loan

proceeds which have improperly been diverted from EPA to EC, where they have already been

seized by the Bank along with other EC assets.

 In support of his Complaint, plaintiff alleges as follows:

 1. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

§ 1332 (a). Plaintiff Petrou is a citizen and resident of the District of Columbia and all

defendants are citizens and residents of Maryland, and the amount in controversy exceeds

2

$75,000. This Court also has subject matter jurisdiction under 15 U.S.C. § 1640, the Truth in Lending Act, 15 U.S.C. § 1601 et seq., the Homeowners Equity and Protection Act, 15 U.S.C. § 1602 et seq., and under principles of pendent and ancillary jurisdiction, the District of Columbia Mortgage Lender & Banker Act, D.C. Code Ann. § 26-1101 et seq. The Court also has jurisdiction under 28 U.S.C. § 2201, the Declaratory Judgment Act.

2. Venue is proper in this district pursuant to 28 U.S.C. § 1391 (a) and (b). A substantial part of the events or omissions giving rise to the claims herein occurred in the District of Columbia, including the signing by Petrou of all relevant loan documents. The property which is the subject of the challenged Home Equity Line of Credit and Deed of Trust is located in the District of Columbia. All defendants, including the Bank, have conducted business in and are subject to personal jurisdiction in the District of Columbia. The corporate defendants therefore reside in and may be found in the District of Columbia.

<u>THE PARTIES</u>

3. Plaintiff David M. Petrou is the former President, Chief Operating Officer, and a former member of the Board of Directors of Eisner Petrou and Associates. He was and remains a 50% stockholder of EPA, although his voting rights associated with his stock holdings were transferred to Steven Eisner on or about August 31, 2004. He is and was at all relevant times a resident of the District of Columbia. He resides at 2810 R Street, NW, Washington DC 2007. This residence is a single-family house which is the subject of a Deed of Trust held by defendant Carrolton Bank.

4. Defendant Eisner Petrou & Associates is a corporation incorporated in the State of Maryland, with its principal place of business at 509 South Exeter Street, Baltimore MD 21201.

3

EPA was a public relations firm which formerly maintained an office at 927 Fifteenth Street, NW, Suite 900, Washington, DC 20005.. Until August 31, 2004, Petrou was a member of the Board of Directors of EPA, as well as its president responsible for day-to-day operations. After August 31, 2004, and until July 31, 2005, EPA continued to maintain its DC office but also operated out of the offices of Eisner Communications in Baltimore. On or about August 31, 2004, control of EPA, including control of its day to day operations and 100% voting control of all stock of EPA, by agreement, became solely the responsibility of EC and Steve and Sara Eisner, who were officers and directors of EC.

5. Defendant Eisner Communications ("EC") is a corporation incorporated in the state of Maryland, with its principal place of business at 509 South Exeter Street, Baltimore MD 21201. EC has been conducting business as an advertising agency. It is wholly owned by Steve Eisner or owned jointly by Steve Eisner and Sara Eisner. EC has conducted business in the District of Columbia through its subsidiary EPA and, on information and belief, through its own operations.

6. Defendant Steven C. Eisner is the Chairman of the Board of Directors of EC. He is also the Chairman of the Board of Directors of EPA and has been since August 31, 2004, solely responsible for its day-to-day operations. He resides at 207 Longwood Road, Baltimore, MD 21210. He has conducted business in the District of Columbia through his control and direction of EPA and EC.

7. Defendant Sara Eisner is the wife of Steve Eisner and a senior corporate officer of EC. Together, Steve and Sara Eisner effectively and completely controlled the operations of EC, and, since August 2004, the operations of EPA. On information and belief, she resides with her husband at 207 Longwood Road, Baltimore, MD 21210. Through her joint control of EC and

4

EPA with her husband, she has conducted business in the District of Columbia.

8. Defendant Carrolton Bank is a state chartered bank with its headquarters in Baltimore Maryland at 344 North Charles Street, Suite 300, Baltimore, MD. It is subject to regulation and oversight by the FDIC and the State of Maryland, Division of Financial Regulation. Carrolton Bank holds a Deed of Trust on plaintiff Petrou's residence in the District of Columbia, and, on information and belief, conducts business in the District of Columbia in other ways as well.

