IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DAVID M. PETROU,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CA No. 06-2159 (GK) |
| | ) |
| | ) |
| **CARROLLTON BANK, et al**. | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFF PETROU'S BRIEF STATEMENT OF THE CASE

David Petrou is the former Chief Operating Officer of Eisner Petrou & Associates ("EPA"), a Maryland public relations firm with an office in the District of Columbia, which office remained active until August 2004. EPA was at all relevant times an affiliate of the much larger advertising agency known as Eisner Communications ("EC"), which operated out of its main office in Baltimore.

Carrollton Bank had extended credit to both EPA and EC. The line of credit extended to EPA was approximately $350,000, but the line of credit extended by Carrollton Bank to EC was in excess of $5 million.

On or about October 31, 2002, Petrou signed a personal guarantee on the $350,000 line of credit to EPA, but not on the much larger extension of credit to EC, which is believed to be roughly contemporaneous. About a month and a half later, he also executed a "Deed of Trust" in the nature of a home equity line purporting to grant the Bank's designated Trustees certain interests in his residence at 2810 R Street, NW, in Washington, DC.

Petrou severed all ties with EPA on August 30, 2004, when he signed an Operating and

Retirement Agreement. Under that Agreement, Steven Eisner and EC were given complete operating control of EPA, and Petrou's shares of EPA were divested of voting rights. (EPA and EC were at that time under the *de facto* control of both Steven Eisner and his wife Sara Eisner, who was named the Chief Operating Officer of EC.) EPA was required by the terms of the Agreement to pay down any remaining indebtedness to Carrollton Bank from EPA's revenues and cash flow, defined in a way that required significant debt reduction even in the absence of actual EPA profits.

EPA did not make the required payments. In fact, it appears that, over the course of almost three years, EPA never made a single debt-reduction payment to Carrollton Bank that it was required to make. To the contrary, Petrou has information that revenues and assets of EPA, which remained a healthy, revenue-producing, albeit smaller subsidiary of EC, were improperly diverted to EC to try to stave off EC's eventual collapse.

On November 10, 2006, the Baltimore community learned, much to its surprise, that EC had collapsed despite all appearances of a thriving business, and despite public proclamations by Steven Eisner of hundreds of millions of dollars in advertising revenues for EC. For unexplained reasons, the Eisners also closed the doors of EPA on the same day. Mr. Eisner is presently under criminal investigation by the U.S. Attorney's office in Baltimore, and a defendant, along with EC, in numerous civil lawsuits by vendors, landlords, and media accounts claiming that EC and Mr. Eisner owe them millions of dollars for unpaid bills. For unexplained reasons, neither EC, nor EPA, nor either of the Eisners has filed for bankruptcy protection.

Mr. Petrou believes that the Bank's demand from him for payment of the Bank's loan to EPA suffers from statutory and other infirmities, including failure of consideration, lapse of the

term of the underlying loan, and failure to follow the lending and disclosure requirements of DC and federal statutes governing home equity extensions of credit.  The Bank also was negligent and failed properly to document and monitor the loan, much to Mr. Petrou's prejudice as its putative guarantor.

Most importantly, however, even if the personal guaranty were otherwise enforceable against him, the Bank has already seized all the assets of both EPA and EC, and collected collateral from both EPA and EC.  Some of this collateral is properly attributable to EPA even though it may have been seized from EC.  <u>Without a full accounting, and even if the personal guarantee were enforceable, the Bank would benefit from a double recovery against the same underlying $350,000 EPA loan: once from the collateral, and again from Mr. Petrou</u>.

The Bank has no interest in safeguarding Mr. Petrou's rights in this situation.  Since the Bank is owed $5 million by EC as well as $350,000 by EPA, and the available funds and collateral seized is far short of that aggregate, the Bank is not interested in sorting out which assets are properly attributable to EPA and which are properly attributable to EC.  As far as the Bank is concerned, all assets collected can be applied against the much larger $5 million debt of EC, and none will be applied against the $350,000 loan to EPA.   However, sorting out the proper allocation is of keen interest to Mr. Petrou, because if he does owe any amount on his personal guarantee, that amount must be reduced by the recoveries the Bank has already achieved from EPA and/or from EC (to the extent that the seized assets of EC actually belonged to EPA).

The only statutes relied upon by Petrou relate to the Bank's obligations under District of Columbia and federal law for disclosures and obligations pertaining to the alleged home equity line of credit.  These are District of Columbia Mortgage Lender & Banker Act, D.C. Code Ann. §

3

26-1101, the Truth in Lending Act, 15 U.S.C. § 1601 et seq., the Homeowners Equity and Protection Act, 15 U.S.C. § 1602(a)(a) et seq., and the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 et seq.

        Respectfully submitted,

/s/_____
Paul G. Gaston, DC Bar # 290833
LAW OFFICES OF PAUL G. GASTON
1120 19th Street, NW, Suite 750
Washington, DC 20036
(202) 296-5856
Fax: (202) 296-4154
*Attorney for Plaintiff*