IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DAVID M. PETROU,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CA No. 06-2159 (GK) |
| | ) |
| | ) |
| **CARROLLTON BANK, et al**. | ) |
| | ) |
| Defendants. | ) |

### PLAINTIFF PETROU'S OPPOSITION TO SARA EISNER'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Plaintiff David Petrou strongly opposes the motion of defendant Sara Eisner to dismiss Petrou's claims against her for lack of personal jurisdiction. Ms. Eisner's claims of lack of minimum contacts with the District of Columbia are contradicted by the facts. Her contacts with this jurisdiction have been extensive, sustained, repeated, and of a nature that clearly demonstrates that she has availed herself of the opportunities and benefits of doing business in the District of Columbia, and that she has collected substantial revenues and other benefits from that business.

With this Opposition, Petrou submits an Affidavit attesting to specific facts well known to him. These facts demonstrate that Ms. Eisner regularly and consistently transacted business in the District of Columbia, actively soliciting business here, meeting with clients and co-workers here, and deriving substantial revenues from advertising accounts with numerous District of Columbia organizations, including the Washington Convention & Visitors' Bureau, Childrens' Hospital of Washington, and the Pharmaceutical Manufacturers' Association.

Also contrary to her Affirmation, Ms. Eisner has communicated with Mr. Petrou, through

his attorney, regarding the subject matter of this litigation, within the last three years. Moreover, that communication, which was itself either an outright misrepresentation or at the least a misleading representation, went to the very heart of Petrou's claims against both Sara and Steven Eisner, because it sought to lull him into a false sense of complacency concerning whether the financial affairs of Eisner Petrou & Associates ("EPA") and Eisner Communications ("EC") remained separate and distinct, as was required by his Operating and Retirement Agreement. Amended Complaint at ¶ ¶24, 29, 33-35. ("Amended Complaint" is hereinafter abbreviated as "AC").

## ARGUMENT

**THIS COURT HAS PERSONAL JURISDICTION OVER SARA EISNER UNDER ALL APPLICABLE LEGAL STANDARDS.**

A court may exercise personal jurisdiction over a non-resident defendant "by finding specific jurisdiction based on conduct connected to the suit, or by finding general jurisdiction." *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.,* 293 F.3d 707, 711 (4th Cir. 2002) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 (1984)).

In the District of Columbia, there are two principal statutory bases-- D.C. Code Sections 13-334 and 13-423 -- for the exercise of personal jurisdiction over a non-resident. See *Richard v. Bell Atlantic Corp.,* 946 F. Supp. 54, 68 (D.D.C. 1996) (citing, inter alia, D.C. Code 13-334, 13-423). General jurisdiction exists under Section 13-334 where the defendant "carries on a consistent pattern of regular business activity within the jurisdiction." *Trerotola v. Cotter,* 601 A.2d 60, 63 (D.C. 1991) (citing D.C. Code § 13-334). Specific jurisdiction under the long-arm statute, Section 13-423, exists over any person for claims arising from the person's "transacting

any business in the District[,] or contracting to supply services in the District." D.C. Code § 13-423(a). If jurisdiction is based solely on Section 13-423, "only a claim for relief arising from acts enumerated in this section may be asserted" against the defendant. Id. § 13-423(b); *Koteen v. Bermuda Cablevision, Ltd.,* 913 F.2d 973, 974-75 (D.C. Cir. 1990). However, if defendant

> regularly did or solicited business, or derived substantial revenue from goods used or services rendered, in the District, he is subject to suit in the District for causing, "by an act or omission outside the District," any tortious injury here. *D.C. Code § 13-423(a)(4)* (1989); *see Gatewood v. Fiat, S. p. A., 617 F.2d 820, 824-25 (D.C. Cir. 1980)* (the regular course of conduct required under subsection (a)(4) need not be related to the injury).