## FACTS

9. For eighteen years, Petrou served as a director, President, and Chief Operating Officer of Eisner Petrou & Associates and managed its day to day affairs. He was and remains a 50 percent equity owner of EPA, along with Eisner Communications, although his shares have had no voting rights since August 31, 2004.

### Carrolton Bank Extends Credit to EPA on October 31, 2002

10. During Petrou's tenure, EPA entered into a number of loan agreements with Carrolton Bank.

11. Generally, these agreements were for the term of one year only, and were renewed each year.

12. The last such agreement of which Petrou has any record was a "Business Loan Agreement" of October 31, 2002, with a maturity date of October 31, 2003. That agreement provided, under a provision with the heading "TERM," as follows: "This Agreement shall be effective as of October 31, 2002, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full...or until October 31, 2003."

13. On information and belief that Business Loan Agreement was never renewed or

5

extended beyond its expiration date of October 31, 2003.

14. At the time EPA entered into that Business Loan Agreement with Carrolton Bank, it also executed a Promissory Note, also with a maturity date of 10/31/2003, promising to pay $350,000 to the bank. The Note provided for a variable interest rate based on Lender's Prime rate, with an initial interest rate of 5.25 percent. On information and belief, that Note was not paid or called on its maturity date, and never renewed or extended.

15. Carrolton Bank conditioned the extension of credit to EPA on receiving personal guarantees from Petrou and Steve Eisner, and also on receiving a fully executed Deed of Trust styled as a "Home Equity Credit Line Deed of Trust" on Petrou's residence at 2810 R Street, NW, in the District of Columbia.

16. Petrou and Eisner executed the guarantees and certain related subordination agreements on that same day, October 31, 2002. Both of the "Commercial Security Agreements" and both of the "Subordination Agreements" executed that day expressly provided that they had a "maturity date" of "10-31-2003."

17. Petrou also signed a "Deed of Trust" purporting to grant Carrolton Bank's designated Trustees certain interests in his real property at 2810 R Street, for the benefit of Carrolton Bank as the "Lender" or "Beneficiary."

18. Petrou was never given a financing statement with respect to this mortgage on his home in the District of Columbia. He was never given any kind of documentation at least 72 hours prior to settlement on this financing, he never waived his right to such advance documentation, and he was never given a settlement statement.

19. Petrou was never advised of any rights of rescission he had with respect to this

6

mortgage on his home in the District of Columbia.

20. Petrou was never given a disclosure statement advising him of the true interest rate, or "A.P.R." with respect to this mortgage on his home in the District of Columbia.

21. Petrou was never advised whether Carrolton Bank was licensed to issue mortgage financings in the District of Columbia. On information and belief, Carrolton Bank did not have a current and valid license to issue such a mortgage financing under District of Columbia law.

22. Petrou's signature on the purported "Deed of Trust" was attested to by a notary licensed and commissioned in the State of Maryland, not the District of Columbia.

23. On information and belief, the Deed of Trust was nonetheless subsequently recorded by the District of Columbia Recorder of Deeds.

### Petrou Retires from EPA Under Terms Requiring EPA to Pay Down Carrolton Bank Loan from Cash Flow

24. On August 31, 2004, Petrou entered into an "Operating and Retirement Agreement" with EPA.

25. Pursuant to that Agreement, Petrou retired from any active role in EPA's affairs as of that date, gave EC an option to buy all of his shares of EPA stock, and assigned complete voting control of such shares to Steve Eisner pending execution of such option right and transfer of such shares. EC still retains such option right and Steve Eisner retains complete voting control on all shares of EPA's stock previously owned by Petrou. EC and Steve Eisner hold complete voting control of all EPA shares.

26. Pursuant to that Agreement, EPA continued to maintain an office in the District of Columbia, and, as part of his retirement and severance arrangement, Petrou retained the title of

7

President and continued to draw a salary for an additional twelve months, or through the end of July 2005.

27. During the period from the date of his retirement through July 2005, Petrou played no role in EPA's business affairs and had no role in directing them.

28. After July 2005, all relations between EPA and Petrou, even those minimal ones involved in his retirement and severance arrangement, were completely terminated.