*American Directory Service, Inc. v. Beam*, 131 F.R.D. 15, 17 (D.D.C. 1990)(some citations omitted).

Where, as here, the Court rules on the basis of the pleadings and any affidavits, discrepancies with respect to jurisdictional facts are resolved in favor of plaintiff. *Reuber v. United States,* 750 F.2d 1039, 1052 (D.C. Cir. 1984).

  **A.**  **Ms. Eisner's Contacts with the District of Columbia Have Been Prolonged and Extensive.**

Plaintiff is the former Chief Operating Officer of Eisner Petrou & Associates, an affiliate of EC with its principal office in the District of Columbia until August 2004. He has known Ms. Eisner since 1986. Affidavit ¶ 3. During that time, she has been a senior officer of Eisner Communications, most recently its Chief Operating Officer. Id. She was primarily responsible for organizing and coordinating presentations to new corporate accounts, including integrated accounts–accounts in which the client contracted with both EC and EPA for advertising and public relations services. Affidavit at ¶ 10. She was also, at all relevant times, the wife of Steven Eisner, and jointly exercised *de facto* control over both EC and EPA. AC ¶¶ 7, 36, 40.

Affidavit ¶ 6.

Ms. Eisner frequently traveled to DC for meetings with plaintiff and other EPA personnel to plan for joint presentations to potential new clients, as well as to meet with the employees and service the accounts of existing DC-based clients. Affidavit ¶ 4, 8, 10, 17. Some examples of DC-based accounts that she helped procure for Eisner Communications included the Washington Convention & Visitors' Bureau; Childrens' Hospital of Washington; and the Pharmaceuticals Manufacturers' Association. Id. at ¶ 16. Some of these were joint accounts that EC and EPA served together, and shared revenues collected from them.

Ms. Eisner also regularly traveled to the District of Columbia for meetings with personnel at Eisner Sanderson, a wholly owned subsidiary of EC, from about 1996 through 2004. Affidavit ¶ 17. Eisner Sanderson initially shared offices with EPA, and later moved to office space on a different floor of the same building at 927 Fifteenth Street, NW. Id.

Although we do not know whether Ms. Eisner shared ownership of 100 percent of the shares of EC with her husband Steve Eisner outright or only by virtue of her marital relationship, in either case she obviously benefitted from the substantial revenues received from District of Columbia accounts such as the Washington Convention & Visitors' Bureau, Childrens' Hospital, and the Pharmaceutical Manufacturers' Association. These revenues were in the millions. Affidavit ¶ 16.

After Eisner Communications won the contract for advertising services to the Washington Convention & Visitors' Bureau in 2001, some Washington-based advertising agencies complained that the lucrative contract had been awarded to a Baltimore-based advertising agency instead of to one of them. Affidavit ¶7, and Exhibit A thereto. In response,

Eisner Communications played up its Washington presence, characterizing the EPA office on Fifteenth Street as also being its office, and having new business cards and letterhead made up expressly listing that DC address as also being EC's office address. Id.

> **B.    Ms. Eisner Transmitted Representations to Mr. Petrou in the District of Columbia about Facts Which Are the Subject of this Lawsuit.**

After plaintiff severed his ties with EPA in August 2004, although EPA maintained a small office in DC for another year, all active control of EPA and its operations was exercised from the same location as the Baltimore office of EC at 509 South Exeter Street, Baltimore Md. After that year, moreover, EPA closed its DC office. AC ¶¶ 26-27. On January 4, 2006, Ms. Eisner responded to an inquiry from plaintiff's lawyer, Ricky Fisch of the law firm of Malizia, Spidi & Fisch, P.C., in the District of Columbia. Affidavit ¶¶ 12-13, and Exhibit B thereto. His inquiry had been prompted by reports he and Mr. Petrou had seen in the Baltimore media to the effect that EPA's operations in Baltimore had been folded in or merged into the operations of its much larger parent company at that time, EC. Id.