29. Pursuant to section 1.08 of that Agreement, EPA undertook to pay down the Carrolton Bank loan: "Commencing on the date of this Agreement and continuing until completion of the interim period, all 'Excess Cash Flow' of EPA shall be applied as quickly as possible to repay the Carrolton Bank indebtedness." This provision was intended by both parties to relieve Petrou of any surviving obligations of his personal guarantee of the Carrolton Bank indebtedness. (See also Section 1.09 of the Agreement stating that the expectation of the parties was that the indebtedness would be paid in full and Petrou relieved of any further obligations within 48 months.)

30. Under the Agreement, "Excess Cash Flow" was defined to mean the difference between cash flow generated from operations and certain expenses due and payable within one year or less, such as salaries, but not general overhead or rent payments to EC.

31. On information and belief, EPA experienced some "Excess Cash Flow" during the period from August 31, 2004, through July 31, 2005, and substantial "Excess Cash Flow" in the period after July 31, 2005 and before November 9, 2006.

### EPA Fails To Make Required Payments

32. However, on information and belief, either EPA did not apply that Excess Cash Flow

to repay the Carrolton Bank indebtedness at all, or EPA did not apply it to the full extent it was contractually obligated to apply it to repay that indebtedness.

33. Moreover, Steve Eisner and EC, on information and belief, limited revenues properly attributable to EPA but which were initially collected by EC and should have been passed through to EPA but were not. Thus, Steve Eisner and EC improperly and artificially limited the Excess Cash Flow of EPA that it was contractually obligated to use to pay down the Carrolton Bank indebtedness.

34. EC also failed to make the required accounting under Section 1.12 of the Agreement necessary to determine the amount of such Excess Cash Flow.

35. EC also failed to properly account for all public relations revenue attributable to business conducted by either EPA or EC in accordance with Section 5.03 of the Agreement, maintaining the exclusive right of EPA to perform all public relations activities of EC or EPA, and therefore deprived EPA of such revenue for purposes of the proper accounting of Excess Cash Flow as required.

### Steve and Sara Eisner Operated EC to the Detriment of EPA

36. Steve Eisner's primary interest was in maintaining the viability and profitability of EC, a much larger company than EPA. Steve Eisner was a Chief Executive Officer and the Chairman of the Board of Directors of EC. He also held the same positions, after Petrou's retirement, with EPA. Sara Eisner was a senior officer and director of EC who also shared *de facto* control over EPA with her husband.

37. Steve and Sara Eisner owed fiduciary duties to EPA no less than he did to EC.

38. However, Steve and Sara Eisner favored EC over EPA because EC was a larger

company and the vast majority of their family's wealth was tied up in EC, not EPA.

39.  In or about June 2004, the Board of Directors of EPA determined by resolution of the Board of Directors at a special meeting of the Board that—even up to that time--Steve Eisner had breached his fiduciary duty to EPA by withholding funds of EPA that were owed to EPA by EC for services performed by EPA for the benefit of clients of EC and billed by EC and collected by EC.  Once Steve and Sara Eisner gained complete control of the Board of Directors of EPA and gained complete control of all voting stock of EPA a few months later on or about August 31, 2004, they resumed such actions to the detriment of EPA and plaintiff Petrou and for the improper benefit of Defendants Steve Eisner, Sara Eisner and EC.

40.  Both Steve and Sara Eisner operated EC and EPA primarily for their own interests, drew from corporate expense accounts for their own personal expenses, commingled personal and corporate funds, and otherwise failed to follow corporate formalities separating EPA from EC and separating their own personal interests from those of the two corporations.

EC and EPA Cease Operations and the Bank Seizes EC Assets,<br>Including Those Properly Attributable to EPA

41.  EC unexpectedly and suddenly ceased operations on November 9, 2006, leaving many unpaid debts and turning its fifty (50) employees out into the street.  EPA also ceased operations at the same time, for unexplained reasons.  On information and belief, EPA was and could have continued as a viable and sustainable separate enterprise.

42.  Carrolton Bank had extended loans pursuant to a line of credit to EC of approximately $5 million.

43.  On information and belief, and based on news reports, on or about November 9,

2006, Carrolton Bank declared those loans to EC in default and acted to seize control of all collateral and security interests at EC, including accounts receivable.

44. On information and belief, the assets of EC seized by the Bank included assets of EPA that had been improperly diverted to EC.