Mr. Fisch's inquiry had been addressed to another manager at EC, Doug Fox. However, Ms. Eisner responded. She stated that Mr. Fisch's inquiry had been referred to her for response. She hastened to re-assure him that the changes reported in the media were "merely a matter of moving around where people sit and to whom they report." "The EPA financial statement remains separate," her email continued. Id. In fact, as plaintiff has properly alleged, whether or not EC and EPA maintained any formal distinction, EC diverted revenues and other assets away from EPA and to EC. AC ¶¶ 33-36, 40. Had revenues of EPA been properly credited to EPA, they could have been used to pay down the line of credit that Carrollton Bank had extended to

EPA, as was required by Petrou's Operating and Retirement Agreement with EPA. AC ¶¶ 24, 29-35. Instead, they were diverted to EC to try to staunch its losses, which eventually led to its failure.

### C. The Court May Exercise General Jurisdiction Over Ms. Eisner Because She Carried On A Consistent Pattern of Regular Business Activity Within This Jurisdiction.

General jurisdiction exists under DC Code Section 13-334 where the defendant "carries on a consistent pattern of regular business activity within the jurisdiction." *Trerotola v. Cotter,* 601 A.2d 60, 63 (D.C. 1991). Here, it is clear that Ms. Eisner did carry on such a consistent pattern of regular business activity within the jurisdiction. She frequently traveled to the District, where she met with clients, potential clients, and co-workers at EPA and Eisner Sanderson; she solicited business in the District through meetings and presentations; and she serviced clients in the District, such as the Washington Convention & Visitors' Bureau, Childrens' Hospital, and the Pharmaceutical Manufacturers' Association. She derived substantial revenues and personally benefitted from these accounts, as both a senior officer of EC as well as a joint owner, either directly or through her marriage to Steven Eisner, of all the shares of EC (and, after August 2004, of all the voting shares of EPA as well).

### D. The Court May Also Exercise Specific Jurisdiction Over Ms. Eisner Under the Long Arm Statute.

Subsection (a)(1) of the District of Columbia long-arm statute, *D.C. Code § 13-423*, provides that the Court "may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's transacting any business in the District of Columbia." *D.C. Code § 13-423(a)(1)*. "This provision is given an expansive interpretation

that is coextensive with the due process clause." *Helmer v. Doletskaya*, 393 F.3d 201, 205 (D.C. Cir. 2004). Thus, "the statutory and constitutional jurisdictional questions, which are usually distinct, merge into a single inquiry." *United States v. Ferrara,* 54 F.3d 825, 828 (D.C. Cir. 1995). The only question is whether Defendants "purposefully established 'minimum contacts with [the District of Columbia] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Helmer, 393 F.3d at 205* (quoting *Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).*

Here, there is no question that Ms. Eisner purposefully established minimum contacts with this jurisdiction, and that being "haled into court" as the result of those contacts would "not offend traditional notions of fair play and substantial justice." The gravamen of Petrou's complaint against Ms. Eisner is that she exercised, along with her husband, joint *de facto* control over both EC and EPA, an allegation which Ms. Eisner has not denied, and that as a result of that control, revenues, funds, and other assets of EPA were improperly and impermissibly diverted to EC.

By diverting those funds, (i) she caused EPA to breach a contract with Petrou that he had entered into in the District of Columbia; and (ii) she breached fiduciary duties she owed to him as a non-voting shareholder of EPA, causing him harm in the District of Columbia. She also advanced her purposes in committing these wrongs by sending a message to his lawyer in the District of Columbia that had the effect of lulling Petrou and his lawyer into a false sense of complacency and keeping them from inquiring further into the separation of finances between EPA and EC.

Her actions in diverting funds outside this jurisdiction caused tortious harm to Petrou

inside it, thus also satisfying the requirements of DC Code § 13-423(a)(4), as detailed at 3, *supra*.