45. On information and belief, these assets already seized by the Bank included, but were not limited to, the following: revenues received by EC on behalf of or on account of EPA, and due and owing to EPA, but which were improperly withheld from EPA; revenues, profits, credits to, and accounts receivable of EPA which related to services performed by EPA either directly for EPA clients or services performed by EPA on behalf of EC client for which EPA billed EC for such services and EC billed its clients for such services that were improperly detained and withheld by EC rather than being paid to EPA; and tangible assets of EPA, including office equipment, furniture, and related items which were improperly deemed to be property of EC but were in fact property of EPA.

46. At all times, Carrolton Bank, in conjunction with and with the active compliance of EC and the Eisner defendants, acted to maximize its recovery of collateral and security on its $5 million line of credit to EC, while prejudicing and minimizing its recovery on the $350,000 line of credit to EPA, a wholly owned subsidiary of EC. On November 20, 2006, Carrolton Bank through its attorneys transmitted a letter to EPA demanding payment in full of EPA's outstanding indebtedness to the Bank on or before December 29, 2006. That letter made no mention of assets already seized from EC that were EPA property. In that letter, copies of which were transmitted to both plaintiff and Steve Eisner personally at their residence addresses, the bank declared that the loan would be in default if not paid by that date, and implied that it would then seek recourse

11

against the personal guarantees of either or both.

47. By maximizing the assets of EC and minimizing the assets of EPA available to satisfy the two different outstanding lines of credit to EC and to EPA, the Bank and the Eisner defendants colluded and conspired to damage the interests of plaintiff Petrou, who is a personal guarantor of the EPA line of credit, but not the EC line of credit.

WHEREFORE, plaintiff Petrou brings the following causes of action:

### I. DEMAND FOR AN ACCOUNTING
### from EPA, EC, and Carrolton Bank

48. Plaintiff repeats and incorporates by reference the allegations of paragraphs one through 47 as though fully set forth herein.

49. Plaintiff and plaintiff's duly authorized representatives demanded to receive a full financial accounting of EPA's business as well as an accounting of all public relations services activities that may have been performed by EC rather than by EPA and for which any revenues associated with such public relations activities should also be credited to the benefit of EPA several times during the "interim period" as defined in the Operating and Retirement Agreement of August 31, 2004. Plaintiff had a right to such an accounting under the Agreement and because he remained a 50 percent shareholder.

50. EPA and EPA's representatives did not provide any audited, complete, or accurate accounting of the kind demanded;

51. EC and the Bank have colluded and conspired to maximize the recovery to EC on its $5 million line of credit to EC while minimizing any recovery from EPA on the Bank's $350,000 line of credit to it by improperly moving assets, revenues, credits, and liabilities between EC and

12

EPA.

52. It is impossible to sort out the precise extent of such activity without a full accounting from EC as well as EPA.

53. It is impossible to sort out the precise extent of the prejudice to EPA and to plaintiff without an accounting from the Bank of the assets of EC already seized and credited against EC's $5 million indebtedness.

54. Therefore, plaintiff has a right to and demands a full accounting from EPA, EC, and the Bank of these matters.

## II. BREACH OF CONTRACT
### Against EPA and Steven Eisner

55. Plaintiff repeats and incorporates by reference the allegations of paragraphs one through 54 as though fully set forth herein.

56. Articles 1.08, 1.09, 1.123 and 5.5 of the Operating and Retirement Agreement of August 31, 2004, were material terms of the contract entered into on that day by plaintiff and by EPA.

57. EPA, under the direction of Steven Eisner, failed to make the payments required under Articles 1.08 and 1.09  to pay down EPA's $350,000 line of credit owed to the Bank.

58. EPA therefore breached material terms of the contract and became liable for contract damages.

59. Steven Eisner directed and caused the breach, in violation of his fiduciary duties to EPA.

60. Steven Eisner operated EPA solely to benefit himself and to benefit EC, and failed to

13

follow proper corporate formalities separating his interests in EPA and EC and separating the operating funds and assets of EPA and EC, and failed to properly account for revenues associated with public relations activities performed by EC and EPA.