### E.  Ms. Eisner Cannot Hide Behind a "Corporate Shield" Defense.

In some circumstances, courts have allowed an employee of a company to assert a "corporate shield" defense to jurisdiction over the employee, notwithstanding that the corporation the employee worked for had sufficient minimum contacts with the jurisdiction. E.g., *Marine Midland Bank, N.A. v. Miller*, 664 F. 2d 899, 902 (2d Cir. 1981).  However, that defense is regarded as an equitable one, and reserved usually for lower level employees in circumstances very different from the facts at hand, where the employee has no direct interest in the business that generates his contacts.  See, e.g., *Zeman v. Lotus Heart, Inc*., 717 F. Supp. 373, 375 (D.Md. 1989)("when a corporate employee has no direct interest in the business that generates his contacts with a state, other than the remote interest derived from serving his employer, the employee may not be subjected to jurisdiction in that state based on those contacts.")

As this Court has held, the corporate shield doctrine does not apply--

> when the corporation has filed for bankruptcy, the corporation and individual are alleged alter egos, the agent derives a substantial benefit from the business he conducts in the state, or the corporation lacks sufficient assets to respond. *See American Directory, 131 F.R.D. at 643* (corporation's filing for bankruptcy tipped the balance in favor of exercising jurisdiction over the individual defendant); *Chase v. Pan Pacific Broadcasting, Inc., 617 F. Supp. 1414, 1423 (D.D.C. 1985)* (fiduciary shield does not apply to motions to dismiss; defense that individual is "not liable because he was acting for a disclosed corporate principal goes to the *merits* of the case, not to the *power* of the court to make the adjudication"); *Zeman v. Lotus Heart, Inc., 717 F. Supp. 373, 378 (D. Md. 1989)* (courts can exercise jurisdiction over principals who voluntarily enter the forum to transact business primarily for their personal benefit, albeit through a corporate form); *Marine Midland, 664 F.2d at 903* (equity supports asserting jurisdiction over the individual when the corporation has insufficient assets to respond or is a mere corporate shell).

*Johns v. Rozet*, 770 F. Supp. 11, 18 (D.D.C. 1991).

Here, plaintiffs have properly alleged all of these factors. Both EPA and EC have collapsed and ceased doing business, although for unknown reasons they have not filed for bankruptcy protection; after Carrollton Bank seized whatever assets remained, neither has any assets left; and there is no question that Ms. Eisner was acting for her own and her husband's benefit when she solicited and conducted business in the District of Columbia on behalf of EC.

In any event, as suggested by the citation above, the corporate shield defense is not properly adjudicated on a motion to dismiss:

> Critics have emphasized, however, that this use of the doctrine "confuses procedural and substantive questions and unreasonably immunizes from jurisdiction one who in fact acted in the forum state." *Id.* (citations omitted). We agree. The doctrine properly "goes to the *merits* of the case, not to the *power* of the court to make the adjudication." *Id.* (quoting *Groom v. Margulies, 257 Md. 691, 265 A.2d 249, 255 (1970)).*

*American Directory Service v. Beam*, 131 F.R.D. 15 at 17 (D.D.C. 1990).

## CONCLUSION

For all the reasons stated above and in the accompanying Affidavit of David M. Petrou, the Court should deny the Motion of Sara Eisner To Dismiss for Lack of Personal Jurisdiction.

Respectfully submitted,

/s/_____
Paul G. Gaston, DC Bar # 290833
LAW OFFICES OF PAUL G. GASTON
1120 19th Street, NW, Suite 750
Washington, DC 20036
(202) 296-5856
Fax: (202) 296-4154
*Attorney for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DAVID M. PETROU,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CA No. 06-2159 (GK) |
| | ) |
| **CARROLLTON BANK, et al.** | ) |
| | ) |
| Defendants. | ) |

### AFFIDAVIT OF DAVID M. PETROU

City of Washington            )
District of Columbia          ) ss:

1. I am the plaintiff in this case and I make this Affidavit based on my personal knowledge of the facts stated herein. I am the former Chief Operating Officer of Eisner Petrou & Associates ("EPA"), an affiliate of Eisner Communications, Inc. ("EC").