61. EPA and Steven Eisner are therefore jointly and severally liable for breach of contract.

62. As a result of the breach of contract described above, Petrou has suffered direct and consequential damages in the amount of at least $350,000, plus attorneys' and other fees and expenses.

### III. CONTRIBUTION
### Against Steven Eisner

63. Plaintiff repeats and incorporates by reference the allegations of paragraphs one through 62 as though fully set forth herein.

64. Defendant Steven Eisner executed a personal guarantee against the $350,000 line of credit extended to EPA by Carrolton Bank.

65. On information and belief, Eisner has failed to pay any amounts that are already due and owing or about to become due and owing under that guarantee.

66. To the extent that Petrou is or may become liable to the Bank on his personal guarantee of that line of credit, he is entitled under applicable law to contribution from Steven Eisner for Eisner's share.

67. Accordingly Petrou demands contribution from Eisner in the amount of $175,000, plus such other and further amounts as are reasonably attributable to the failure of Eisner to uphold his guarantee.

14

## IV. CIVIL CONSPIRACY
### Against EPA, EC, Steven Eisner, Sara Eisner, and Carrolton Bank

68. Plaintiff repeats and incorporates by reference the allegations of paragraphs one through 67 as though fully set forth herein.

69. After Petrou left EPA it was controlled and directed by EC and Steven Eisner.

70. EC was at all relevant times controlled and directed by Steven and Sara Eisner.

71 EPA, EC, and Steven and Sara Eisner at all relevant times managed the affairs of EC and EPA to favor the allocation of assets, revenues, and credits away from EPA and toward EC, and the allocation of debts, liabilities, and expenses to EPA and away from EC.

72 In doing so, they impermissibly, improperly, and illegally diverted revenues, payments, and profits away from EPA and toward EC, and withheld payments and revenues due and owing to EPA from EC, and thwarted plaintiff Petrou's efforts to obtain an accounting of such activities and profits owing to EPA for purposes of repayment of such Bank debt.

73. Carrolton Bank also aided, abetted, participated in and encouraged this process, at least with respect to assets of EPA that could be used to collateralize the Bank's extensions of credit to both EPA and EC.

74. All defendants agreed and colluded to maximize the assets of EC and to minimize the assets of EC that were available to satisfy the two lines of credit, to the detriment of plaintiff, whose personal guarantee encompassed only the line of credit extended to EPA.

75. All defendants are therefore liable, jointly and severally, for their civil conspiracy, which has damaged plaintiff in the amount of at least $350,000, plus expenses and costs of protecting plaintiff's interests.

15

## V. NEGLIGENCE AND BREACH OF FIDUCIARY DUTY
### Against Steven and Sara Eisner

76. Plaintiff repeats and incorporates by reference the allegations of paragraphs one through 75 as though fully set forth herein.

77. Steven Eisner owed plaintiff at least a duty of ordinary care in discharging his duties as chairman and CEO of EPA after Petrou's departure from active management of EPA. Although Petrou remained a 50 percent shareholder of EPA, he had relinquished all voting control over his shares in accordance with the Agreement upon his good faith belief that Steven Eisner would execute his duties as an officer and director of EPA for the benefit of all shareholders of EPA, not for the benefit only of EC and adverse to the shareholder interests of plaintiff Petrou. Steve Eisner was also a signatory to the Operating and Retirement Agreement with EPA. Sara Eisner, jointly with Steve Eisner, exercised *de facto* control over the affairs of both EC and EPA, and therefore also owed plaintiff a duty of ordinary care.

78. Steven Eisner, as a director of EPA, also owed plaintiff a fiduciary duty for the same reasons described in the paragraph preceding. Sara Eisner, jointly with Steve Eisner, exercised *de facto* control over the affairs of both EC and EPA, and therefore also owed plaintiff a fiduciary duty.

79. Steven and Sara Eisner breached both their duty of ordinary care and their fiduciary duty to plaintiff by operating EPA in disregard of EPA's corporate interests and in disregard of EPA's corporate formalities as a separate entity from EC.

80. Plaintiff was damaged thereby in an amount to be determined at trial, but not less than $350,000.

16

## VI. PIERCING OF THE CORPORATE VEIL
### Against Steven and Sara Eisner

81. Plaintiff repeats and incorporates by reference the allegations of paragraphs one through 80 as though fully set forth herein.