2. I am familiar with facts showing that, contrary to Ms. Eisner's Affirmation submitted in support of her Motion To Dismiss for Lack of Jurisdiction, she has for a long time regularly conducted business in the District of Columbia on behalf of Eisner Communications, frequently traveling here, soliciting business here, and meeting with EPA personnel and clients here. Also contrary to her Affirmation, she has made representations concerning the subject matter of this lawsuit to my lawyer in the District of Columbia within the last three years. In fact she sent him an email message on January 4, 2006, specifically assuring him that the financial statement of EPA remained separate from EC's, which is an issue at the heart of this case.

3. I have known Sara Eisner since 1986. During that period, she held various senior

level management positions with Eisner Communications, and was also an officer of the company jointly with her husband, Steven Eisner. Most recently, she held the position of Chief Operating Officer of Eisner Communications.

4. Throughout her time with EC, Ms. Eisner regularly came to the District of Columbia for business purposes. Eisner Communications had several major clients in the District of Columbia, some of which it shared with EPA as "integrated accounts." An "integrated account" was one in which both EC and EPA were under contract by the client to perform and be paid for advertising and public relations services. By agreement between EC and EPA, a set percentage of monthly fees received from integrated accounts was allocated to both EPA and EC, generally with a much larger fee to EC.

5. One example of a major Washington DC client served by EC was the Washington Convention & Visitors' Bureau. Ms. Eisner was instrumental in securing that account for EC by participating in presentations to that client here in the District of Columbia in 2001. She also met with me and other members of the EPA staff at EPA's offices in the District of Columbia to plan for the presentation that eventually secured the work for EC.

6. For several years subsequent to 2001, EC received substantial revenues from the Washington Convention & Vistors' Bureau. Ms. Eisner benefitted from those revnenues both directly and indirectly as as an officer of EC and through her de facto joint control of EC with her husband Steven Eisner.

7. After it became known that Eisner Communications, a Baltimore-based advertising agency, had won the contract, many Washington-based advertising agencies voiced strong complaints. See Article of October 26, 2001, from <u>Washington Business Journal</u> attached as

Exhibit A hereto. In response, EC deliberately played up its District of Columbia presence, noting that it was planning on "expanding the DC office [of EC], Eisner Petrou & Associates." Exhibit A at 1. I can also add that EC's business cards and letterhead were then changed to show the address of EPA's Washington office as EC's address as well.

8. An earlier example of a District of Columbia integrated account shared by both EPA and EC was the Children's National Medical Center, better known as Children's Hospital of Washington. EPA handled public relations for Children's Hospital, and EC handled advertising for them throughout much of the late 1990s. I and other key members of EPA worked closely with Ms. Eisner on many aspects of this client representation, and she often came to DC for both internal and client meetings and strategy sessions.

9. Another example of a DC account for which both EC and on occasion EPA performed services was the Pharmaceutical Manufacturers Association, a national trade association based in the District of Columbia.

10. In general, it was Ms.Eisner's role to pull together the various service disciplines needed to to make presentations to potential new accounts, including integrated accounts. On winning these accounts, Ms. Eisner often played a management, supervisory, or account service role. Ms. Eisner came to the DC office of EPA for new business strategy and planning sessions as well. This included our joint presentation to the Bermuda Tourism Board. Preparation for that presentation included meetings that Ms. Eisner attended in our DC offices with Lisa Miles, who was a Senior Vice President of EPA in charge of our Tourism and Travel Practice.

11. Ms. Eisner is also mistaken with respect to whether she has communicated with me or any of my representatives concerning the subject matter of this action in the past three years.

Although I have had no active role in the affairs of EPA since August 2004, she has indeed communicated directly with my lawyer concerning the subject matter of this suit since then.