82. Steven and Sara Eisner ran EC and EPA as though they were not distinct corporate entities.

83. They improperly diverted funds, withheld funds, and re-allocated assets from one corporate entity to another without consideration of the separate legal status of each entity and the different stockholder ownership of each entity.

84. They also improperly used corporate funds for personal expenses, commingled personal and corporate funds, and failed to honor corporate formalities separating EC from EPA and separating both corporations from their own interests.

85. Plaintiff was damaged thereby because, as a result of these activities of Steven and Sara Eisner, less assets and funds of EPA remained available to satisfy EPA's indebtedness to the Bank.

86. Steven and Sara Eisner are therefore liable, jointly and severally, to Petrou for all debts, obligations, damages, and payments otherwise owed to Petrou, or arising from these causes of action, that would be payable by either EC or EPA.

## VII. PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF
### Against Carrolton Bank

87. Plaintiff repeats and incorporates by reference the allegations of paragraphs one through 86 as though fully set forth herein.

88. On November 20, 2006, Carrolton Bank through its attorneys transmitted a letter,

17

received by Petrou at his personal residence in the District of Columbia, demanding payment from EPA of $349,730.51.

89. The Bank implied in that letter that, in the event of default by EPA, it would seek full recourse to other remedies, including demanding payment of the full amount of plaintiff's personal guarantee on the loan and possibly even seeking foreclosure of plaintiff's personal residence in the District of Columbia.

90. The affairs of EPA have not been properly managed for quite a while, and assets have not been properly assigned between and among EC and EPA. The Bank's November 20, 2006, letter fails to recognize those errors and deficiencies in accounting for EPA assets.

91. Therefore, without an accounting, it is impossible to know how much of the $349,730.51 demanded can properly be paid from assets and security of EPA.

92. Plaintiff would be irreparably harmed if the Bank initiated foreclosure proceedings against his personal residence. Plaintiff would also be irreparably harmed if the Bank demanded immediate payment of the full amount of his personal guarantee because plaintiff does not have such an amount available for payment or anything close to such an amount.

93. Until a proper accounting pursuant to plaintiff's First Cause of Action above is received from EPA, EC, and the Bank, moreover, it is impossible to know: (I) how much of the assets properly attributable to EPA have been diverted to EC; (ii) how much of those diverted assets have already been seized and/or made available to the Bank in satisfaction of its $5 million dollar line of credit to EC rather than its $350,000 line of credit to EPA; or even (iii) what assets properly belonging to EPA are actually available to satisfy or reduce EPA's indebtedness.

94. Accordingly, in order to avoid irreparable harm, to avoid double recovery by the

18

Bank, and according to principles of equity and fairness, Plaintiff is entitled to and demands a

preliminary and permanent injunction against Carrolton Bank (I) enjoining it from demanding

payment of all or any part of his personal guarantee of the $350,000 line of credit extended by the

Bank to EPA; and (ii) enjoining it from accelerating or demanding payment on its home equity

line of credit and deed of trust, or initiating any foreclosure proceedings with respect to that

home equity line of credit and deed of trust, until such time as the three parties named in the First

Cause of Action above provide a full, complete and accurate accounting as demanded, and all

issues related to the diversion of assets from EPA to EC and their subsequent seizure by the Bank

are fully resolved and adjudicated.

## VIII.  DECLARATORY JUDGMENT AND DAMAGES FOR VIOLATION OF FEDERAL AND DISTRICT OF COLUMBIA LENDING STATUTES
### Against Carrolton Bank

95.  Plaintiff repeats and incorporates by reference the allegations of paragraphs one

through 94 as though fully set forth herein.

96.  Carrolton Bank has demanded payment of EPA and indicated that it would declare a

default if payment was not received in full.  In the same letter the Bank implied it would pursue

other remedies available to it against plaintiff as guarantor.

97.  An actual case or controversy therefore exists.

98.  Carrolton Bank never renewed its Business Loan Agreement of October 31, 2002,

entered into with EPA.

99.  That Agreement expired by its terms on October 31, 2003.

100.  The Bank never renewed its promissory note of the same date, which had a maturity

date of October 31, 2003.

101. The Bank never renewed its Commercial Security Agreement or its Subordination Agreement of the same date, both of which also are designated to have maturity dates of October 31, 2003.