12. On January 4, 2006, she transmitted an email message addressed to my lawyer, Richard ("Ricky") Fisch, in the District of Columbia. Mr. Fisch had inquired on my behalf about certain reports he had seen in the Baltimore media alleging that the operations of EPA had been merged or folded into the operations of EC. This was significant to me because Mr. Fisch had negotiated the severance agreement under which EPA was contractually bound to pay down the personal guaranty at the heart of this case from EPA's separate cash flow. Any "merging" or "folding" of EPA into EC would have been a breach of this contractual obligation. See Amended Complaint at paragraphs 29-33, 44-46, and 56-59.

13. A copy of Sara Eisner's January 4, 2006, email to Mr. Fisch is attached as Exhibit B hereto. In it, Ms. Eisner says that Mr. Fisch's inquiry had been referred to her for answer, and indicated that the changes reported in the media were "merely a matter of moving around where people sit in the building and to whom they report." "The EPA fincancial statement remains separate," she assured him.

14. Whether this statement was accurate or not, and I have reason to believe that it was not, it clearly related to the subject matter of this lawsuit, which specifically alleges that EPA failed to make the payments required because its assets were diverted to EC, and it clearly was addressed to me–through my lawyer–here in the District of Columbia.

15. This documentary evidence flatly contradicts Ms. Eisner's sworn statement that she "never transacted any business in the District of Columbia with David Petrou ...in the past three years," and that she "never engaged in any conduct that is the subject of the pending lawsuit...."

4

Paragraphs 4 and 5, Eisner Affirmation. A little over a year ago, she expressly represented–or misrepresented–to my attorney in the District of Columbia that EPA's operations remained separate and distinct from EC's, despite some contrary media reports, and that the changes consisted only of "moving people around" and changing "to whom they report."

16. Similarly, as detailed above, my personal knowledge flatly contradicts Ms. Eisner's sworn statement that "at no time have I regularly engaged in or transacted business in the District of Columbia relating to Eisner Communications....." Paragraph 7, Eisner Affirmation. As detailed above, she was involved in procuring and servicing the accounts for the Washington Convention & Visitors' Bureau, Children's Hospital of Washington, and the Pharmaceutical Manufacturers' Association, all based in the District of Columbia, among others. Moreover, EC received millions of dollars in fees from all these District-based organizations over the course of many years.

17. Ms. Eisner also regularly visited the offices of Eisner Sanderson, a wholly-owned subsidiary of EC, which had offices in the same building as EPA, at 927 Fifteenth Street, NW, for the period from about 1995 through 2004.

_____
David M. Petrou

Subscribed and sworn to before me this 7th day of March, 2007.

_____
Notary Public

Sharon S. Carlos
Notary Public, District of Columbia
My Commission Expires 10-31-2009

# EXHIBIT A

Case 1:06-cv-02159-GK    Document 26-2    Filed 03/12/2007    Page 6 of 9

Washington Business Journal - October 29, 2001
http://washington.bizjournals.com/washington/stories/2001/10/29/story2.html

# BUSINESSJOURNAL

BUSINESS PULSE SURVEY: Do you think your property tax assessment was fair this year?

## Ad Club irked by award to Baltimore firm

Washington Business Journal - October 26, 2001 by Greg A. Lohr Staff Reporter

Eisner Communications has been hired to bring visitors back to the District. But so far, the selection of Eisner as the ad agency for D.C.'s top tourism group has brought only controversy.

Bill Hanbury, CEO of the Washington, D.C. Convention & Tourism Corp., spent much of Oct. 23 answering one question: Why would the WCTC, which champions spending in the Washington area, give an ad account worth at least $2.5 million to Baltimore-based Eisner?

In a letter to Hanbury, local Ad Club President Ron Owens writes of anger and frustration among D.C.-area advertising executives. Hanbury also was forced to defend the WCTC's decision to the D.C. Mayor's Office -- to which Owens sent a copy of his letter -- and other tourism officials.