102. The Bank also failed to comply with applicable federal and District of Columbia law in taking a mortgage on plaintiff's residence when it demanded and received a home equity credit line deed of trust on plaintiff's residence.

103. The Bank did not advise plaintiff of his rights of rescission under the applicable home equity credit line.

104. The Bank did not provide loan documentation to Petrou at least 72 hours prior to the time of settlement on the home equity credit line.

104. The Bank did not prepare and present to plaintiff a complete financing or settlement statement related to such home equity credit line.

105. The Bank did not disclose to plaintiff his true "APR."

106. On information and belief, the Bank was not properly licensed with the District of Columbia as a mortgage lender at the time it executed this mortgage.

107. The Bank did not have plaintiff's signature attested to by a District of Columbia Notary Public.

108. The Bank improperly recorded the deed of trust despite the lack of proper notarization.

109. These actions violate provisions of applicable law, including, but not limited to, the District of Columbia Mortgage Lender & Banker Act, D.C. Code Ann. § 26-1101, the Truth in Lending Act, 15 U.S.C. § 1601 et seq., and the Homeowners Equity and Protection Act, 15

20

U.S.C. § 1602(a)(a) et seq., and the Real Estate Settlement Procedures Act, 12 U.S.C. § 7601 et seq.

110. Plaintiff was damaged by these failures and suffered and continues to suffer losses as result.

111. For all of the above reasons, plaintiff is entitled to certain damages and costs, including applicable legal fees, for violation of the above statutes; and is also entitled to a Declaratory Judgment that Carrolton Bank does not have, and cannot enforce, a valid personal guarantee against plaintiff, and does not have, and cannot enforce or take any action to foreclose, any home equity credit line deed of trust on his personal residence.

## IX. NEGLIGENCE AND LENDER LIABILITY
### Against Carrolton Bank

112. Plaintiff repeats and incorporates by reference the allegations of paragraphs one through 111 as though fully set forth herein.

113. Carrolton Bank owed a duty of care to plaintiff as the personal guarantor of the Bank's loan to EPA.

114. The Bank breached that duty of care by failing properly to monitor or administer that loan.

115. The Bank breached that duty of care by failing even to renew the loan when it expired on October 31, 2003, and failing to demand payment on its promissory note associated with that loan upon its maturity date of the same date.

116. The Bank also breached its duty of care to plaintiff when it failed to demand a proper accounting or financial statements of EPA in a timely manner, and to determine whether

EPA's assets were being siphoned off or diverted to EC.

117. The Bank is therefore liable to Petrou in an amount to be determined at trial, but no less than $350,000.

## X. CREATION OF A CONSTRUCTIVE TRUST
### Against Carrolton Bank

118. Plaintiff repeats and incorporates by reference the allegations of paragraphs one through 117 as though fully set forth herein.

119. EC and Steven and Sara Eisner have improperly diverted funds and assets of EPA to EC, and/or have improperly withheld funds and assets of EPA by retaining them in EC and failing to pay or transfer them to EPA.

120. On information and belief, Carrolton Bank has seized and now controls all assets of EC, including those that properly belong to EPA.

121. EC as the sole voting shareholder of EPA owed EPA a fiduciary duty to safeguard and hold separate all of EPA's assets from its own.

122. Carrolton Bank has succeeded to all the duties and obligations of a fiduciary and a trustee with respect to EPA's assets it seized when it took control of EC's assets.

123. Plaintiff therefore demands the creation of a constructive trust with Carrolton Bank as the trustee for all of EPA's assets improperly diverted to or held by EC that were subsequently seized by Carrolton Bank.