While Hanbury is explaining, he's not apologizing. Nor is he about to change his mind. He says Eisner, which has an affiliated PR agency in D.C., easily beat several finalists culled from 30 initial respondents.

"I will tell you," he says, "it wasn't even close."

'Shame on them'
In his letter dated Oct. 18, Owens writes, "It is ironic that your decision -- you, the chief booster of the nation's capital -- will take away jobs and paychecks that will go to Baltimore vendors and suppliers instead of to local businesses."

Hanbury calls that "ridiculous criticism" from a "disgruntled group of people who felt they were unfairly treated."

Eisner has told WCTC it will add employees to its 15-year-old D.C. office to handle the "Be inspired" campaign's creative work. That could mean money for vendors and suppliers in the Washington area.

"I'm very aggravated about this," Hanbury says. "These are the kinds of foolish side issues that are very detrimental to us moving forward in recovering this community's economy. And shame on them for serving up such a fundamentally flawed complaint."

Abe Novick, an Eisner executive in Baltimore, says the agency is looking into expanding the D.C. office, Eisner Petrou & Associates. Novick doesn't know, however, where Eisner (**http://www.eisner-communications.com**) will find its vendors and suppliers.

"I think it was a fair and level playing field that we competed on, and we won the business fair and square," Novick says.

Hanbury says Eisner Petrou (**http://www.eisnerpetrou.com**) has a significant D.C. presence, with 30 employees on two floors. Novick puts that office's staff count at 15 to 20.

'Shame on us'
Some people, even within the Washington-area ad community, see the selection of Eisner as a sad commentary on local ad agencies, not on WCTC.

"I think WCTC did what they felt was in the best interest of their organization and of Washington as a tourism destination, and I can't fault them for that," says Cary Hatch, president of District-based MDB Communications (**http://www.mdbcomm.com**). "Am I disappointed it wasn't a Washington agency? Sure. But shame on us. I wish an agency from Washington had been more competitive."

Owens says he has nothing against Eisner, and in fact "respects them highly."

"But for the WCTC to appoint a Baltimore agency is like a slap in the face," he says. "We feel like the Rodney Dangerfields. We just don't get any respect."

*E-mail: glohr@bizjournals.com Phone: 703/312-8344*

Contact the Editor | Need Assistance? | More Latest News →

Subscribe or renew online

All contents of this site © American City Business Journals Inc. All rights reserved.

# EXHIBIT B

Case 1:06-cv-02159-GK    Document 26-2    Filed 03/12/2007    Page 8 of 9

| | |
|---|---|
| Subj: | **EPA** |
| Date: | 1/4/2006 7:39:16 PM Eastern Standard Time |
| From: | smeisner@eisner-communications.com |
| To: | rickyfisch@aol.com |
| CC: | sceisner@eisner-communications.com |

Dear Ricky,

Doug Fox referred your email to me about the recent article in the Sun.

No changes have happened that effect our arrangement with EPA at all. This is merely a matter of moving around where people sit in the building and to whom they report.   The EPA financial statement remains separate.

Please let me know if there are any further questions.

Best regards,

Sara Eisner
410-843-3024

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DAVID M. PETROU,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **CA No. 06-2159 (GK)** |
| | ) |
| | ) |
| **CARROLLTON BANK, et al**. | ) |
| | ) |
| Defendants. | ) |

ORDER

Having received and reviewed Defendant Sara Eisner's Motion To Dismiss for Lack of Jurisdiction, and plaintiff's Opposition thereto, and supporting Affirmations and Affidavits, and it appearing that Ms. Eisner's motion is not well-founded, it is hereby

ORDERED,

that Defendant Sara Eisner's Motion To Dismiss is DENIED.

SO ORDERED this __ day of _____, 2007.

_____
United States District Court Judge