**RELIEF REQUESTED:**

**WHEREFORE**, and for all the reasons stated above, plaintiff demands the relief described above, and summarized as follows:

22

1. A full complete, and accurate accounting from EPA, EC, and Carrolton Bank of the assets and liabilities of EC and EPA and the assets and security of EC already seized by the bank;

2. Damages for breach of contract from EPA and Steven Eisner in the amount of at least $350,000 plus expenses and costs;

3. Contribution from Steven Eisner, personally, in the amount of at least $175,000;

4. Damages for civil conspiracy against all defendants, jointly and severally, in the amount of at least $350,000;

5. Damages against Steven Eisner, as an officer and director of EPA, in an amount to be determined at trial, but not less than $350,000, for negligence and breach of fiduciary duty;

6. Damages against Steven and Sara Eisner, each as corporate officers of EC and as individuals, in an amount to be determined at trial, but not less than $350,000, for any liabilities of EC and EPA for which they may be liable, jointly and severally, on a theory of piercing the corporate veil of EC;

7. A Preliminary and Permanent Injunction against Carrolton Bank prohibiting it from attempting to enforce any personal guarantee against plaintiff, and prohibiting it from attempting to accelerate or foreclose on its deed of trust on plaintiff's personal residence, until such time as EPA, EC, and the Bank provide the accounting demanded in the First Cause of Action, and all issues and disputes with respect to assets properly allocable to EPA rather than to EC are fully resolved;

8. Damages in an amount to be determined against Carrolton Bank for its violation of applicable Federal and District of Columbia lending law, and a Declaration that Carrolton Bank has no right to enforce either the personal guarantee against plaintiff or to foreclose upon or

23

otherwise accelerate its deed of trust on plaintiff's residence;

9. Damages against Carrolton Bank in an amount to be determined at trial, but no less than $350,000, for its negligence and breach of its duties of care to plaintiff with respect to monitoring and administering its loan to EPA;

10. Creation of a Constructive Trust in favor of EPA and Petrou for all of EPA's assets improperly diverted to or in the possession of EC that are now held by Carrolton Bank;

11. Costs and expenses of bringing this suit, including reasonable attorneys' fees;

12. And such other proper and further relief as the Court may deem appropriate.

**A JURY TRIAL IS DEMANDED.**

Respectfully submitted,

/s/

Paul G. Gaston, DC Bar # 290833
LAW OFFICES OF PAUL G. GASTON
1120 19th Street, NW
Suite 750
Washington, DC 20036
(202) 296-5856
Fax: (202) 296-4154

*Attorney for Plaintiff David M. Petrou*

Dated : December 20, 2006

24

Case 1:06-cv-02159-GK   Document 1-2   Filed 12/20/2006   Page 1 of 2

06-2159
GK

JS-44
(Rev.1/05 DC)

**CIVIL COVER SHEET**

**I (a) PLAINTIFFS** DAVID M. PETROU

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** 11001
(EXCEPT IN U.S. PLAINTIFF CASES)

WASHINGTON, D.C.

**DEFENDANTS** CARROLTON BANK, EISNER COMMUNICATIONS, EISNER PETROU + ASSOCIATES, STEVEN C. EISNER, SARA EISNER

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT BALTIMORE, MD
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**
PAUL G. GASTON (202-298-5856)
LAW OFFICES OF PAUL G. GASTON
1120 19th St., N.W., Suite 750, WASHINGTON DC 20036

CASE NUMBER   1:06CV02159

JUDGE: Gladys Kessler

DECK TYPE: General Civil

DATE STAMP: 12/20/2006

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES**
FOR PLAINTIFF

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**☐ A. Antitrust**

☐ 410 Antitrust

**☐ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**☐ C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**☐ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**☒ E. General Civil (Other) OR ☐ F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ☐ **G.** *Habeas Corpus* 2255 | ☐ **H.** *Employment Discrimination* | ☐ **I.** *FOIA/PRIVACY ACT* | ☐ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ☐ **K.** *Labor/ERISA (non-employment)* | ☐ **L.** *Other Civil Rights (non-employment)* | ☐ **M.** *Contract* | ☐ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☑ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

☑ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district (specify)    ☐ Multi district Litigation    ☐ 7 Appeal to District Judge from Mag. Judge

---

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

28 USC § 1332(c) Diversity Jurisdiction, Breach of Contract, Breach of Fiduciary Duty, etc.

**VII. REQUESTED IN COMPLAINT**    CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23    **DEMAND $** 350,000    Check YES only if demanded in complaint **JURY DEMAND:** ☑ YES  ☐ NO

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    ☐ YES ☑ NO    If yes, please complete related case form.

**DATE** 12/20/06 ✓    **SIGNATURE OF ATTORNEY OF RECORD** Paul S. Rosen ✓

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

N:\forms\js-44.wpd