UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DAVID M. PETROU,                              :
                                             :
            Plaintiff/Counter-Defendant,     :
                                             :
      v.                                     :    1:06-CV-02159-GK
                                             :    (No event currently scheduled)
CARROLLTON BANK, et al.                      :
                                             :
            Defendants/Counter-Plaintiff/:
            Cross-Plaintiff                   :

MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES OF
DEFENDANT CARROLLTON BANK FOR SUMMARY JUDGMENT
AS TO ALL COUNTS I, IV, VII, VIII, IX, AND X OF THE AMENDED COMPLAINT

Carrollton Bank, by and through counsel, respectfully requests the entry of

summary judgment in favor of Defendant/Counter-Plaintiff/Cross-Defendant Carrollton

Bank as to Counts I, IV, VII, VIII, IX, and X of Plaintiff's Amended Complaint and as

grounds therefore states as follows:

I.  SUMMARY OF CASE

Plaintiff's Amended Complaint for Damages and Declaratory and Injunctive

Relief filed herein on or about February 16, 2007 (hereinafter "Complaint") contains six

counts against Defendant Carrollton Bank (hereinafter "Carrollton Bank").  As between

Plaintiff and Carrollton Bank this case is nothing but a simple breach of contract case and

the material facts are undisputed.  The Bank is therefore entitled to judgment on all six

counts against the Bank.

In 2002 and 2003 Defendant Eisner, Petrou & Associates, Inc. ("EPA") signed

Loan Documents with Carrollton Bank which included a personal guaranty by its

president, Plaintiff David Petrou ("Mr. Petrou") secured by a Deed of Trust on Mr.

Petrou's house.  EPA was current on its loan obligation to Carrollton Bank until

November, 2006.  EPA has not made any payments to Carrollton Bank since October,

2006 and now is out of business.  A total of $345,396.25 in principal plus interest,

penalties, costs and attorney's fees is currently due and owing to Carrollton Bank.  In

November, 2006 Carrollton Bank made demand on EPA and on Mr. Petrou for

repayment.  Despite demand, EPA, Mr. Eisner, and Mr. Petrou have not made any

payments on the Loan and Mr. Petrou has instead filed this lawsuit.

Mr. Petrou's lawsuit against the Bank is without legal basis.  Fundamentally,

Plaintiff Mr. Petrou argues that because he breached the Loan Documents by failing to

monitor EPA's financial affairs, because Defendant EPA breached the Loan Documents

by permitting its assets to be moved from EPA to its parent corporation Eisner

Communications, Inc. ("EC"), because Defendant Mr. Eisner breached the Loan

Documents by failing to conform EPA's actions to the Loan Documents, and because

EPA's parent company Eisner Communications breached the Loan Documents by

accepting payments from EPA before the Bank was paid in full, Mr. Petrou should not

have to perform his personal guaranty and pay amounts legitimately due and owing to the

Bank.  This is not factually or legally the case.  There are no disputed material facts and

Carrollton Bank is entitled to judgment as a matter of law as to Plaintiff's Counts I, IV,

VII, VIII, IX, and X against the Bank.[1]

---

[1] Carrollton Bank has previously filed a motion to dismiss Mr. Petrou's Count VII (injunctive relief) and
Count VIII (declaratory relief for violation of statutes).

## II.  STATEMENT OF FACTS

Defendant Eisner, Petrou & Associates, Inc. ("EPA") is a Maryland corporation formed in May, 1986 and owned 50% by Plaintiff David Petrou ("Mr. Petrou") and 50% by defendant Eisner Communications, Inc. ("EC").  Mr. Petrou was President of EPA and Defendant Steven Eisner ("Mr. Eisner") was Chairman and Chief Executive Officer of EPA.

From 1999 to the present EPA has been a customer of Carrollton Bank and has entered into various secured loan agreements with the Bank.  Statement of Undisputed Material Facts ("SUMF"), ¶ 4.  The most recent loan agreement began on October 31, 2002 with loan documents executed by EPA, Mr. Petrou, Mr. Eisner, and EC consisting of a Business Loan Agreement, Promissory Note, Petrou Guaranty and Deed of Trust, Eisner Guaranty, Petrou Subordination Agreement, EC Subordination Agreement, Security Agreement, and related documents (hereinafter all together the "2002 Loan Documents").  SUMF, ¶¶ 6 - 19.

These 2002 Loan Documents provided that the Bank would lend EPA up to $350,000.00 and EPA would repay amounts loaned to it plus interest on the sooner of the Bank's demand or October 31, 2003.  Mr. Petrou personally guaranteed all amounts EPA borrowed from the Bank and secured his personal guaranty with a deed of trust (the "2002 Deed of Trust") on real property owned by Mr. Petrou and located at 2810 R Street, N.W., Washington, D.C. (the "Property").  SUMF, ¶ 17.  In the Loan Documents Mr. Petrou agreed to subordinate to the Bank as to any amounts which EPA may owe him at any time and consented to any renewals, extensions or changes which the Bank and EPA might agree to make to the Loan Documents in the future.  SUMF, ¶ 9.  The

Bank advanced funds pursuant to the 2002 Loan Documents (hereinafter such advance and Loan Documents together, the "Loan").

The original of one document which was part of the 2002 Loan Documents, the 2002 Deed of Trust, was lost by the loan servicer prior to being recorded. SUMF, ¶ 20. The Bank therefore sought a replacement Deed of Trust from Mr. Petrou. SUMF, ¶ 20. Mr. Petrou attempted to persuade the Bank that he did not need to sign a deed of trust. SUMF, ¶ 21. On October 21, 2003 the Bank sent Mr. Petrou a letter noting EPA's "recent incidences of large operating losses" and large losses for the prior year. The letter also stated "I apparently must clearly state that without the properly executed and recorded IDOT [deed of trust], promptly delivered to the bank, a formal request for full repayment of outstanding balances will be forthcoming." SUMF, ¶ 22.

Mr. Petrou thereafter transmitted a replacement deed of trust to the Bank. Mr. Petrou represented in his covering letter "...I'm returning those documents [the Deed of Trust] with my signatures and notarization, where required." SUMF, ¶ 23. The replacement deed of trust (the "2003 Deed of Trust") was enclosed with Mr. Petrou's covering letter. The Bank did not select the notary for the 2003 Deed of Trust. SUMF, ¶24. The notary who notarized the 2003 Deed of Trust was at the time she affixed her seal a District of Columbia notary. SUMF, ¶ 26. After receiving the executed 2003 Deed of Trust back from Mr. Petrou the Bank recorded the 2003 Deed of Trust with the Recorder of Deeds of the District of Columbia. SUMF, ¶ 25.

Effective October 28, 2003 Mr. Petrou as president of EPA and Mr. Eisner as CEO executed a Change in Terms Agreement ("Change in Terms 1") which changed the maturity date of the Loan from October 28, 2003 to December 31, 2003. SUMF, ¶ 27.

Effective December 31, 2003 Mr. Petrou as president of EPA and Mr. Eisner as CEO executed a Change in Terms Agreement ("Change in Terms 2") which made the Loan "payable on demand". SUMF, ¶ 28. (All of the 2002 Loan Documents, the Changes in Terms 1 and 2, and the 2003 Deed of Trust are all together hereinafter the "Loan Documents" and all advances pursuant thereto the "Loan".) None of the Loan Documents are disputed.

Mr. Petrou alleges that in June 2004, after he and EPA executed the Loan Documents, he determined that Mr. Eisner had breached his fiduciary duty to EPA by withholding funds of EPA owed to EPA by EC. Complaint, ¶39. Neither Mr. Petrou nor EPA told the Bank of any such determination and the Bank was unaware that any such issue existed between Mr. Eisner and EPA. SUMF, ¶ 30.

On August 31, 2004 Mr. Petrou executed an Operating and Retirement Agreement (the "Retirement Agreement"). SUMF, ¶ 31. The Retirement Agreement provided that Mr. Petrou would resign as a director of EPA, would remain as president of EPA until July 31, 2005 at an annual salary of $175,000 plus a "royalty" and benefits, and would transfer all of the voting rights of his stock to EC[2], all for valuable consideration. SUMF, ¶ 31 . Pursuant to the Retirement Agreement Mr. Petrou retained the right to monitor financial matters relevant to payments to the Bank and was assured of receiving quarterly balance sheets, income statements, and cash flows from EPA. SUMF, ¶ 31 (Retirement Agreement, ¶ 1.12, Exhibit C, ¶5). Neither Mr. Petrou nor EPA told the Bank about the Retirement Agreement and the Bank was unaware that any such agreement existed or that there was to be any change in the management of EPA.

---

[2] If Mr. Petrou had transferred his stock to EC instead of only his voting rights, the transfer would have constituted a breach of the Loan Documents.

5

Mr. Petrou would no longer be associated with EPA.  SUMF, ¶¶ 32 - 35.

EPA was current on the Loan until November, 2006.  SUMF, ¶ 36.  EPA has not made any payments to Carrollton Bank pursuant to the Loan Documents since October, 2006 and the Bank has been informed that EPA is now out of business.  SUMF, ¶ 39.  In November, 2006 Carrollton Bank made a demand on EPA and on Mr. Petrou for payment of the Loan.  SUMF, ¶ 37.

A single payment of $9,000.00 was received by the Bank and credited to the EPA loan when a single account debtor apparently paid a single EPA invoice in January, 2007. SUMF, ¶ 38.  The Bank has not received any other payments on the Loan from any other source.  SUMF, ¶ 38.  The Bank does not have knowledge of any accounts receivable of EPA, even including any invoice for which the $9,000 payment was apparently made. SUMF, ¶ 40.  EPA's Bank account was overdrawn in October, 2006 and has been closed by the Bank.  SUMF, ¶ 41.

No asset in the possession or control of Carrollton Bank has been identified as belonging to EPA.  SUMF, ¶ 44.  The Bank obtained a large amount of used furniture and office equipment from EC.  The Bank has been informed that a small undefined amount of this used furniture and office equipment may be the property of EPA.  The Bank believes that the small amount which may be the property of EPA would have a maximum value of $2,000.00 (the "EPA Property").  SUMF, ¶¶ 42 - 43.  The EPA Property is in storage pending sale and the Bank is incurring monthly storage charges which are added to the loan balance due from EPA and Mr. Petrou pursuant to the Loan Documents.  Monthly storage charges may now have exceeded the value of the used furniture and computers which may be the property of EPA.  SUMF, ¶ 42.

Carrollton Bank has no other assets of EPA in its possession or control. SUMF, ¶ 43. Carrollton Bank is not aware of any other assets of EPA despite searching therefore. SUMF, ¶ 43. Carrollton Bank did not communicate with any person or agree with any person to move, retitle, reduce, reallocate or minimize any assets of EPA. SUMF, ¶ 44.

Carrollton Bank was not aware that Mr. Petrou was seeking an accounting from EPA. SUMF, ¶ 45. Carrollton Bank was not aware that Mr. Petrou was not able to obtain an accounting from EPA. SUMF, ¶ 45. Carrollton Bank did not communicate with any other person regarding any request by Plaintiff Petrou to EPA to obtain an accounting. SUMF, ¶ 46. Mr. Petrou did not contact Carrollton Bank seeking an accounting or any other information regarding the status of the Loan to EPA or the collateral before filing this lawsuit. SUMF, ¶ 47. Carrollton Bank believed that Mr. Petrou was an authorized officer of EPA. SUMF, ¶ 48. At all relevant times Mr. Petrou was authorized to receive information from Carrollton Bank regarding EPA and the Loan. SUMF, ¶ 48.

Carrollton Bank never had control over the cash flow of EPA. SUMF, ¶ 49. Carrollton Bank took deductions from EPA's Carrollton Bank accounts only by written authorizations and only to apply such deductions to payments on the Loan. SUMF, ¶ 50. Carrollton Bank did not write any checks, cause any other deductions to be made from EPA's bank accounts, or make any payments to others from the bank accounts of EPA. SUMF, ¶ 49.

Carrollton Bank did not monitor the income or expenses of EPA and had no knowledge of them other than as periodically reported by EPA to Carrollton Bank. SUMF, ¶ 52. Carrollton Bank had no obligation to monitor the income or expenses of

EPA.  SUMF, ¶ 52.  The last periodic report of EPA income and expenses which

Carrollton Bank received from EPA was for the period January to May, 2004.  SUMF,

¶53.

Carrollton Bank did not withhold any payments due to EPA.  SUMF, ¶ 54.

Carrollton Bank was not obligated to make any payments to EPA and therefore could not

have withheld any such payments.  SUMF, ¶ 54.

## III.  LEGAL ARGUMENT

A.    Grounds for Summary Judgment

Fed.R.Civ.Pro. 56(c) provides that summary judgment "shall be rendered

forthwith if  ... there is no genuine issue as to any material fact and that the moving party

is entitled to a judgment as a matter of law."  See also Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  As to Mr. Petrou's Counts I, IV,

VII, VIII, IX, and X against Carrollton Bank there are no genuine issues as to any

material fact and Carrollton Bank is entitled to judgment as a matter of law.

B.    Mr. Petrou's Bases for his Causes of Action for Accounting (Count I), Injunctive
      Relief (Count VII), Declaratory Judgment (Count VIII), Negligence (Count IX),
      and Constructive Trust (Count X), Art Not Factually Accurate and Do Not
      Legally Entitle Mr. Petrou to Relief So That Summary Judgment Should Be
      Granted in Favor of the Bank and Against Mr. Petrou as to Counts I, VII, VIII, IX
      and X.

As common threads in his several counts against the Bank, Mr. Petrou argues that

he is entitled to relief as against Carrollton Bank because:  (a) the notary on the 2003

Deed of Trust was not a District of Columbia notary, (b) there was no consideration for

the 2003 Deed of Trust, (c) the Loan was not renewed or extended beyond December 31,

2003, and (d) the Bank improperly seized cash and office furniture from EC which had

been diverted to EC from EPA.  The undisputed material facts are at variance with these

allegations but, even if true, they would not be a basis for legal relief against the Bank.

>    1.    The Notary on the 2003 Deed of Trust Was a District of Columbia Notary
>          at the Time She Notarized the 2003 Deed of Trust.

In paragraphs 22, 112 and 113 of the Complaint, Mr. Petrou alleges that the notary who signed the attestation on the 2003 Deed of Trust was a Maryland notary and not a District of Columbia notary. Mr. Petrou bases his causes of action for injunctive relief (Count VII) and declaratory judgment (Count VIII) on this alleged failure of attestation by a District of Columbia notary. It is an undisputed fact, however, that the notary was a District of Columbia notary. Although the notary is not currently a District of Columbia notary, she was a District of Columbia Notary at the time she signed the attestation on the 2003 Deed of Trust. SUMF, ¶ 26.[3] Even had the notary not been a District of Columbia notary, however, the 2003 Deed of Trust would not have been legally impacted. District of Columbia law does not require that an attestation be made by a District of Columbia notary. See D.C. Code, §§42-144(a), 42-146, and 42-147 (notarial act performed by notary of another jurisdiction same effect as District of Columbia notary).

The 2003 Deed of Trust is valid and enforceable. The allegations in paragraphs 22, 112 and 113 of the Complaint that Plaintiff's signature was not attested by a District of Columbia notary are factually inaccurate and cannot form the basis of any claim against the Bank, including Mr. Petrou's claims for injunctive relief (Count VII) and declaratory judgment (Count VIII).

---

[3] Mr. Petrou transmitted the executed 2003 Deed of Trust to the Bank, representing in his covering letter "...I'm returning those documents [the 2003 Deed of Trust] with my signatures and notarization, where required." SUMF, ¶ 23. If any misrepresentation was made regarding the notary on the attestation to the 2003 Deed of Trust, it was made by Mr. Petrou.

      2.     The 2003 Deed of Trust Was Supported by Adequate Consideration and Is Therefore Valid and Binding on Mr. Petrou and the Property.

Mr. Petrou alleges in paragraphs 15 and 17 of the Complaint that because the 2003 Deed of Trust was signed at a later time than the other Loan Documents it must fail for lack of consideration. Mr. Petrou bases his cause of action for injunctive relief (Count VII) on the alleged failure of consideration for the 2003 Deed of Trust. The opposite legal conclusion must flow from the undisputed material facts.

Mr. Petrou signed the 2002 Deed of Trust but it was lost by the loan servicer prior to recordation. The Bank asked Mr. Petrou to execute a replacement deed of trust. Mr. Petrou tried to talk the Bank out of requiring him to execute a deed of trust. The Bank did not agree. In fact on October 21, 2003 the Bank sent Mr. Petrou a letter noting EPA's "recent incidences of large operating losses" and large losses for the prior year. The letter also stated "I [the Bank] apparently must clearly state that without the properly executed and recorded IDOT [deed of trust], promptly delivered to the bank, a formal request for full repayment of outstanding balances will be forthcoming."

It is undisputed that the Bank had a legal right to request full payment of the Loan if Mr. Petrou did not provide the deed of trust. The Bank's forbearance from requesting full payment of the Loan constituted consideration for Mr. Petrou's execution of the 2003 Deed of Trust.

      "It is well established in Maryland that forbearance to exercise or pursue a right or claim, or an agreement to forbear, constitutes sufficient consideration to support a promise or agreement. [citations omitted]"

Erie Ins. Exchange v. Calvert Fire Ins. Co., 253 Md. 385, 389, 252 A.2d 840, 842 (1969). See also Cheek v. United Healthcare of Mid-Atlantic, Inc., 378 Md. 139, 148, 835 A.2d 656, 661 (2003) (forbearance is adequate consideration); Chernick v.

Chernick, 327 Md. 470, 480, 610 A.2d 770, 774 (1992) ("Forbearance to exercise a right or pursue a claim, or an agreement to forbear, constitutes sufficient consideration to support a promise or agreement.").

The Bank's forbearance from requiring full repayment of the Loan was sufficient consideration so that the 2003 Deed of Trust was supported by adequate consideration and remains valid and binding on Mr. Petrou. These allegations cannot be the basis of any claim against the Bank, including Mr. Petrou's claims for declaratory judgment (Count VIII).

      3.      The Maturity Date of the Loan Was Validly Changed and Was Not December 31, 2003.

In paragraphs 13, 14, 102, 104, and 120 of the Complaint, Mr. Petrou alleges that the Loan was never "renewed" or "extended" beyond its "expiration date" of October 31, 2003. Mr. Petrou further alleges that the Security Agreement and the Subordination Agreements had a maturity date of October 31, 2003. Complaint, ¶¶16, 105. And that the (unidentified) "Agreement" expired on either October 31, 2003 or December 31, 2003. Complaint, ¶103. Mr. Petrou bases his causes of action for declaratory judgment (Count VIII) and negligence and lender liability (Count IX) on the Bank's alleged failure to renew or extend the Loan. These allegations, however, are not true, either factually or as legal conclusions from the undisputed material facts.

EPA, Mr. Petrou, Mr. Eisner and EC executed the 2002 Loan Documents with a maturity date of October 31, 2003. Effective October 28, 2003 Mr. Petrou as president of EPA and Mr. Eisner as CEO executed Change in Terms 1 which changed the maturity date to December 31, 2003. Effective December 31, 2003 Mr. Petrou as president of EPA and Mr. Eisner as CEO executed Change in Terms 2 which made the Loan "payable

on demand" and did not set forth any other express maturity date.

The Loan Documents are governed by Maryland law.  A note is "payable on demand" pursuant to Maryland law "if it (i) states that it is payable on demand or at sight, or otherwise indicates that it is payable at the will of the holder, or (ii) does not state any time of payment."  Md. Code, CL Art., § 3-108.  A note payable on demand becomes overdue "on the day after the day demand for payment is duly made..."  MD Code, CL Art., § 3-304(a).  And as to a note payable on demand, the lender may bring an action to enforce the note within six (6) years after the demand.  Md. Code, CL Art., §3-118(b).  The Bank did not make demand for payment until its letter dated November 20, 2006.  The Loan did not therefore come due until the time set forth in that letter.

Both EPA and Mr. Petrou personally expressly agreed that the Bank could at any time and in its sole discretion, without notice to Mr. Petrou, change the due date of the Loan and change the terms of the Loan.  The express agreements to any extension of time and to any changes in loan terms are contained in the Loan Documents:

(a)  EPA expressly agreed to extensions and changes in loan terms:

"Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorses, shall be released from liability.  All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan...and take any other action deemed necessary by Lender without the consent of or notice to anyone.  All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. [emphasis added]"  Promissory Note, p.2.

(b)  Mr. Petrou expressly agreed to extensions and changes in loan terms:

"Guarantor [Mr. Petrou] authorizes Lender...without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time:  ...(B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the

<u>indebtedness</u> or any part of the indebtedness, including increases and decreases of the rate of interest on the indebtedness; ...(D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose...[emphasis added]"  Petrou Guaranty, p. 2.

(c)  The 2003 Deed of Trust expressly states:

"The word 'indebtedness' means all obligations of Grantor [Mr. Petrou] under the Guaranty, together with <u>all renewals of, extensions of, modifications of,</u> consolidations of and substitutions for the obligations under the Guaranty and any amounts expended or advanced by Lender...The word 'note' means the promissory note dated October 31, 2002, in the original principal amount of $350,000.00 from Borrower to Lender, together with <u>all modifications of and renewals,</u> replacements and substitutions for the promissory note or agreement. [emphasis added]" 2003 Deed of Trust, p. 8.

See also Security Agreement, p. 5, and Loan Agreement, p. 6.

Mr. Petrou expressly agreed that any future change or extension of the obligation of EPA to the Bank would not relieve him from liability pursuant to the Petrou Guaranty or the 2003 Deed of Trust.  Mr. Petrou expressly consented to any extension or modification of the due date for the obligation of EPA to the Bank.  A party is not discharged from liability if the party consents to the event or conduct that is the basis for the discharge.  MD Code, Commercial Law, § 3-605(i).  Mr. Petrou was not discharged from his obligation by the Changes in Terms modifying the Loan due date because he consented to them.

The EPA Note, being a demand note, was not due until demand was made and was not overdue until the deadline set by Carrollton Bank in its November, 2006 demand letter.  The Note had therefore clearly not "expired" prior to demand being made on Mr. Petrou.  No modification to the Loan Documents invalidated any Loan Document or relieved Mr. Petrou of any liability to the Bank.  The Loan Documents, including the

Petrou Guaranty and the 2003 Deed of Trust remain valid and fully enforceable. These allegations cannot be the basis for any claim against the Bank, including Mr. Petrou's claims for declaratory judgment (Count VIII) or negligence (Count IX).

    4.  The Bank Did Not Improperly Seize Assets of EPA in the Hands of EC.

In paragraphs 43, 44, 45, 47, 51, 73, 93, 121, and 125 of the Complaint, Mr. Petrou alleges that the Bank seized assets of EPA and improperly moved assets, revenues, credits and liabilities between EC and EPA; the assets allegedly moved were cash, accounts receivable, and used office furniture. Mr. Petrou bases his causes of action for accounting (Count I), injunctive relief(Count VII), negligence (Count IX) and constructive trust (Count X) on the alleged seizure of EC assets.

Mr. Petrou and EPA both expressly agreed that the Bank could take such steps as the Bank may deem appropriate regarding any property of EPA which was collateral for the Loan, including releasing the collateral. EPA expressly agreed to releases of any collateral by the Bank:

> "All [such] parties agree that <u>Lender may ...release any ...collateral</u>; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. [emphasis added]" Promissory Note, p.2.

Mr. Petrou also expressly consented to the Bank's release of any collateral:

> "Guarantor [Mr. Petrou] authorizes Lender...without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time: ...(C) to take and hold security for the payment of this Guaranty or the indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and <u>release any such security</u>, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose... [emphasis added]" Petrou Guaranty, p. 2.

The Security Agreement expressly provides the Bank with discretion regarding the collateral:  "Lender shall <u>not be required</u> to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, <u>preserve or maintain any security interest</u> given to secure the indebtedness. [emphasis added]"  Security Agreement, p. 3.  Mr. Petrou expressly waived any right to require the Bank to "proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person..."  Petrou Guaranty, pp. 1-2.  The Bank is therefore not required to seek any other collateral or obligor before demanding payment in full from Mr. Petrou.

In this case the Bank is not aware of any other assets of EPA which it could pursue.  The only EPA assets which the Bank is aware of were the $9,000 check the Bank received in January, 2007 (and credited to the Loan) and those few items of used office furniture and personal computers which may already be in the Bank's possession.  Arguments between EC and EPA about allocations of income do not create collateral for EPA.  Mr. Petrou expressly agreed not to offset any claim he might believe he has against amounts due to the Bank:

> "Guarantor further waives and <u>agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right</u>, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both....Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences .. [emphasis added]."  Petrou Guaranty, p. 2.

Moreover, if EPA transferred any of its assets to EC as Mr. Petrou alleges, then Mr. Petrou is still not entitled to any relief or reduction in liability to the Bank.  If EPA made such a transfer, then EPA would be in default pursuant to the Loan Documents,

including the Security Agreement, for transferring its assets outside of the ordinary course of business. EC would be in violation of the EC Subordination Agreement by accepting assets before the Bank was paid in full. Mr. Petrou would be in breach of the Petrou Guaranty for failing to monitor, ensure and protect the Bank with respect to EPA's collateral for the Loan. Mr. Eisner would be in breach of the Eisner Guaranty for failing to monitor, ensure and protect the Bank with respect to EPA's collateral for the Loan. Such breaches would, of course, entitle the Bank to immediate relief, including foreclosure on Mr. Petrou's House.

Such breaches would also prevent EPA, EC, Mr. Eisner and Mr. Petrou from bringing any actions against the Bank founded on the Loan Documents. The party who commits the first breach of a contract is not entitled to enforce it or to maintain an action on the contract against the other party for its subsequent failure to perform. Fromm Sales Co. v. Troy Sunshade Co., 222 Md. 229, 159 A.2d 860 (Md. 1960); Diener Enterprises, Inc. v. Miller, 35 Md.App. 410, 371 A.2d 439 (Md.App. 1977).

Therefore no disputed allocation or ownership argument between EC and EPA as alleged by Mr. Petrou could provide Mr. Petrou with the basis for any claim against the Bank, including Mr. Petrou's claims for accounting (Count I), injunctive relief (Count VII), negligence (Count IX) and constructive trust (Count X).

C.    Summary Judgment Should be Granted for Carrollton Bank as to Count I of Mr. Petrou's Complaint for Accounting Because the Bank Can Not Provide An Accounting of EPA's Finances and Mr. Petrou's Breach of the Loan Documents Relieves the Bank of Any Obligation to Provide an Accounting of EPA's Finances to Mr. Petrou.[4]

---

[4] The Bank has previously provided an accounting of the Loan amount to Mr. Petrou. See also Section III(B)(4), above.

1.      Mr. Petrou Is Not Legally Entitled to the Remedy of Accounting Against
        Carrollton Bank Because It is Impossible for Carrollton Bank to Render
        Such an Accounting.

Plaintiff Petrou's Count I seeks from Carrollton Bank a "full financial accounting

of EPA's business".  Complaint, ¶49.  Carrollton Bank can not provide Mr. Petrou with a

full financial accounting of EPA's business.  It is undisputed that the Bank does not have

the business records of EPA, EPA's public relations services records, or EPA's personnel

records.  SUMF, ¶¶ 55 - 56.

It is impossible for Carrollton Bank to provide Plaintiff Petrou with "a full

financial accounting of EPA's business" as requested in the Complaint.  A court should

not order performance which is incapable of being performed.  Powichrowski v.

Sicinski, 114 A. 899, 901-902 (Md. 1921); Hupp v. George R. Rembold Bldg. Co., 279

Md. 597, 602, 369 A.2d 1048, 1051 (Md. 1977) (specific performance not decreed when

performance is impossible).

As Carrollton Bank cannot possibly provide such an accounting, this Court should

enter judgment for Defendant Carrollton Bank as to Plaintiff Petrou's Count I for an

Accounting.

2.      Mr. Petrou agreed to keep himself adequately informed of EPA's finances and
        His Failure to do so constitutes a breach of the Loan Documents Which
        Relieves Carrollton Bank of Any Obligation to Provide an Accounting to Mr.
        Petrou.

Mr. Petrou's breach of the Loan Documents by failing to keep himself informed

of EPA's financial condition relieves Carrollton Bank of any duty to account to Mr.

Petrou.  Mr. Petrou expressly agreed that:

"Guarantor [Mr. Petrou] has established adequate means of obtaining from
Borrower [EPA] on a continuing basis information regarding Borrower's financial
condition.  Guarantor agrees to keep adequately informed from such means of any

facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, ..."

Petrou Guaranty, p. 1, Subparagraph (J).   See also Subordination Agreement, p. 2; 2003 Deed of Trust, p. 1.

Mr. Petrou specifically alleges that he failed to establish any means of obtaining information regarding EPA's financial condition and that he did not keep himself informed of EPA's financial condition.  Complaint, ¶¶27 and 34.  Mr. Petrou was therefore in breach of the Petrou Guaranty.  The party who commits the first breach of a contract is not entitled to enforce it or to maintain an action on the contract against the other party for its subsequent failure to perform. Fromm Sales Co. v. Troy Sunshade Co., 222 Md. 229, 159 A.2d 860 (Md. 1960); Diener Enterprises, Inc. v. Miller, 35 Md.App. 410, 371 A.2d 439 (1977).  Mr. Petrou breached the Petrou Guaranty and may not maintain any action against the Bank for an accounting.  Therefore judgment should be entered in favor of Carrollton Bank and against Plaintiff Mr. Petrou as to Plaintiff's Count I for accounting.

D.    Judgment Should be Entered in Favor of Carrollton Bank as to Plaintiff's Count IV for Civil Conspiracy Because Carrollton Bank did Not Perform any Unlawful Acts or Use Any Unlawful Means.

In order to maintain a cause of action for conspiracy under Maryland law a plaintiff must prove:

"...a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff. [citations omitted]"

Green v. Washington Suburban Sanitary Commission, 259 Md. 206, 221, 269 A.2d 815, 824 (1970).  In this case it is undisputed that Carrollton Bank did not perform any

unlawful act.  It is undisputed that Carrollton Bank did not use any unlawful means to accomplish any of its legitimate business objectives.

The only "wrongful" acts which Plaintiff alleges in his Count IV for conspiracy are that Carrollton Bank "aided, abetted, participated in and encouraged" the Eisners in "diverting" revenue, payments and profits away from EPA and toward EC to maximize the assets of EC and to minimize the assets of EC [sic]".  Complaint, ¶¶73, and 74.

No specific actions are alleged and therefore no unlawful acts as are required to establish a conspiracy are alleged.  The Bank did not in fact take any illegal actions.  It is undisputed that Carrollton Bank did not communicate with any person to move, retitle, reduce, reallocate or minimize any asset or revenue of EPA at any time.  The Bank did not have control over EPA's cash flow or assets.

No specific unlawful means to accomplish any of the Bank's actions are alleged.  The Bank was contractually permitted to use its discretion regarding all collateral for the EPA Loan, including to abandon any collateral.  Therefore any such action would not constitute either illegal means or illegal acts but rather lawful actions expressly authorized by the Loan Documents.

Therefore, Carrollton Bank is entitled to summary judgment as a matter of law as to Plaintiff's Count IV, Civil Conspiracy.

E.    Judgment Should be Entered in Favor of Carrollton Bank as to Plaintiff's Count
      VII for Injunctive Relief Because Plaintiff Can Not Show Grounds for Injunctive
      Relief Under Either Federal or Maryland Law.[5]

Rule 65(a), F.R.Civ.Pro., governs the issuance of preliminary injunctions.[6]  The

Loan Documents require the application of Maryland law.  Applying either federal or

Maryland law, the material facts are undisputed and Carrollton Bank is entitled to

judgment as a matter of law as to Plaintiff's Count VII for injunctive relief.

When an important federal policy is at issue, federal law rather than state law

should apply in a diversity action.  Hanna v. Plumer, 380 U.S. 460, 85 S.Ct. 1136 (1965).

In light of the applicability of Rule 65(a), F.R.Civ.Pro., federal law rather than state law

may apply in this diversity action.  See Federal Leasing, Inc. v. Underwriters at Lloyds,

487 F.Supp. 1248, 1261 (D.C.Md. 1980); Capital Tool and Manuf. Co., Inc. v.

Maschinenfabrik Herkules, 837 F.2d 171 (4th Cir. 1988); In re DeLorean Motor Co., 755

F.2d 1223 (6th Cir. 1985).

Four factors determine whether preliminary injunctive relief is proper under

federal law.

> "Four factors are particularly important in determining whether a preliminary
> injunction is proper: (1) the likelihood of plaintiff's success on the merits; (2)
> whether the injunction will save the plaintiff from irreparable injury; (3) whether
> the injunction would harm others; and (4) whether the public interest would be
> served by the injunction. [citations omitted]"

In re DeLorean Motor Co., 755 F.2d 1223, 1228 (6th Cir. 1985).

Four similar factors are applicable for a grant of permanent injunctive relief under

federal law.

---

[5] See also Sections III(B)(2) and (4), above.
[6] Carrollton Bank has also filed a motion to dismiss this cause of action.  See Motion of Defendant
Carrollton Bank to Dismiss Counts VII and VIII of the Amended Complaint as to Defendant Carrollton
Bank filed on or about March 5, 2007.

> "According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. [citation omitted]"

eBay Inc. v. MercExchange, L.L.C., -- U.S. --, --, 126 S.Ct. 1837, 1840 (2006).

Mr. Petrou has presented no legal basis sufficient under federal law for a court to grant Mr. Petrou injunctive relief and thereby be relieved from his own wrongful actions. Summary judgment is appropriate as to all of Plaintiff's counts against Defendant Carrollton Bank.  Mr. Petrou alleges that he has "a strong probability of success on the merits of his claims against the Bank for civil conspiracy and for negligence, as well as his demand for an accounting."  Complaint, ¶95.  In fact, Mr. Petrou has little likelihood of success on any of these claims.  See Sections III(B)(1)-(4), III(C) and III(D), above, and  Section III(G), below.  This element of a claim for injunctive relief is therefore clearly missing.

Mr. Petrou's harm is due to his own actions.  Mr. Petrou voluntarily gave up his voting rights, failed to enforce his own rights to EPA's financial information, and breached his Guaranty by failing to keep himself informed of EPA's finances and permitting EPA to become insolvent and terminate its business.  There can be no showing under these circumstances that Mr. Petrou has meritorious equitable claims.

Mr. Petrou and EPA are in monetary default under the Loan Documents for failing to make payment (or even to discuss payment arrangements) despite the Bank's demand.  Mr. Petrou has also committed multiple other (non-monetary) defaults under his Personal Guaranty.  Mr. Petrou's other defaults under the Loan Documents include the

following:

(a) Mr. Petrou agreed to establish adequate means to obtain information regarding EPA's financial condition.  Petrou Guaranty, p. 1, Subparagraph (J).  See also Subordination Agreement, p. 2; 2003 Deed of Trust, p. 1.  Mr. Petrou has not established any means of obtaining such information nor has he taken any steps himself to actually obtain the required information.  Further he asks this Court to require the Bank to fulfill his obligation for him.  Such a failure by Mr. Petrou constitutes a default under the Loan Documents entitling the Bank to foreclose on the Property.

(b) Mr. Petrou agreed to waive all of his own claims if EPA at any time became unable to pay its obligation to the Bank.  In his Guaranty, p. 2, Mr. Petrou expressly agreed that if EPA "is or shall become insolvent and the indebtedness shall not at all times until paid be fully secured by collateral pledged by Borrower [EPA], Guarantor hereby forever waives and gives up in favor of Lender and Borrower...any claim or right to payment Guarantor may now have or hereafter have or acquire against Borrower, by subrogation or otherwise, so that at no time shall Guarantor be or become a 'creditor' of Borrower...[emphasis supplied]"  Petrou Guaranty, p. 2.  Instead of waiving any claims, Mr. Petrou has filed this lawsuit against the Bank in direct breach of his express agreement to waive such claims.

(c) Mr. Petrou agreed to prevent EPA from impairing the Bank's collateral. Security Agreement, p. 2; Loan Agreement, p. 3.  Mr. Petrou alleges that he knew there was a danger to EPA from Mr. Eisner and EC which resulted in

Mr. Eisner and EC erroneously allocating income from EPA to EC.  But Mr.
Petrou did nothing to prevent any such actions and in fact secreted his
concerns from the Bank.  Mr. Petrou expressly agreed that he waived any and
all rights or defenses arising by reason of any right "on the basis of unjustified
impairment of any Collateral for the indebtedness..."  Petrou Guaranty, p. 2.
Any such transactions and this very lawsuit both constitute a breach of the
express terms of the Loan Documents entitling the Bank to foreclose on the
Property.

(d) Mr. Petrou complains that no one is currently running EPA and therefore he
should have no liability to the Bank.  But Mr. Petrou expressly agreed, in the
2003 Deed of Trust, that "The dissolution or termination of Borrower's
[EPA's] or Grantor's existence as a going business..." would constitute a
default under the 2003 Deed of Trust.  2003 Deed of Trust, p. 4.  The
termination of EPA as a going concern therefore constitutes a default under
the Loan Documents entitling the Bank to foreclose on the Property.

Any one of these defaults, monetary or otherwise, is sufficient to permit the Bank
to foreclose on the Property pursuant to the 2003 Deed of Trust.  See 2003 Deed of Trust,
p. 5.  The very grounds which Mr. Petrou advances as grounds for injunctive relief are in
fact breaches of the Loan Documents precluding Mr. Petrou or EPA from obtaining any
legal relief against the Bank and expressly permitting the Bank to foreclose on the
Property.  Mr. Petrou presents no legal or equitable ground under federal law to enjoin a
foreclosure by the Bank.

Mr. Petrou can not show any grounds which constitute a cause for a grant of injunctive relief under Maryland law either.  Maryland procedural requirements for foreclosures are set forth in Maryland Rule 14-209(b), which prohibits an injunction of a foreclosure unless

> "the motion [for injunctive relief] is supported by affidavit as to all facts asserted and contains: (1) a statement as to whether the moving party admits any amount of the debt to be due and payable as of the date the motion is filed, (2) if an amount is admitted, a statement that the moving party has paid the amount into court with the filing of the motion, and (3) a detailed statement of facts, showing that: (A) the debt and all interest due thereon have been fully paid, or (B) there is no default, or (C) fraud was used by the secured party, or with the secured party's knowledge, in obtaining the lien."

In this case, Mr. Petrou has not submitted a statement (or even alleged as elements of his Complaint) a single one of these elements.  Moreover, under Maryland law

> "It is well settled that the mere allegation in a bill that irreparable loss and injury will ensue is not sufficient, unless such facts be stated, as will satisfy the court that the apprehension is well founded....The mortgages in this case are regular in form, properly executed, and duly recorded, as required by law, and they appear in every way to be valid and binding instruments. It is difficult to perceive upon what legal principle the appellants could be allowed to set up, in defense, an alleged verbal agreement, absolutely inconsistent with their clearly expressed terms, and contradictory thereof. The cases are conclusive that this cannot be done. [emphasis supplied]"

Fowler v. Pendleton,  121 Md. 297, 298, 88 A. 124, 125 (Md. 1913).

The relationship between Mr. Petrou and Carrollton Bank is governed by the Loan Documents.  It is undisputed that Mr. Petrou has committed many defaults under the Loan Documents.  Where there is a default under the loan documents there are no grounds for an injunction to prevent foreclosure.  See Stater v. Dulany, 236 Md. 399, 404, 204 A.2d 71, 74 (Md. 1964); Saunders v. Stradley, 25 Md.App. 85, 98, 333 A.2d 604, 611 - 612 (Md.App. 1975) (even where borrower is deserving of sympathy the rights of the lender can not be disregarded and injunctive relief must be denied).  Mr. Petrou

and EPA are in multiple monetary and other defaults pursuant to the Loan Documents.

Mr. Petrou is not entitled to injunctive relief pursuant to Maryland law.

Mr. Petrou also argues that the Bank should not be permitted to foreclose because the exact amount due to the Bank from EPA is disputed. The amount is not disputed. But, even if Plaintiff were able to dispute the exact amount due, the mere existence of an accounting error or dispute as to amount would not provide grounds to enjoin a foreclosure. An incorrect calculation of the amount due does not constitute grounds to enjoin a foreclosure under Maryland law. See Pacific Mortg. & Inv. Group, Ltd. v. LaGuerre, 81 Md.App. 28, 33, 566 A.2d 780, 783 (Md.App., 1989) (mere alleged wrong in some aspect of the deed of trust or in some inaccurate calculation of amount due is not sufficient grounds to enjoin a foreclosure sale); Maryland Permanent Land & Bldg. Soc. of Baltimore v. Smith, 41 Md. 516 (Md. 1875) (incorrect calculation of amount due on deed of trust and potential issue of usury are not grounds to enjoin foreclosure sale); Stater v. Dulany, 236 Md. 399, 404, 204 A.2d 71, 74 (1964) (deed of trust is lien against the property and foreclosure on that lien will not be enjoined under Maryland law merely because the amount due may be disputed).

Mr. Petrou alleges invalidity of his legal obligation to the Bank based on an improper application of collateral by the Bank. This is not a valid ground to enjoin a foreclosure under Maryland law. A lender will not be enjoined from foreclosing merely because the borrower alleges some ground to invalidate the obligation. Stack v. Marney, 252 Md. 43, 50, 248 A.2d 880, 885 (Md. 1969) (even if usury exists, it is not a ground for enjoining a foreclosure sale); Talbott v. Laurel Bldg. Ass'n of Prince George's County, 118 A. 63, 64 (Md. 1922) (illegal interest does not invalidate mortgage or affect

power to sell and complainant must pay principal and legal interest before he can claim

intervention of court of equity by injunction); Burroughs v. Garner, 43 Md.App. 302,

319, 405 A.2d 301, 311 (Md.App., 1979) (possibility of laches defense is not ground to

enjoin foreclosure sale).  Therefore Mr. Petrou's allegations of invalidity of the Loan

Documents, even if well-founded (which they are not), do not form a legally sufficient

basis to enjoin a foreclosure sale under Maryland law.

Mr. Petrou further alleges that he should not be obligated by the Loan Documents

he signed and agreed to because he "does not have such an amount available for

payment."  Complaint, ¶92.  Mr. Petrou is not now legally relieved of his contractual

obligation merely because it may have become difficult to perform.

> "The fact that the promised performance of a contractual obligation may be more
> difficult than was expected at the time the promise was made does not discharge
> the promissor from his duty to perform. Am. Tow., Etc., Co. v. Baker-W. C. Co.,
> 117 Md. 660, 678, 84 A. 182 (1912); Pennsylvania R. R. Co. v. Reichert, 58 Md.
> 261, 274 (1882); 6 Corbin, Contracts s 1333 (1962); see Levine v. Rendler, 272
> Md. 1, 7-12, 320 A.2d 258 (1974). The insurer has unconditionally promised to
> defend the insured and therefore has assumed the risk that performance might be
> more difficult under some circumstances than others."

Brohawn v. Transamerica Ins. Co., 276 Md. 396, 410, 347 A.2d 842, 851 (Md. 1975).

Mr. Petrou signed the Loan Documents and agreed to repay the Bank in the event that

EPA failed to do so.  EPA has failed to repay the Bank.  Therefore Mr. Petrou must

repay the Bank.

Mr. Petrou is not able to meet either the federal or Maryland standards for

injunctive relief.  The material facts are undisputed and Carrollton Bank is entitled to

judgment as a matter of law as to Plaintiff's Count VII for injunctive relief.

F.    Judgment Should be Entered in Favor of Carrollton Bank as to Plaintiff's Count VIII for Declaratory Judgment and Damages Because the Bank's Loan Documents Are Legally Valid.[7]

Plaintiff brings his action for declaratory judgment and damages in Count VIII based on three grounds:  (1) that EPA's loan was "never renewed" and "expired by its terms" on October 31, 2003 or December 31, 2003; (2) that the 2003 Deed of Trust did not contain an attestation by a District of Columbia notary; and (3) that Carrollton Bank failed to comply with District of Columbia and federal law in the documentation of the 2003 Deed of Trust.  Based on the undisputed material facts Carrollton Bank is entitled to judgment as a matter of law as to Plaintiff's Count VIII for declaratory judgment and damages.

The EPA Loan was not "expired" prior to the Bank's demand on November 20, 2006 and Plaintiff's argument that the Loan "expired" can not provide legal grounds for relief.  See Section III(B)(3), above.  The 2003 Deed of Trust in fact did contain an attestation by a District of Columbia notary and is not invalid by reason of a defective attestation.  See Section III(B)(1), above.  The Bank has fully complied with all applicable federal and District of Columbia law regarding the EPA Loan.

Count VIII of the Complaint apparently seeks to allege a cause of action against Defendant Carrollton Bank for Carrollton Bank's alleged violations of D.C. Code, §§26-1101, et seq., the Mortgage Lender and Broker Act, 15 U.S.C. §1601, et seq. ( the Truth in Lending Act or TILA), and 12 U.S.C. §2601 et seq. (Real Estate Settlement Procedures Act or RESPA).  None of these statutes, however, apply to Carrollton Bank and the transactions between EPA, Mr. Petrou and the Bank.  Therefore summary judgment should be granted as against Plaintiff as to Count VIII of the Complaint.

---

[7] See also Sections III(B)(1)-(4), above.

1.    Summary Judgment Should be Granted in Favor of Carrollton Bank as to
Plaintiff's Count VIII of the Complaint for Declaratory Judgment Because
the District of Columbia Statute Does Not Apply to Defendant Carrollton
Bank.

Plaintiff references two types of statutes as a basis for Count VIII of his

Complaint, a District of Columbia statute and two federal statutes.  The District of

Columbia statute which Plaintiff cites as one of his bases for relief in Count VIII is D.C.

Code, §§26-1101, et seq., the Mortgage Lender and Broker Act.  Plaintiff alleges in

paragraph 111 of the Complaint that "On information and belief, the Bank was not

properly licensed with the District of Columbia as a mortgage lender at the time it

executed this mortgage."

The Bank is not required to be licensed with the District of Columbia as a

mortgage lender.  The District's Mortgage Lender and Broker Act prohibits entities from

engaging in business as mortgage lenders or mortgage brokers unless first obtaining a

District of Columbia license to do so. D.C. Code, §26-1103(a).  The Act, however,

specifically exempts state banks from the license requirement:

"The provisions of this chapter shall not apply to:  (1) any bank, trust company,
savings bank, savings and loan association, or credit union incorporated or
chartered under the laws of the United States, any state or territory of the United
States, or the District....."

D.C. Code, §26-1102.

It is undisputed that Carrollton Bank is a bank chartered under the laws of the

State of Maryland.  The District of Columbia's Mortgage Lender and Broker Act does

not apply to state banks.  Carrollton Bank is therefore not required to be licensed under

the Act.  Any failure of Carrollton Bank to obtain a District of Columbia license can have

no impact on the validity of either Plaintiff's personal guarantee or deed of trust and can

not form a basis for Mr. Petrou's Count VIII for declaratory relief.

>    2.    Summary Judgment Should be Granted in Favor of Defendant Carrollton
>          Bank Regarding Count VIII of the Complaint for Declaratory Judgment
>          Because the Federal Statutes Do Not Apply to the EPA Loan.

Plaintiff alleges that in obtaining the Petrou Guaranty and 2003 Deed of Trust the Bank violated two federal consumer protection statutes: 15 U.S.C. §1601, et seq.[8] (Truth in Lending Act or TILA), and 12 U.S.C. §2601 et seq. (Real Estate Settlement Procedures Act or RESPA).

Neither of these federal statutes apply to the business transactions between EPA and the Bank. Plaintiff was President and a Director of EPA and for 18 years he managed EPA's day-to-day affairs. Plaintiff is clearly a sophisticated, experienced businessman familiar with lending transactions with banks, including specifically Carrollton Bank. EPA, by its president Mr. Petrou, represented that the Loan was "solely for Borrower's business operations..." Loan Agreement, p. 3. Mr. Petrou signed the Loan Agreement. If there was any argument that the Loan was for other than EPA's business operations, then Mr. Petrou made a false representation to the Bank, thereby relieving the Bank of any liability to Mr. Petrou and subjecting Mr. Petrou to further liability.

---

[8] In paragraph 114 of the Amended Complaint Plaintiff also cites "the Homeowners Equity and Protection Act, 15 U.S.C. §1602(a)(a) et seq." The Home Ownership and Equity Protection Act of 1994 is the correct name for this law and there are no currently effective sections of the law. Therefore it is not dealt with in this argument.

(a)    TILA Does Not Provide a Basis for Count VIII of the Complaint Because it Does Not Apply to the Business Transactions Between EPA and the Bank.

TILA[9] does not apply to any business transactions.  TILA was enacted to attempt to provide protection to consumers "against inaccurate and unfair credit billing and credit card practices."  15 U.S.C. §1601(a).  The Loan, including the Petrou Guaranty, does not involve any credit cards or any consumer transaction.  EPA and Mr. Petrou expressly represented that the Loan was solely for EPA's business operations.

TILA does not apply to "[C]redit transactions involving extensions of credit primarily for business, commercial, or agricultural purposes, or to government or governmental agencies or instrumentalities, or to organizations. [emphasis supplied]"  15 U.S.C. §1603(1).  See also, for example, Poe v. First National Bank, 597 F.2d 895 (5th Cir. 1979) (where purpose was to finance corporate business this subchapter not applicable notwithstanding that individuals joined in notes and gave personal guarantee); Bokros v. Associates Finance, Inc., 607 F.Supp. 869 (N.D.Ill. 1984) (business loan exempt from chapter where part used to retire mortgage on residence and part used to make down payment on business property); Morse v. Mutual Federal Sav. & Loan Ass'n, 536 F.Supp. 1271 (D.C.Mass. 1982) (loan was exempt from TILA where purpose was to pay for business supplies, even though one person who signed note was not involved in running business).

The Loan in this case is a business loan to which TILA does not apply and therefore TILA can not provide the legal basis for any grant of relief against the Bank as to Plaintiff's Count VIII for declaratory relief.

---

[9] Sections 1601 to 1667(f) of Title 15 of the U.S. Code.

(b)    RESPA Does Not Apply to the Business Transactions Between EPA and the Bank as Guaranteed by Mr. Petrou.

RESPA, at 12 U.S.C. §2606(a) states:  "This chapter does not apply to credit transactions involving extensions of credit (1) primarily for business, commercial, or agricultural purposes..."  The Loan is specifically and expressly and solely a business loan.  Therefore RESPA does not apply to the EPA Loan or to Mr. Petrou's Guaranty of the Loan.

Because none of the material facts of Plaintiff's Count VIII are disputed and because Defendant Carrollton Bank is entitled to judgment as a matter of law based on the undisputed material facts, summary judgment should be entered in favor of Carrollton Bank as to Plaintiff's Count VIII for declaratory judgment and damages.

G.    Judgment Should be Entered in Favor of Carrollton Bank as to Plaintiff's Count IX for Negligence and Lender Liability Because the Bank Does Not Owe Any Duty of Care to Mr. Petrou.[10]

Plaintiff argues that Carrollton Bank owed Mr. Petrou a duty of care.  Complaint, ¶118.  Mr. Petrou argues that the Bank breached this duty of care by failing to renew the Loan, failing to demand payment on the maturity date of the Loan and failing to demand an accounting from EPA so as to determine if EPA's assets were being "siphoned off or diverted."  Complaint, ¶119-121.

The undisputed material facts are that the Bank renewed the Loan and timely made demand on EPA and Mr. Petrou for repayment as there was no "maturity date" due to the demand nature of the Note.  The Bank was not legally required to make any demand for an accounting from EPA or to otherwise to monitor EPA's internal finances.  Moreover, Carrollton Bank owes no duty of care to Mr. Petrou.

---

[10] See also Sections III(B)(1)-(4), above.

To state a cause of action for negligence a plaintiff must show that the defendant owed him a duty. <u>Parker v. Columbia Bank</u>, 91 Md.App. 346, 604 A.2d 521, 531 (1992). <u>See also DeLeon Enterprises, Inc. v. Zaino,</u> 92 Md.App. 399, 608 A.2d 828, 837 (1992). Under Maryland law, the relationship of a bank to its customer is solely contractual.

> "It is pellucid that, in Maryland, the relationship of a bank to its customer in a loan transaction is ordinarily a contractual relationship between debtor and creditor...Consequently, appellants [loan applicants] in the case sub judice cannot attach to the appellee [bank] the assumption of any greater duty than that specified in the Commitment Agreement [loan application documents]."

<u>Yousef v. Trustbank Savings, F.S.B.</u>, 568 A.2d 1134, 1138-1139, 81 Md.App. 527, 537 (1990). See also <u>Steigerwald v. Bradley</u>, 136 F.Supp.2d 460, 467-469 (D.Md. 2001).

> "The mere negligent breach of a contract, absent a duty or obligation imposed by law independent of that arising out of the contract itself, is not enough to sustain an action sounding in tort."

<u>Heckrotte v. Riddle</u>, 224 Md. 591, 595, 168 A.2d 879, 882 (Md. 1961). <u>Parker v. Columbia Bank</u>, 91 Md.App. 346, 604 A.2d 521 (Md.App., 1992), cert. den. 327 Md. 524, 610 A.2d 796 (1992) (plaintiff must prove duty independent of contract). See also <u>Martens Chevrolet, Inc. v. Seney</u>, 292 Md. 328, 439 A.2d 534 (1982) (in order to make claim for negligent misrepresentation plaintiff must show that defendant had a duty of care to plaintiff); <u>Jacques v. First Nat'l Bank</u>, 307 Md. 527, 531, 515 A.2d 756, 758 (1986) (in order to state a claim for negligence plaintiff must allege a duty owed by the defendant to plaintiff). "To find the existence of a legal duty where none is expressed in the contract has much the same effect as judicially rewriting the contract for the parties." <u>Rockhill v. U. S.</u>, 288 Md. 237, 252, 418 A.2d 197, 204 (1980).

The relationship of Mr. Petrou and the Bank is solely a contractual one. The contract consists of the Loan Documents. The Loan Documents do not include any duty of Carrollton Bank to Plaintiff Petrou to minimize the Bank's recovery on any

outstanding loan, to manage or monitor EPA's assets or income, to monitor or administer the Loan, to demand payment on the Loan at some time convenient to Mr. Petrou, to procure accountings or financial statements from EPA for the benefit of Mr. Petrou, or to act as a fiduciary with respect to any collateral in the Bank's possession for any loan.  In fact, under the Loan Documents, the Bank can explicitly "release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone."  Promissory Note, p. 2.  The Bank can make demand for payment of the Loan, both from EPA and from Mr. Petrou, at any time and can enforce the 2003 Deed of Trust upon any default.  Change in Terms 2, p. 1; 2003 Deed of Trust, p. 5.

Even if the Bank had failed to perform some contractual duty (which is obviously not the case and which the Bank does not concede), a mere failure to perform a contractual duty is not actionable as a breach of duty in tort.  "[T]he duty giving rise to the tort cause of action must be independent of the contractual obligation. ...Mere failure to perform a contractual duty, without more, is not an actionable tort. [citations omitted]" Wilmington Trust Co. v. Clark,  289 Md. 313, 328-329, 424 A.2d 744, 754 (1981).  See also Silver Hill LP v. HSA/Wexford Bancgroup, 158 F.Supp.2d 631 (D.C.Md. 2001) (under Maryland law no tort duty imposed in financing deal gone awry between businesses bargaining at arm's length and with their eyes open).

The contractual duty to monitor and protect EPA's assets and income belonged not to the Bank but to EPA and Mr. Petrou.  Under the Loan Documents EPA may "not sell, offer to sell, or otherwise transfer or dispose of the Collateral[11]....Unless waived by

---

[11]  "Collateral" is defined to include all property and assets granted as collateral security for the Loan. Loan Agreement, p. 5.

Lender [in writing] all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds...Upon receipt, Grantor [EPA] shall immediately deliver any such proceeds to Lender."  Security Agreement, p. 2.  Any "siphoning" or "diverting" of EPA's assets would therefore constitute a breach of the Loan Documents by EPA.

Mr. Petrou expressly represented that "(J) Guarantor [Mr. Petrou] has established adequate means of obtaining from Borrower [EPA] on a continuing basis information regarding Borrower's financial condition.  Guarantor agrees  to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, ..."  Petrou's Guaranty, p. 1, Subparagraph (J). See also Subordination Agreement, p. 2; Deed of Trust, p. 1.  If Mr. Petrou permitted any "siphoning" or "diverting" of EPA's assets to occur, then Mr. Petrou was in breach of the Loan Documents. It is clear that both EPA and Mr. Petrou were in default of the Loan before any action by the Bank to realize on any collateral.[12]

The Loan Documents are undisputed.  The Loan Documents do not create any duty of Carrollton Bank to Plaintiff Petrou.  There is no independent basis for any tort duty to Mr. Petrou.  Since Carrollton Bank owes no duty to Plaintiff Petrou there can be no breach of a duty and therefore judgment must be entered for Carrollton Bank and against Plaintiff as to Mr. Petrou's claim for negligence (Count IX).

---

[12] The party who commits the first breach of a contract is not entitled to enforce the contract or to maintain an action on the contract against the other party for its subsequent failure to perform. Fromm Sales Co. v. Troy Sunshade Co., 222 Md. 229, 159 A.2d 860 (Md. 1960); Diener Enterprises, Inc. v. Miller, 35 Md.App. 410, 371 A.2d 439 (Md.App. 1977).

H.    Judgment Should be Entered in Favor of Carrollton Bank as to Plaintiff's Count X for Creation of Constructive Trust Because No Legal or Factual Basis Exists for the Imposition of a Constructive Trust on the Bank.

Plaintiff claims that a constructive trust should be imposed on the Bank because the Bank seized assets of another borrower (EC) against whom Mr. Petrou alleges he has claims.   Complaint, ¶¶ 125, 128.  The seizure of collateral by the Bank does not require the Bank to hold that collateral in trust for the benefit of other creditors of its debtor customer.  There are no disputed material facts and Carrollton Bank is entitled to judgment as a matter of law as to Plaintiff's Count X for constructive trust.

Pursuant to Maryland law, "[a] constructive trust is the remedy employed by a court of equity to convert the holder of the legal title to property into a trustee for one who in good conscience should reap the benefits of the possession of said property." Wimmer v. Wimmer, 287 Md. 663, 669, 414 A.2d 1254, 1258 (1980). The basis for the imposition of a constructive trust is fraud.  Id.; See also Bowie v. Ford, 269 Md. 111, 118, 304 A.2d 803, 808 (1973).  But a constructive trust is not "a remedy for every moral wrong arising in societal affairs.  A court of equity will not deprive one person of property titled in his name and give it to another merely because the latter believes herself to be deserving of it."  Wimmer v. Wimmer, 287 Md. 663, 674, 414 A.2d 1254, 1261 (1980).   Plaintiff has not alleged fraud against the Bank and the undisputed material facts do not show any such claim.

Plaintiff claims a constructive trust not based on the original loan transaction at all, but rather based on subsequent events.  Whether to impose a constructive trust, however, must be determined by examining the "circumstances surrounding the inception of the transaction, and not from the effect of subsequent events." Mayor of Annapolis v.

<u>West Annapolis Fire & Improvement Co.</u>, 264 Md. 729, 736, 288 A.2d 151, 155 (1972).

"Constructive trusts, therefore, cannot arise by post hoc rationalizations provided by

putative beneficiaries who are displeased because they are merely general, unsecured

creditors." <u>In re Greenbelt Road Second Ltd. Partnership</u>, 1994 WL 592766, 3 (C.A.4,

1994) (unreported decision, 39 F.3d 1176 (Table)).  Mr. Petrou does not allege any fraud,

misrepresentation or improper method occurring at the inception of the EPA Loan.

Rather he now attempts to rationalize his elevation over the Bank as a creditor of EC and

EPA.  Such an argument provides no legal basis for the imposition of a constructive trust.

Therefore no constructive trust may be imposed and Carrollton Bank is entitled to

judgment as a matter of law as to Plaintiff's Count X Creation of a Constructive Trust.

I.    <u>Mr. Petrou Expressly Waived Any Claim Against the Bank Including All Claims in Counts I, IV, VII, VIII, IX, and X.</u>

Mr. Petrou may not now bring this lawsuit against the Bank because he has

already waived any rights he may have had against the Bank.  Mr. Petrou expressly

agreed that "Guarantor further waives and <u>agrees not to assert or claim at any time any</u>

<u>deductions to the amount guaranteed under this Guaranty for any claim</u> of setoff,

counterclaim, counter demand, recoupment, or similar right, whether such claim, demand

or right may be asserted by the Borrower, the Guarantor, or both. [emphasis supplied]"

Petrou Guaranty, p. 2.  Therefore, even if Mr. Petrou had any claims as he asserts, he

expressly waived them and may not bring them against the Bank now.

<div align="center">IV.  CONCLUSION</div>

The legal relationship between Mr. Petrou and the Bank is governed entirely by

the Loan Documents.  Mr. Petrou breached the Loan Documents.  Mr. Petrou is liable to

the Bank for his breach of the Loan Documents.  The Bank has fully performed its

obligations pursuant to the Loan Documents.  The Bank is not liable to Mr. Petrou for its

performance of the Loan Documents pursuant to their terms.

WHEREFORE, Defendant/Counter-Plaintiff/Cross-Defendant Carrollton Bank

respectfully requests judgment against Plaintiff and in favor of Carrollton Bank as to

Counts I, IV, VII, VIII, IX, and X of Plaintiff's Amended Complaint, and such other and

further relief as this Court may deem just and proper.

Respectfully submitted,

   /s/  Janet L. Eveland                              .
Janet L. Eveland, Esquire
DC Bar #370611
Law Offices of Janet L. Eveland, Chartered
10320 Little Patuxent Parkway, Suite 311
Columbia, Maryland  21044
301-621-4722
Attorney for Defendant, Carrollton Bank

### CERTIFICATE OF SERVICE

I hereby certify, that a copy of the foregoing Motion and Memorandum of Points

and Authorities of Defendant Carrollton Bank for Summary Judgment as to All Counts I,

IV, VII, VIII, IX, and X of the Amended Complaint, Statement of Undisputed Material

Facts in Support of Motion of Defendant Carrollton Bank for Summary Judgment,

Affidavit of Robert Altieri, Affidavit of Steven Eisner, and Exhibits A through Y was

served electronically pursuant to the Court's Electronic Mail Notice List and was mailed,

postage pre-paid, this 18th day of May, 2007 to:

> Andrew M. Dansicker, Esq.
> Schulman, Treem, Kaminkow, Gilden & Ravenell, PA
> Suite 1800, World Trade Center
> 401 East Pratt Street
> Baltimore, Maryland  21202

   /s/ Janet L. Eveland                .
Janet L. Eveland, Esq.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DAVID M. PETROU,                          :
                                          :
            Plaintiff/Counter-Defendant,  :
                                          :
      v.                                  :      1:06-CV-02159-GK
                                          :      (No event currently scheduled)
CARROLLTON BANK, et al.                   :
                                          :
            Defendants/Counter-Plaintiff/:
            Cross-Plaintiff               :

STATEMENT OF UNDISPUTED MATERIAL
FACTS IN SUPPORT OF MOTION OF DEFENDANT CARROLLTON BANK
FOR SUMMARY JUDGMENT AS TO COUNTS I, IV, VII, VIII,
IX, AND X OF THE AMENDED COMPLAINT

Defendant/Counter-Plaintiff Carrollton Bank, by and through counsel,

respectfully represents the following statement of undisputed material facts:

1.      Carrollton Bank ("The Bank") is a Maryland corporation and a federally

insured financial institution.  Affidavit of Robert Altieri (hereinafter "Altieri Affidavit")

¶1.

2.      Eisner Petrou & Associates, Inc ("EPA") is a Maryland corporation with a

principal place of business in Baltimore, Maryland.  Plaintiff's Amended Complaint for

Damages and Declaratory and Injunctive Relief filed herein on or about February 16,

2007 (hereinafter "Complaint") Complaint, ¶ 4.

3.      Eisner Communications, Inc ("EC") is a Maryland corporation with a

principal place of business in Baltimore, Maryland.  Complaint, ¶ 5.

4.      From 1999 to the present EPA has been a customer of Carrollton Bank

and has entered into various secured loan agreements with the Bank.  Altieri Affidavit,

¶10-11.

5.      On or about October 28, 2002, the Bank sent a commitment letter to EPA regarding a commercial revolving line of credit in the amount of $350,000.00.  Altieri Affidavit, ¶ 14.

6.      Effective October 31, 2002, EPA, by defendant Steven Eisner ("Mr. Eisner") as its Chairman and CEO and plaintiff David Petrou ("Mr. Petrou") as its President and COO, executed a Corporate Resolution to Borrow/Grant Collateral/Subordinate Debt.  Altieri Affidavit, ¶ 18, Exhibit C.

7.      Effective October 31, 2002, EPA executed a Promissory Note in the amount of $350,000.00.  Altieri Affidavit , ¶ 17, Exhibit B.

8.      Effective October 31, 2002 Mr. Petrou executed a Commercial Guaranty guaranteeing the obligation of EPA to the Bank in full.  Altieri Affidavit , ¶ 19, Exhibit D ("Petrou Guaranty").

9.      Effective October 31, 2002 Mr. Petrou and EPA executed a Subordination Agreement which required the Bank to be repaid in full before EPA would repay any obligation to Mr. Petrou.  Altieri Affidavit , ¶ 20, Exhibit E ("Petrou Subordination").

10.      Effective October 31, 2002 Mr. Eisner executed a Commercial Guaranty guaranteeing the obligation of EPA to the Bank in full.  Altieri Affidavit , ¶ 25, Exhibit J ("Eisner Guaranty").

11.      Effective October 31, 2002 EC and EPA executed a Subordination Agreement which required the Bank to be repaid in full before EPA would repay any obligation to EC.  Altieri Affidavit , ¶ 21, Exhibit F ("EC Subordination").

12.      Effective October 31, 2002 EPA and the Bank executed a Business Loan Agreement.  Altieri Affidavit , ¶ 24, Exhibit I ("Loan Agreement").

13.     Effective October 31, 2002 EPA and the Bank executed a Commercial Security Agreement.    Altieri Affidavit , ¶ 26, Exhibit K ("Security Agreement").

14.     Effective October 31, 2002, EPA executed a Notice of Insurance Requirements notifying its insurance agent to provide proof of the required insurance coverage to the Bank.  Altieri Affidavit , ¶ 27, Exhibit L.

15.     Effective October 31, 2002, EPA executed a Disbursement Request and Authorization requesting that the Loan amount of $350,000 be made available for disbursement to EPA.  Altieri Affidavit , ¶ 28, Exhibit M.

16.     Effective October 31, 2002, EPA, Mr. Petrou individually and Mr. Eisner individually executed a Notice of Final Agreement acknowledging their guaranty obligations and all of the loan documents.  Altieri Affidavit , ¶ 29, Exhibit N.

17.     Effective October 31, 2002, Mr. Petrou executed a Deed of Trust in the real property commonly known as 2810 R Street, Northwest, Washington, D.C.  20007 ("The Property").  Altieri Affidavit , ¶ 30, Exhibit O (the "2002 Deed of Trust").

18.     Effective October 31, 2002 Mr. Petrou executed an Agreement to Provide Insurance agreeing to insure the Property.  Altieri Affidavit , ¶ 22, Exhibit G.

19.     Effective October 31, 2002 Mr. Petrou executed a Notice of Insurance Requirements notifying his insurance agent to provide proof of the required insurance coverage to the Bank.  Altieri Affidavit , ¶ 23, Exhibit H.

20.     The Bank forwarded the 2002 Deed of Trust to its servicer for recordation with the Recorder of Deeds of the District of Columbia but it was lost and not recorded. Altieri Affidavit , ¶31.  The  Bank asked Mr. Petrou to execute a replacement deed of trust.  Altieri Affidavit , ¶31.

21.     In response to the Bank's request for a replacement Deed of Trust, the Bank received a letter dated October 15, 2003 from Mr. Petrou asking the Bank to forego its right to a replacement deed of trust.  Altieri Affidavit, ¶32, Exhibit P.

22.     The Bank declined to forego its right to a replacement deed of trust.  By letter dated October 21, 2003 the Bank required Mr. Petrou to execute a replacement deed of trust or the Bank would demand immediate payment of the EPA Loan.  Altieri Affidavit, ¶33, Exhibit Q.

23.     The Bank received a letter from Mr. Petrou dated October 23, 2003 enclosing an original executed replacement deed of trust (the "2003 Deed of Trust"). Altieri Affidavit, ¶34-35, Exhibits R and S.

24.     The Bank did not select the notary for the attestation to the 2003 Deed of Trust.  Altieri Affidavit, ¶36.

25.     The 2003 Deed of Trust was recorded with the District of Columbia Recorder of Deeds.   Altieri Affidavit, ¶37.

26.     The new Deed of Trust was notarized by Sandy R. Gorton, who was during the period from April 15, 1996 to April 14, 2006, a notary of the District of Columbia.  Certified Copy of Secretary of District of Columbia certification of notary status, attached hereto as Exhibit Y.

27.     Effective October 28, 2003, EPA executed a Change in Terms Agreement changing the maturity date of the loan to December 31, 2003.  Altieri Affidavit, ¶38, Exhibit T ("Change in Terms 1").

28.     Effective December 31, 2003, EPA executed a Change in Terms Agreement changing the maturity date to "payable on demand."  Altieri Affidavit, ¶39, Exhibit U ("Change in Terms 2").

29.     The Bank was not aware that Mr. Petrou believed that Mr. Eisner had breached his fiduciary duty to EPA by withholding funds of EPA owed to EPA by EC. Altieri Affidavit, ¶41.

30.     Mr. Petrou did not inform the Bank that Mr. Petrou believed that Mr. Eisner had breached his fiduciary duty to EPA by withholding funds of EPA owed to EPA by EC.  Altieri Affidavit, ¶42.

31.     On or about August 31, 2004 Mr. Petrou executed an Operating and Retirement Agreement (the "Retirement Agreement").  Eisner Affidavit, ¶3, Exhibit A. The Retirement Agreement provided that Mr. Petrou would resign as a director of EPA, would remain as president of EPA until July 31, 2005 at an annual salary of $175,000 plus a "royalty" and benefits, and would transfer all of the voting rights of his stock to EC.  Mr. Petrou specifically retained the right to monitor financial matters relevant to EPA's payments to the Bank and the right to receive quarterly balance sheets, income statements, and cash flows from EPA.

32.     The Bank was not aware that Mr. Petrou executed an Operating and Retirement Agreement with EPA.  Altieri Affidavit, ¶43.

33.     Mr. Petrou did not inform the Bank that Mr. Petrou had executed an Operating and Retirement Agreement with EPA.  Altieri Affidavit, ¶44.

34.     The Bank did not know when Mr. Petrou ceased being the president of EPA.  Altieri Affidavit, ¶45.

35.     Mr. Petrou did not inform the Bank that he ceased being president of EPA. Altieri Affidavit, ¶46.

36.     From November, 2002 to October, 2006 EPA made payments to the Bank pursuant to the Loan Documents.  Altieri Affidavit, ¶47.

37.     On November 20, 2006 the Bank sent a demand letter to EPA, Mr. Eisner, and Mr. Petrou.  Altieri Affidavit, ¶39, Exhibit V.

38.     On January 30, 2007 the Bank received a check in the amount of $9,000.00 which was applied to the EPA Loan and has received no other payments since October, 2006.  Altieri Affidavit, ¶49-50, Exhibit W.

39.     The Bank was informed that EPA was out of business.  Altieri Affidavit, ¶51.

40.     The Bank has no knowledge of any accounts receivable which are the property of EPA.  Altieri Affidavit, ¶52.

41.     EPA's bank account with Carrollton Bank had a negative balance as of November 1, 2006 and the Bank closed said account.  Altieri Affidavit, ¶53.

42.     The Bank may have some used furniture and computers which were the property of EPA but believes that the value of this used furniture and equipment is less than the storage costs incurred to date.  Altieri Affidavit, ¶54-57.

43.     Other than the used office furniture and computers which may have been the property of EPA, the Bank is not aware of any other property of EPA.  Altieri Affidavit, ¶58-59.

44.    The Bank did not communicate with any person or agree with any person to move, retitle, reduce, reallocate, transfer, or minimize any asset of EPA.  Altieri Affidavit, ¶60.

45.    The Bank was not aware that Mr. Petrou was seeking an accounting from EPA or that he could not obtain an accounting from EPA.  Altieri Affidavit, ¶61.

46.    The Bank did not communicate with any other person regarding any request by Mr. Petrou to EPA to obtain an accounting.  Altieri Affidavit, ¶62.

47.    Mr. Petrou did not contact the Bank to ask for an accounting or any other information regarding the status of the loan to EPA or the collateral before filing this lawsuit. Altieri Affidavit, ¶63.

48.    EPA did not remove Mr. Petrou from the Bank's records as an authorized representative of EPA for purposes of the EPA Loan.  Altieri Affidavit, ¶64.

49.    The Bank never had control over the cash flow, checks, or payments made to others from the bank accounts of EPA.  Altieri Affidavit, ¶65.

50.    The Bank took deductions from EPA's bank accounts only by written authorizations from EPA and only for purposes of payments made on the Loan.  Altieri Affidavit, ¶66.

51.    The Bank did not monitor the income or expenses of EPA and had no knowledge of them other than as periodically reported by EPA to Carrollton Bank. Altieri Affidavit, ¶67.

52.    Carrollton Bank had no obligation to monitor the income or expenses of EPA. Altieri Affidavit, ¶68.

53.     The last periodic report of EPA income and expenses which Carrollton

Bank received from EPA was for the partial year 2004 to May, 2004.  Altieri Affidavit,

¶69.

54.     The Bank did not withhold any payments due to EPA and was not

obligated to make any payments to EPA.  Altieri Affidavit, ¶70.

55.     The Bank does not have any audited, complete or accurate financial

accounting of EPA's business, services, revenues or activities.  Altieri Affidavit, ¶71.

56.     The Bank does not have any employment records or related financial

records of EPA which would show which services may have been performed or for which

customers.  Altieri Affidavit, ¶72.

57.     The total amount currently due from Plaintiff pursuant to the Agreement is

$356,352.71, plus reasonable attorneys fees and costs. Altieri Affidavit, ¶73, Exhibit X.

Respectfully submitted,


        /s/  Janet L. Eveland                          .
Janet L. Eveland, Esquire
DC Bar #370611
Law Offices of Janet L. Eveland, Chartered
10320 Little Patuxent Parkway, Suite 311
Columbia, Maryland  21044
Telephone:  301-621-4722
Fax:          410-772-8988
Counsel for Defendant/Counter-Plaintiff/
Cross-Plaintiff, Carrollton Bank

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DAVID M. PETROU,                         :

      Plaintiff/Counter-Defendant,  :
                          :

      v.                    :     1:06-CV-02159-GK
                          :     (No event currently scheduled)
CARROLLTON BANK, et al.       :

      Defendants/Counter-Plaintiff/:
      Cross-Plaintiff/Cross-     :
      Defendants             :

## AFFIDAVIT OF STEVEN EISNER

Steven Eisner, being duly sworn, deposes and says that:

1.      I am an adult over the age of 18 years.

2.      I was the Chief Executive Officer and President of Eisner Communications, Inc.

("EC"), a Maryland corporation.

3.      In my capacity as CEO and President of EC I executed the Operating and

Retirement Agreement, copies of relevant portions of which are attached hereto as Exhibit A.

4.      Exhibit A is a true and accurate copy of relevant portions of the original

Operating and Retirement Agreement and Employment Agreement executed by me as CEO and

President of EC.

I solemnly affirm under the penalties of perjury that the contents of the foregoing

affidavit are true.

                             _____
                             Steven Eisner

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DAVID M. PETROU,                 :

        Plaintiff              :

v.                        :       Civil Case No. 1:06CV02159

CARROLLTON BANK, et al.    :

        Defendants      :

## AFFIDAVIT OF ROBERT ALTIERI

Robert Altieri, being duly sworn, deposes and says that:

1.     I am the President of Carrollton Bank ("Carrollton Bank" or the "Bank"), a

Maryland corporation and a federally insured financial institution.

2.     I am an adult over the age of 18 years.

3.     I have been authorized by the Bank to make this affidavit regarding the books and

records of the Bank.

4.     I submit this affidavit in support of Motion of Defendant Carrollton Bank for

Summary Judgment as to Counts I, IV, VII, VIII, IX, and X of the Amended Complaint.

5.     I took all of the actions recited in this Affidavit and authorized the actions of Bank

employees as an authorized representative of the Bank.

6.     In my capacity as president I am in overall charge of the books and records of the

Bank.

7.     In my capacity of President of the Bank I am familiar with the books and records

of the Bank as they pertain to its customer Eisner Petrou & Associates, Inc. ("EPA") and its

personal guarantors Steven Eisner ("Mr. Eisner") and David Petrou ("Mr. Petrou").

8.    I also have personal knowledge of the transactions between EPA, Mr. Eisner, Mr. Petrou, and the Bank.

9.    All of the documents attached hereto are documents maintained in the ordinary course of the Bank's business.

10.    In 1999 EPA approached me, as agent of Carrollton Bank, to obtain a loan from the Bank for EPA's business use.

11.    From 1999 to 2003 the Bank entered into a series of loan agreements with EPA. In 1999 the total principal loan amount was $200,000. In 2000 the total principal loan amount was $250,000. In 2001 the total principal loan amount was $250,000 line of credit and EPA also had a $100,000 five-year term loan.

12.    From 1999 to 2002 EPA's financial condition was declining.

13.    In 2002 when EPA approached the Bank to extend and consolidate the $250,000 line of credit and $100,000 term loan, the Bank declined to extend the loan unless Mr. Petrou personally guaranteed the loan and secured his guarantee with his house.

14.    The Bank sent EPA a loan commitment letter setting forth its conditions for a loan in 2002.

15.    EPA, Mr. Eisner and Mr. Petrou agreed to the terms presented in the commitment letter and the Bank prepared loan documents reflecting the terms of the commitment letter as modified by the agreement of the parties.

16.    From my personal experience with EPA, Mr. Petrou and Mr. Eisner from 1999 to 2007 I am familiar with the signatures and handwriting of Mr. Petrou and Mr. Eisner.

<div align="right">
Affidavit of Robert Altieri<br>
Page 2 of 9
</div>

17.     The Promissory Note, a copy of which is attached hereto as Exhibit B, is a true and accurate copy of the original Promissory Note executed by EPA.

18.     The Corporate Resolution to Borrow/Grant Collateral/Subordinate Debt, a copy of which is attached hereto as Exhibit C, is a true and accurate copy of the original Corporate Resolution to Borrow/Grant Collateral/Subordinate Debt executed by EPA.

19.     The Commercial Guaranty, a copy of which is attached hereto as Exhibit D (the "Petrou Guaranty"), is a true and accurate copy of the original Commercial Guaranty executed by Mr. Petrou.

20.     The Subordination Agreement, a copy of which is attached hereto as Exhibit E ("Petrou Subordination"), is a true and accurate copy of the original Petrou Subordination executed by Mr. Petrou.

21.     The Eisner Communications, Inc. ("EC") Subordination Agreement, a copy of which is attached hereto as Exhibit F (the "EC Subordination"), is a true and accurate copy of the original EC Subordination executed by EC.

22.     The Agreement to Provide Insurance, a copy of which is attached hereto as Exhibit G, is a true and accurate copy of the original Agreement to Provide Insurance executed by Mr. Petrou.

23.     The Notice of Insurance Requirements, a copy of which is attached hereto as Exhibit H, is a true and accurate copy of the original Notice of Insurance Requirements executed by EPA.

24.     The Business Loan Agreement, a copy of which is attached hereto as Exhibit I ("Loan Agreement"), is a true and accurate copy of the original Loan Agreement executed by

EPA.

25.     The Eisner Commercial Guaranty, a copy of which is attached hereto as Exhibit J

("Eisner Guaranty"), is a true and accurate copy of the original Eisner Guaranty executed by Mr.

Eisner.

26.     The Commercial Security Agreement, a copy of which is attached hereto as

Exhibit K ("Security Agreement"), is a true and accurate copy of the original Security Agreement

executed by EPA.

27.     The Agreement to Provide Insurance, a copy of which is attached hereto as

Exhibit L, is a true and accurate copy of the original Agreement to Provide Insurance executed by

EPA.

28.     The Disbursement Request and Authorization, a copy of which is attached hereto

as Exhibit M, is a true and accurate copy of the original Disbursement Request and Authorization

executed by EPA.

29.     The Notice of Final Agreement, a copy of which is attached hereto as Exhibit N,

is a true and accurate copy of the original Notice of Final Agreement executed by Mr. Petrou, Mr.

Eisner, EPA, and the Bank.

30.     The Deed of Trust secured by the real property commonly known as 2810 R

Street, Northwest, Washington, D.C., a copy of which is attached hereto as Exhibit O (the "2002

Deed of Trust"), is a true and accurate copy of the original 2002 Deed of Trust executed by Mr.

Petrou .

31.     The Bank sent the 2002 Deed of Trust to a mortgage servicer for recordation and

the 2002 Deed of Trust was lost prior to recordation.  The Bank asked Mr. Petrou to execute a

replacement deed of trust.

32.      In response to the Bank's request for a replacement Deed of Trust, the Bank received a letter dated October 15, 2003 from Mr. Petrou, a true and accurate copy of which is attached hereto as Exhibit P.  Mr. Petrou's letter asked the Bank to forego its right to a replacement deed of trust.

33.      The Bank declined to forego its right to a replacement deed of trust.  By letter dated October 21, 2003 the Bank required Mr. Petrou to execute a replacement deed of trust or the Bank would demand immediate payment of the EPA Loan.  A true and accurate copy of the file copy of the October 21, 2003 Bank letter to Mr. Petrou is attached hereto as Exhibit Q.

34.      In October, 2003 the Bank received a letter from Mr. Petrou dated October 23, 2003 and enclosing an original executed replacement deed of trust (the "2003 Deed of Trust").  A true and accurate copy of this letter is attached hereto as Exhibit R.

35.      A true and accurate copy of the 2003 Deed of Trust is attached hereto as Exhibit S.

36.      The Bank did not select the notary for the attestation to the 2003 Deed of Trust.

37.      I instructed that the 2003 Deed of Trust be recorded and the 2003 Deed of Trust was recorded with the District of Columbia Recorder of Deeds.

38.      The Change in Terms Agreement dated October 28, 2003, a copy of which is attached hereto as Exhibit T ("Change in Terms 1"), is a true and accurate copy of the original Change in Terms 1 signed by EPA.

39.      The Change in Terms Agreement dated December 31, 2003 a copy of which is attached hereto as Exhibit U ("Change in Terms 2"), is a true and accurate copy of the original

Change in Terms 2 signed by EPA, Mr. Eisner and Mr. Petrou.

40.     All of the documents referenced in paragraphs 17 to 39 of this Affidavit are hereinafter referred to all together as the "Loan Documents".

41.     The Bank was not aware that Mr. Petrou believed that Mr. Eisner had breached his fiduciary duty to EPA by withholding funds of EPA owed to EPA by EC.

42.     Mr. Petrou did not inform the Bank that Mr. Petrou believed that Mr. Eisner had breached his fiduciary duty to EPA by withholding funds of EPA owed to EPA by EC.

43.     The Bank was not aware that Mr. Petrou executed an Operating and Retirement Agreement with EPA.

44.     Mr. Petrou did not inform the Bank that Mr. Petrou had executed an Operating and Retirement Agreement with EPA.

45.     The Bank did not know when Mr. Petrou ceased being the president of EPA.

46.     Mr. Petrou did not inform the Bank that he ceased being president of EPA.

47.     From November, 2002 to October, 2006 EPA made payments to the Bank pursuant to the Loan Documents.

48.     On November 20, 2006 the Bank sent a demand letter to EPA, Mr. Eisner, and Mr. Petrou, a true and accurate copy of which is attached hereto as Exhibit V.

49.     On January 30, 2007 the Bank received a check in the amount of $9,000.00, a true and accurate copy of which is attached hereto as Exhibit W, which amount was applied to the EPALoan.

50.     The Bank has received no payments for the EPA Loan since October, 2006 other than the $9,000 check attached hereto as Exhibit W.

51.    The Bank was informed that EPA was out of business.

52.    The Bank has no knowledge of any accounts receivable which are the property of
EPA.

53.    EPA's bank account with Carrollton Bank had a negative balance as of November
1, 2006 and the Bank closed said account.

54.    The Bank has been informed and therefore believes that it may have fewer than
ten (10) used desks and five (5) used computers of EPA which were on the EC premises and
which were obtained with office furniture of EC when the Bank obtained it from EC. Any
furniture and computers of EPA were not separated or separately identified from any office
furniture of EC. The Bank does not know which office furniture may be the property of EPA.

55.    The Bank is an experienced lender familiar with collateral consisting of used used
office furniture and computers.

56.    The Bank believes that used office furniture and computers such as that obtained
by the Bank from the EC premises and now in the possession and control of the Bank has little
value and that the fewer than ten (10) desks and five (5) computers which may be the property of
EPA in the Bank's possession have a value less than $2,000.

57.    The Bank is paying to store all of the used office furniture and computers in its
possession and is incurring monthly storage charges. Any storage charges attributable to any
property of EPA being held in storage will increase the amount of the EPA Loan due to the Bank.

58.    Other than the used office furniture and computers which may be the property of
EPA, the Bank has no assets of EPA in its possession or control.

59.    The Bank is not aware of any assets of EPA other than the used furniture and used

computers which may be the property of EPA.

60.     The Bank did not communicate with any person or agree with any person to move, retitle, reduce, reallocate, transfer, or minimize any asset of EPA.

61.     The Bank was not aware that Mr. Petrou was seeking an accounting from EPA or that he could not obtain an accounting from EPA.

62.     The Bank did not communicate with any other person regarding any request by Mr. Petrou to EPA to obtain an accounting.

63.     Mr. Petrou did not contact me or the Bank to ask for an accounting or any other information regarding the status of the loan to EPA or the collateral before filing this lawsuit.

64.     EPA did not remove Mr. Petrou from the Bank's records as an authorized representative of EPA for purposes of the EPA Loan.

65.     The Bank never had control over the cash flow, checks, or payments made to others from the bank accounts of EPA.

66.     The Bank took deductions from EPA's bank accounts only by written authorizations from EPA and only for purposes of payments made on the Loan.

67.     The Bank did not monitor the income or expenses of EPA and had no knowledge of them other than as periodically reported by EPA to Carrollton Bank.

68.     Carrollton Bank had no obligation to monitor the income or expenses of EPA.

69.     The last periodic report of EPA income and expenses which Carrollton Bank received from EPA was for the partial year 2004 to May, 2004.

<div align="right">Affidavit of Robert Altieri<br>Page 8 of 9</div>

70.    The Bank did not withhold any payments due to EPA and was not obligated to make any payments to EPA.

71.    The Bank does not have any audited, complete or accurate financial accounting of EPA's business, services, revenues or activities.

72.    The Bank does not have any employment records or related financial records of EPA which would show which services may have been performed or for which customers.

73.    The total amount currently due from Plaintiffs pursuant to the Agreement is $356,352.71, plus reasonable attorneys fees and costs, calculated as per the accounting attached hereto as Exhibit X.

I solemnly affirm under the penalties of perjury that the contents of the foregoing affidavit are true.

_____
Robert Altieri, President

# EXHIBIT
# A

# EISNER COMMUNICATIONS, INC.

Operating and Retirement Agreement
by and among
Eisner Communications, Inc.
Eisner Petrou & Associates, Inc.
and David Petrou

August 31, 2004

# EISNER COMMUNICATIONS, INC.
### a Maryland corporation

### OPERATING AND RETIREMENT AGREEMENT DATED AUGUST 31, 2004, BY AND AMONG EISNER COMMUNICATIONS, INC., A MARYLAND CORPORATION, EISNER PETROU & ASSOCIATES, INC., A MARYLAND CORPORATION, AND DAVID PETROU

### August 31, 2004

**Document Description**                                                                                          **Tab No.**

Operating and Retirement Agreement dated August 31, 2004,
by and among Eisner Communications, Inc., Eisner Petrou & Associates, Inc.
and David Petrou..................................................................................................................................1

Resignation of David Petrou dated August 31, 2004....................................................................2

Resignation and Release of John Petrou dated August 31, 2004.....................................................3

Resignation of Brad Spencer dated August 31, 2004 ...................................................................4

Employment Agreement dated August 31, 2004 by and between
Eisner Petrou & Associates, Inc. and David Petrou........................................................................5

Irrevocable Proxy dated August 31, 2004 by David Petrou ...........................................................6

Phantom Agreement dated dated August 31, 2004, by and among
Eisner Communications, Inc., Eisner Petrou & Associates, Inc. and David Petrou........................7

Unanimous Written Consent of the Board of Directors of
Eisner Petrou & Associates, Inc. dated August 31, 2004 .............................................................8

Stock Power – Assignment Separate from Certificate
dated August 31, 2004 by David Petrou .....................................................................................9

Eight Thousand (8,000) shares of Common Stock of Eisner Petrou & Associates, Inc.
held in the name of David Petrou, represented by the following: ..................................................10

>    Certificate No. 3 dated December 20, 1989 evidencing 1,000 shares of Common Stock
>    Certificate No. 4 dated December 20, 1989 evidencing 1,000 shares of Common Stock
>    Certificate No. 5 dated December 20, 1989 evidencing 6,000 shares of Common Stock

## OPERATING AND RETIREMENT AGREEMENT

THIS OPERATING AND RETIREMENT AGREEMENT (this "Agreement") is made as of the 31st day of August, 2004, by and among EISNER COMMUNICATIONS, INC., a Maryland corporation ("EC"), EISNER PETROU & ASSOCIATES, INC., a Maryland corporation ("EPA"), and DAVID PETROU, an individual resident of the District of Columbia ("DP").

## RECITALS

WHEREAS, EPA, has an office at 927 Fifteenth Street, NW, Suite 900 Washington, D.C. 20005 (the "Washington, D.C. Property"), and an office within the space occupied by EC, located at 509 South Exeter Street, Baltimore, Maryland 21202 (the "Baltimore Office"), and EPA is a public relations agency specializing in marketing communications services; and

WHEREAS, EC owns 8,000 shares of common stock, par value $1.00 per share ("Common Stock"), of EPA and DP owns 8,000 shares of Common Stock (the "DP Shares"), which shares represent all of the issued and outstanding capital stock of EPA; and

WHEREAS, DP has been responsible for the day-to-day business and operations of EPA for a period of years and now desires to make arrangements leading to and concluding with his retirement from the business, and the parties hereto desire to enter into this Agreement to govern the terms of operations during the period commencing on the date hereof and ending on the Exercise Date (as defined herein); and

WHEREAS, EC desires to obtain an option to purchase, and DP desires to grant EC an option to purchase, all of the DP Shares on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises and covenants set forth herein, and for other good and sufficient consideration, the sufficiency and receipt of which is hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## TERMS OF OPERATIONS AMONG THE PARTIES

1.01    Resignation as Officers of EPA.  Immediately upon and concurrent with the execution and delivery of this Agreement (the "Effective Time"), DP shall, and DP shall cause John Petrou, a director of EPA, and any and all other directors and officers of EPA (with the exception of Steven C. Eisner ("SE")) to, resign their respective positions as officers and members of the Board of Directors of EPA, except insofar as DP shall remain as "President" of EPA, as herein provided.

1.02    Cancellation of Indebtedness. At the Effective Time, certain indebtedness owed by EPA to DP and JP in the aggregate principal amount of $200,000, together with any and all accrued and unpaid interest, charges and fees, shall be cancelled and DP shall cause JP and any other directors of EPA (other than SE) to release EPA, EC and SE from any and all claims, demands or liabilities relative to EPA. Consistent with the foregoing and Section 1.01 above, at the Effective Time, DP shall deliver a Resignation Letter in the form attached hereto as Exhibit A, and DP shall agree to the provisions of Section 7.02 below (which provides for the release of the aforesaid indebtedness) and cause JP and each of the other EPA directors (other than SE) to deliver a Resignation and Release, in the form attached hereto as Exhibit B-1 and B-2, respectively (collectively, the "Director Releases"). At the Effective Time, that certain indebtedness owed by EPA to EC in the aggregate principal amount of $100,000, together with all accrued and unpaid interest, charges and fees, shall be and hereby is cancelled and discharged, and EPA is hereby fully and forever released and discharged from any and all obligations in respect thereof. At such time as the release of Stephen Blum is fully-executed and delivered to EC pursuant to Section 1.03 below, EPA shall pay to DP the sum of $20,000 in full satisfaction of the loan made from DP to EPA on June 14, 2004, and DP shall use such funds to repay the credit facility for which such funds were borrowed by DP so that the funds could be reloaned to EPA.

1.03    Termination of Certain Employees of EPA. DP, as President of EPA, shall cause its accounting staff positions to be eliminated and to that end shall cause the employment of Stephen Blum, Chief Financial Officer of EPA ("Blum"), and Kelly Hoyle, Assistant to the Chief Financial Officer ("Hoyle") to terminate on or before August 31, 2004. In addition, DP shall cause EPA to enter into a Retirement Agreement with Mr. Blum in the form attached hereto as Schedule 1.03.

1.04    Employment of DP. As of the Effective Time, DP and EPA shall enter into that certain Employment Agreement (the "Employment Agreement") substantially in form of Exhibit C attached hereto, pursuant to which DP will remain as "President" of EPA for the period therein provided.

1.05    Washington, D.C. Property. As of the Effective Time, DP shall cause (i) the lease previously existing relative to the Washington, D.C. Property (the "Prior Lease") to be terminated; and (ii) EPA to be relieved of all further obligations under the Prior Lease. EPA agrees that it will make available the sum of (in the aggregate, the "Monthly Amount") $1,500 per month, plus the monthly out of pocket costs actually incurred by EPA (i) to maintain its current Washington, DC telephone and facsimile numbers at the subleased premises within the Washington, DC Property, consistent with past practices, and (ii) for other expenses reasonably incurred and necessary to the conduct of business at this office, including the cost of DSL internet access fees, cellular telephone, one car phone and one copier (the items identified under this clause (ii) not to result in the incurrence of additional costs in excess of $400.00 per month unless reasonably justified as necessary for the conduct of EPA business), commencing with the month of August, 2004 and continuing through and including July, 2005, to be applied toward the payment of the costs associated with the maintenance and operation of office facilities in Washington, D.C. to serve as the base of operations for EPA and DP during the term of his

service and in his capacity as "President" of EPA pursuant to the Employment Agreement (the "Washington, D.C. Base of Operations"). EPA's obligations under this Section 1.05 shall, however, in any event be limited to the payment of not more than the Monthly Amount, and only for so long as DP continues to maintain his status as "President" EPA under the Employment Agreement, and shall be conditioned upon the continued cooperation by DP in allowing EPA and EC to identify whatever premises serves as the Washington, D.C. Base of Operations as an additional address for each of EPA and EC. EPA shall have no further or additional obligations in respect of the maintenance or operation of any base of operations in Washington, D.C., except as expressly provided above in this Section 1.05, and by way of example and without limitation, EPA shall have no obligation to staff, provide supplies for, or to provide telephone or other utilities to or for the benefit of any such base of operations. Any portion of the Monthly Amount not applied toward the establishment or maintenance of the Washington, D.C. base of operations (the "Excess Amount") shall be available for payment to DP as reimbursement for expenses incurred by him in the performance of his duties under and as provided in the Employment Agreement.

1.06    Hiring of New EPA Personnel. During the period (the "Interim Period") commencing with the Effective Time and ending on the date of the earlier to occur of (x) repayment in full of the Carrollton Bank Indebtedness (as hereinafter defined) and (y) release of DP from any and all obligations in respect of the Carrollton Bank Indebtedness (i) EPA may hire additional personnel in response to additional business, consistent with reasonable industry practices and standards; and (ii) EPA shall not materially increase its obligations to third parties other than obligations incurred in the ordinary course and/or relative to new business conducted or to be conducted by EPA.

1.07    Back Office Support/Baltimore Office. During the Interim Period, EC shall provide EPA with accounting and administrative support services, and will allow EPA personnel (other than DP who shall report to the Washington, D.C. Office) to continue to operate at its Baltimore Office (or EC will provide equivalent space in Baltimore, Maryland), and although no payment need or shall be made by EPA to EC during the Interim Period in respect of the costs thereof, EC shall be free to accrue on its books, as an expense receivable due from EPA, a reasonable and customary fee and rental/utility amount therefor (in the aggregate, the "Baltimore Office Obligation"). The payment by EPA of the Baltimore Office Obligation shall not be deemed a Current Liability for purposes hereof, may not and shall not be paid until such time as the Interim Period expires, and shall be deemed part of the Subordinated Obligations provided for in Section 1.10 hereof. Notwithstanding the foregoing, EPA shall be responsible for paying EC's out-of-pocket expenses incurred in connection with the delivery or providing of such accounting and administrative services, and EPA shall reimburse EC for all such out-of-pocket expenses upon receipt of an invoice for such costs, all of which shall be deemed "Current Liabilities".

1.08    Payments of Excess Cash Flow. Commencing on the date of this Agreement and continuing until completion of the Interim Period, all "Excess Cash Flow" of EPA shall be applied as quickly as possible to repay the Carrollton Bank Indebtedness. "Excess

Cash Flow" means the difference between (i) the cash flow generated from the operations of EPA and (ii) Current Liabilities.

"Current Liabilities" means any indebtedness or other obligations owed by EPA that is due within one year from the then current date, but excluding the Carrollton Bank Indebtedness and the Subordinated Obligations. During the Interim Period, EPA shall not make payments on any outstanding indebtedness other than (x) Current Liabilities and (y) as otherwise set forth in this Section 1.08, and without limiting the generality of the foregoing, EPA will not make payment of any portion of the Subordinated Obligations during the Interim Period.

"Carrollton Bank Indebtedness" means that certain indebtedness owed by EPA to Carrollton Bank, a subsidiary of Carrollton Bancorp ("Carrollton Bank"), in the aggregate principal amount of approximately $399,000, which indebtedness is further described on Schedule 1.08 hereto.

Notwithstanding the above, EPA may make payment of Current Liabilities as and when accrued, including those due EC.

1.09    Assurances Regarding Carrollton Bank Indebtedness. EC hereby covenants and agrees to and for the benefit of DP, that EC will cause EPA to comply with the provisions of Sections 1.04, 1.05, 1.06, 1.07 and 1.08 above, as otherwise applicable to EPA, it being the intent and expectation of the parties (based in the case of EC on its current actual knowledge of the facts and circumstances applicable to EPA and in reliance on the representation and warranties made by others pursuant to the provisions of this Agreement) hereto that performance of such provisions, coupled with reasonably successful business operations on the part of EPA going forward, should allow and provide for the Carrollton Bank Indebtedness to be satisfied in full, and for DP to be relieved as a personal guarantor thereof, prior to the expiration of forth-eight (48) full calendar months following the date hereof. Correspondingly, DP covenants and agrees to and for the benefit of EPA and EC that DP will take no action, or fail to take any action within the control of DP and neither EPA nor EC, which has or will have the effect of, or result in the occurrence of, any default or event of default under the documents, instruments or agreements evidencing, guaranteeing and/or securing the Carrollton Bank Indebtedness.

1.10    Subordination of EC Indebtedness. For the benefit of DP and until the expiration of the Interim Period, EC does hereby agree that any obligation, right or claim EC may have against EPA for or in respect of (the "Subordinated Obligations") the Baltimore Office Obligations provided for under Section 1.08 above, shall be subordinated to any obligation, right or claim of (x) Carrollton Bank against EC in respect of the Carrollton Bank Indebtedness, and (y) DP against EC under this Agreement and the Employment Agreement. Without limiting the generality of the foregoing, in no event will the Subordinated Obligations be deemed a Current Liability.

1.11    Funding of EPA Expenses. If EPA determines that it does not have funds sufficient to operate its business in the ordinary course following the date hereof, EC shall first

advance to EPA, on a revolving credit basis, up to $125,000 at any time outstanding (the "EC Obligation") to EPA. EPA will not borrow additional funds from third parties (other than EC) to fund ongoing business operations; provided, however, that EPA shall have the right to borrow from third parties to fund business operations and cash flow needs in excess of the EC Obligation so long as those borrowings do not represent personal obligations of any of the stockholders of EPA, other than EC. In any event, once curtailments are made on the Carrollton Bank Indebtedness as contemplated by Section 1.08, no additional funds will be drawn thereunder (unless Carrollton Bank agrees that neither DP nor, unless he otherwise consents in writing, Steve Eisner has any personal responsibility therefor). In the event EC advances funds to EPA pursuant to this Section 1.11, such advance shall be deemed a Current Liability and shall be repaid in the ordinary course upon the earlier to occur of: (i) 30 days, or (ii) if such advance(s) relates to a specific client project, out of the receivable from such client project.

        1.12    Reporting Requirements.  Commencing on the first fiscal quarter of EPA following the Effective Time and up and to the Exercise Date, EPA shall deliver to each of the parties hereto, within 45 days after the close of such fiscal quarter, an internally prepared balance sheet, income statement, statement of stockholders' equity and statement of cash flows (collectively, the "Quarterly Statements").

## ARTICLE II

## OPTION TO PURCHASE THE DP SHARES

        2.01    Option to Purchase DP Shares.  In consideration for the agreements and undertakings of EC under this Agreement, DP grants to EC an irrevocable, exclusive right and option (the "Option") to purchase the DP Shares for $10.00 (the "Exercise Price"). The Option expires at 5:00 p.m. Maryland time (the "Expiration Time") on December 31, 2008. EC may exercise the Option at any time (the "Exercise Date") prior to the Expiration Time by delivering the Exercise Price, in cash, to DP. As a condition to exercise of the Option, EC will certify in writing to DP that the Interim Period has expired. DP represents, warrants and covenants to EC that as of the Effective Time the DP Shares are, and that on the Exercise Date the DP Shares shall be, free and clear of all title defects, objections, liens, pledges, claims, options, charges, security interests or other encumbrances of any nature whatsoever (collectively, "Encumbrances"). Upon execution and delivery of this Agreement, a stock certificate or certificates representing the DP Shares duly endorsed for transfer or accompanied by properly executed blank stock powers (collectively, the "Escrowed Property") shall be delivered to EC, who shall hold such Escrowed Property until the first to occur of the following: (i) if and in the event that at any time on or prior to June 30, 2007 (the "Expiration Date") EC shall have delivered a written certification to DP to the effect that the Carrollton Bank Indebtedness has been paid in full, together with a check payable to the order of DP, in the amount of Ten Dollars ($10.00) (the "Check"), then the Escrowed Property shall be deemed released from the constraints of this agreement and shall thereupon become the sole and exclusive property of EC; and (ii) in the event that the conditions to the release of the Escrowed Property pursuant to clause (i) above, shall not have been satisfied on or prior to the Expiration Date, then EC shall forthwith

return the Escrowed Property to DP. DP hereby grants to EC a security interest in the Escrowed Property, as collateral for DP's obligations in respect of the Option.

    2.02 <u>Granting of Proxy</u>. DP, as holder of the DP Shares, hereby appoints SE as an agent and proxy of DP, with full power of substitution, to appear at, and, except as set forth below, to vote the DP Shares which DP would be entitled to vote at, any and all meetings of the stockholders of EPA, with all power of DP would possess if personally present, upon any and all matters that may properly come before any such meeting or any adjournment thereof. DP hereby revokes any proxy or proxies heretofore given to vote otherwise with respect to the DP Shares and affirms that this proxy is coupled with an interest and is irrevocable so long as the DP Shares are held by the Escrow Agent, and ratifies and confirms all that the Proxy may lawfully do or cause to be done by virtue hereof. To that end, at the Effective Time, DP is delivering to EC an Irrevocable Proxy in the form attached hereto as <u>Exhibit E</u>.

<div align="center">ARTICLE III</div>

<div align="center">REPRESENTATIONS AND WARRANTIES<br>OF EPA AND DP</div>

    EPA and DP, jointly and severally, represent and warrant to EC and, without reliance in any manner on the representations and warranties of EPA hereunder, DP does hereby separately represent and warrant to EPA, as follows:

    3.01 <u>Organization of EPA; No Subsidiaries</u>.

    (a) EPA is a corporation duly organized, validly existing and in good standing under the laws of the State of Maryland and has the corporate power and authority to carry on its business as now being conducted.

    (b) EPA has no subsidiaries, does not conduct any of its business through any other corporation or affiliate, and is not a participant in any joint venture, partnership or other enterprise with any entity.

    (c) The copies of the Articles of Incorporation and By-Laws of EPA, and all amendments, as delivered to EC prior hereto are true, complete and correct copies thereof.

    3.02 <u>Qualification and Licensing</u>. Set forth on Schedule 3.02 attached hereto (a) is a list of all jurisdictions in which, to the knowledge of each of DP and EPA, EPA is required to be qualified as a foreign corporation in order to conduct its business as currently conducted, and EPA is currently duly qualified in all such jurisdictions, and (b) a list and description of all licenses and permits which, to the knowledge of DP and EPA, are necessary for the operation of EPA's business as currently conducted, and the same are in full force and effect and neither EPA nor DP have received any notice of, nor is there any pending, or, to the knowledge of DP or EPA, any threatened proceeding relating to, the revision, cancellation or termination of any such permits or licenses. The consummation of the transaction contemplated hereby will not adversely affect the validity or continuation of any of the licenses or permits.

The copies of all licenses and permits, and applications therefore, and all amendments, as delivered to EC prior hereto are true, complete and correct copies thereof.

        3.03    Capitalization of EPA. The sole authorized securities of EPA consist of 100,000 shares of Common Stock, of which 16,000 shares of Common Stock are issued and outstanding, of which 8,000 shares are issued and outstanding and owned of record by DP, free and clear of all Encumbrances. All of the DP Shares are duly authorized, validly issued and outstanding, fully paid and nonassessable. There are no outstanding subscriptions, options, warrants or other contracts, commitments or agreements to which EPA or DP is a party or otherwise bound relating to the issuance of additional securities of EPA.

        3.04    Authority of DP and EPA; No Conflict.

        (a)    Each of DP and EPA has full power and authority to execute and deliver this Agreement and to consummate the transaction contemplated hereby.

        (b)    This Agreement is a valid and binding obligation of each of DP and EPA, enforceable against each of DP and EPA in accordance with its terms. The Director Releases are each a valid and binding obligation of the signatories thereto, enforceable in accordance with their respective terms.

        (c)    Upon exercise of the Option in accordance with its terms, EC will acquire good and marketable title to the DP Shares, free and clear of any Encumbrance.

        (d)    Neither the execution and delivery of this Agreement by DP and EPA nor the consummation of the transactions contemplated hereby (i) requires any filing with, or permit, authorization or consent or approval of, any governmental or regulatory authority or any other person or entity except as set forth on Schedule 3.04 attached hereto, or as required under state or federal securities laws, the failure to make or obtain of which would result in a material adverse effect on EPA; (ii) violates or will violate any law, rule, regulation, order, judgment or decree of any court or governmental or regulatory body the violation of which will result in a material adverse effect on EPA; or (iii) violates, breaches or constitutes a default under (whether with or without notice or lapse of time) or will violate, breach or constitute a default under any agreement or other instrument to which EPA or DP is a party or by which it is bound which violation, breach or default will result in a material adverse effect on EPA, except that DP offers no representation or warranty as to the Carrollton Bank Indebtedness.

        3.05    Financial Statements. Attached hereto as Schedule 3.05(a)(1) is a due diligence report prepared by Clifton Gunderson, LLP (the "Gunderson Report"). The Gunderson Report (after application of the adjustments therein contemplated) accurately reflects the financial condition of EPA, on and as of the date reflected therein, in accordance with reasonable accounting principles consistently applied, except as noted in Schedule 3.05(a)(2) hereto. There have been no changes in the financial condition of EPA since the dates reflected in the Gunderson Report, except as reflected in the Financial Statement Update attached hereto as Schedule 3.05(b), which is true, complete and correct in all material respects, and which,

together with the Gunderson Report, truly and accurately reflects the financial condition of EPA on and as of the (the Gunderson Report, as so updated, the "Updated Gunderson Report"), in accordance with reasonable accounting principles consistently applied.

3.06    Assets and Properties. Except as set forth in Schedule 3.06 attached hereto, EPA owns good and marketable title to all of the assets and properties, whether tangible or intangible, used in the operation of its business or necessary for the conduct of its business as presently conducted, free and clear of all Encumbrances.

3.07    Accounts Receivable. Set forth in Schedule 3.07 attached hereto are all of the existing accounts receivable of EPA.

3.08    No Undisclosed Liabilities. EPA has no liabilities or obligations, matured or unmatured, direct or contingent, known or unknown, of any kind or nature whatsoever which individually or in the aggregate are material (defined as not more than $10,000) and not either fully reflected in the Updated Gunderson Report or a consequence of the transactions contemplated hereby. Neither DP nor EPA has against the other any claim or cause of action, nor does either have in favor of the other any liability or obligation, in each case direct or contingent, known or unknown, of any kind or nature whatsoever, which individually or in the aggregate are or would be material, and which are not either fully reflected in the Updated Gunderson Report or a consequence of the transactions contemplated hereby.

3.09    Certain Tax Matters. EPA has timely filed all tax and information returns required by law and has paid all taxes, charges, levies or other assessments (including with respect to income, sales, use, unemployment and other taxes or similar charges, and including all interest or penalties with respect thereto) ("Taxes") due from EPA to any federal, state or local taxing authority, and each such return, when filed, was materially true and correct. Prior hereto, EPA has delivered to EC true, complete and correct copies of all federal, state and local income tax returns which EPA has filed since January 1, 1998. No federal income tax return of EPA has been audited by any taxing authority nor has EPA received any notice of any deficiency, delinquency, assessment or penalty in connection with any tax return that has not been fully resolved and/or paid. All Taxes which EPA is required to withhold or collect have been duly withheld and collected and, to the extent required, paid over to the proper governmental authorities or are currently held in separate bank accounts for such purpose. There are no outstanding agreements or waivers extending the statutory period of limitation applicable to any tax return of EPA for any period.

3.10    Leases. Schedule 3.10 attached hereto sets forth a list of all leases of real or personal property leased by EPA (the "Lessee"), and EPA has heretofore delivered a true and complete copy of each such lease to EC. None of the leases set forth on Schedule 3.10 are currently in default and no notice of intended cancellation or termination of such leases has been received. No consent of or notice to any party is or will be required under any of the Lessees as a result of the change in control of EPA contemplated hereby.

3.11    Customers. To the knowledge of DP, all of the current customers of EPA are identified in Schedule 3.11 hereof, which schedule also sets forth the true and correct amount of fees received by EPA from each such customer for the period indicated. EPA has not received any notice, oral or written, that any customer representing five percent (5%) or more, either individually or in the aggregate, of fees received for the indicated period intend to terminate their relationship with EPA at any time in the future.

3.12    Trademarks and Similar Rights. To the knowledge of DP, EPA owns or is licensed or otherwise has the full right to use all trademarks, service marks and trade names and all copyrights, technology and software which are used in or necessary for the conduct of its business as heretofore conducted and owns and has the exclusive right to use all of its proprietary databases and software. True, complete and correct copies of all registrations, agreements and licenses related to the foregoing have previously been delivered to EC.

3.13    Litigation. Except as set forth on Schedule 3.13, there are no claims, actions, suits, proceedings or investigations pending against or, to the knowledge of any of DP, threatened against, or involving in any way, EPA (including, without limitation, any of its owned or leased properties) or any of its officers, directors, or, to the knowledge of DP, employees or agents, in their capacity as such, nor does DP have any reason to believe there is a valid basis for any such action.

3.14    Insurance. Schedule 3.14 contains an accurate and complete list of all policies of insurance maintained by EPA, and true and correct copies of all such policies have been delivered to EC prior to the date hereof except the cash value life insurance policies on each of DP, which EC acknowledges will be assigned to DP, respectively, as of the Exercise Date. All such policies are in full force and effect, and shall remain in full force and effect through and after the execution of this Agreement.

3.15    Employment Matters.

(a)    Except as set forth on Schedule 3.15 attached hereto, EPA does not maintain or contribute to any pension, profit sharing, thrift or retirement plan; medical, hospitalization, life, disability insurance plan; or any other employee benefit plan or policy (including any policies on officers). To the knowledge of DP, each such plan or policy is in compliance with all applicable laws, except as set forth on Schedule 3.15 hereto. Other than claims for the benefit by employees, beneficiaries or dependents under the disclosed plans or policies arising in the normal course of operation of such plans, no claim is pending or threatened with respect to any plan. All returns required to be filed with any governmental agency with respect to any plan, including returns required by the Department of Labor, have been timely filed, except as set forth on Schedule 3.15 hereto.

(b)    Except as set forth in Schedule 3.15, EPA is not a party to any collective bargaining, employment, consulting, or other similar agreement of any type whatsoever with any person or entity, and is not committed or obligated to enter into any of the foregoing.

MD_DOCS_A #1232975 v6

(c)    A true, correct and complete list of all current EPA employees is attached hereto as Schedule 3.15 and all such employees, as well as all prior employees of EPA, and without limitation each of Blum and Hoyle, are and were at all times employed by EPA as "at will" employees, and EPA is party to no agreement, written or verbal, with either or any of them, regarding their continued employment or termination of employment.

3.16    Contracts.  Schedule 3.16 sets forth, to the knowledge of DP, a complete list of all material contracts, commitments and agreements to which EPA is a party or by which it is bound, and true, complete and correct copies of all such contracts, commitments and agreements have been delivered to EC.

3.17    Compliance with Laws.  The operations of EPA have been conducted in substantial compliance with all applicable laws, rules, regulations and governmental orders, including without limitation, insurance laws and regulations, unless the failure to comply with such applicable laws, rules, regulations and governmental orders, including without limitation, insurance laws and regulations would not have a material adverse effect on EPA, and, except as set forth on Schedule 3.17, neither EPA nor DP has received any notification of any asserted past or present noncompliance in the past five years.

3.18    Records.  The books of account, minute books, stock certificate books and stock transfer ledgers of EPA are complete and correct in all material respects and are being delivered to EC concurrent with the execution and delivery hereof, along with all other records of EPA, including, without limitation, tax records and returns.

3.19    Disclosure.  No representation or warranty by DP in this Agreement and no statement contained in any document, certificate, or other writing furnished or to be furnished by DP to EC or EPA pursuant to the provisions hereof or in connection with the transactions contemplated hereby, contains or will contain any untrue statement of material fact or omits or will omit to state any material fact necessary, in light of the circumstances under which it was made, in order to make the statements herein or therein not misleading.

### ARTICLE IV

### REPRESENTATIONS AND WARRANTIES
### OF EC AND SE

EC, and as respects only Section 4.04 below and to his knowledge and without inquiry, SE, represent and warrant to DP as follows:

4.01    Organization of EC.  EC is a corporation duly organized, validly existing and in good standing under the laws of the State of Maryland and has the corporate power and authority to carry on its business as now being conducted.

4.02    Authority Relative to this Agreement.

(a)    EC has the corporate power and authority to execute and deliver this Agreement and to consummate the transaction contemplated hereby.

(b)    The execution and delivery of this Agreement by EC has been duly authorized by all necessary corporate action on the part of EC.

(c)    This Agreement constitutes the valid and binding agreement of EC enforceable in accordance with its terms.

4.03    Consummation of Transaction. EC is not presently a party to or subject to or bound by any agreement or any judgment, order, writ, injunction or decree of any court or any governmental body that contains any provision which would or could operate to prevent the carrying out of this Agreement or the transactions contemplated hereby. There are no actions, suits or proceedings at law or in equity by any person or entity, or any arbitration or administrative proceedings or other proceeding, pending or threatened against EC which could prevent consummation of the transactions contemplated by this Agreement.

4.04    Accuracy of EPA and DP Representations and Warranties. To the actual knowledge of EC and SE, but without inquiry and without regard to knowledge that might otherwise have been imputed to him as an officer or director of EPA, none of the representations or warranties of EPA or DP contained in Article III above and relating to the business or operations of EPA, are false or misleading in any material respect.

ARTICLE V

ADDITIONAL COVENANTS

5.01    Access to Business. At or promptly following the Effective Time, DP, as resigning director of EPA, shall deliver to EC (or to its nominees assuming positions of management with EPA) full and complete access to the facilities, employees, books and records of EPA heretofore under the control of DP, and shall provide such persons or entities with all information and copies of all documents reasonably requested or required by EC (or its nominees assuming positions of management with EPA) to facilitate a smooth change in operation and control of EPA, including, without limitation, access to financial information and operating data.

5.02    Further Assurances. DP shall use his commercially reasonable efforts to take, or cause to be taken, actions, and to do, or to cause to be done, all things necessary or advisable to consummate and make effective the transactions contemplated hereby, whether such actions are required before or after the Exercise Date.

5.03    Continuation of Right of First Refusal. Until the expiration of the Interim Period, EC will continue to provide to EPA a right of first refusal in respect of public relations work, and EPA will continue to provide to EC a right of first refusal in respect of advertising

work, all as set forth in that certain letter agreement dated July 10, 1988 between EC and DP. Such obligations shall terminate immediately upon expiration of the Interim Period.

        5.04    Repayment of Debts to DP and JP.  Not later than five years from the Effective Time or immediately prior to any sale of EC in its entirety to a third party, EC shall make payment to DP the sum of $9,000 and shall make payment to JP the sum of $25,000.

## ARTICLE VI

### SURVIVAL AND NATURE OF REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION

        6.01    Survival of Representations and Warranties.  All representations, warranties, covenants and agreements made by any party in this Agreement or pursuant hereto shall survive the Effective Time and the Exercise Date hereunder, until the expiration of the applicable statute of limitations, notwithstanding any investigation made by or on behalf of any party prior to the date hereof.

        6.02    Nature of Representations and Warranties.  The representations and warranties made by the respective parties to this Agreement are made hereunder by each to and for the benefit of the other party or parties hereto and to whom or which such representations and warranties are directed; provided, however, that each party does expressly acknowledge and agree that he or it is not relying on the representations, warranties or statements made by any other party, in his or its making the representations and warranties that he or it is making hereunder to the other parties to this Agreement; and DP does further agree that EC shall have the right to pursue him, and not EPA, or to pursue EPA, or both, for any breach or failure of any representation or warranty made by DP hereunder, and that DP shall have no corresponding claim or cause of action against EPA therefor, or as a result or in respect thereof, by way of contribution or otherwise, any and all of which such claims be, and hereby are, released and discharged by DP.

## ARTICLE VII

### PRIOR ARRANGEMENTS

        7.01    Termination.  At the Effective Time, except as expressly provided in Section 5.03 above, the parties hereto do agree that all documents, instruments and agreements between them, relating to the business, affairs or operations of EPA (including any Stockholder Agreements or the like), previously entered into or executed and delivered by and between some or all of them, together with any verbal or other understandings or agreements of similar kind or nature, are hereby terminated. Without limiting the preceding sentence, except as expressly provided in Section 5.03 above, that certain letter agreement dated July 11, 1988, by and between EC and DP is hereby terminated and of no further force or effect. The foregoing shall not, however, serve to release or terminate any agreements to which any of the parties hereto may be party to and which involve or relate to obligations to third parties, or any of the Transaction Documents.

MD_DOCS_A #1232975 v6

7.02    Release by DP. DP, for himself and his heirs, successors, administrators, executors and assigns, does hereby fully release, remise and forever discharge EC, EPA and SE and all corporations controlled by, intertwining with or under common control with EC, EPA and/or SE, together with their officers, board members, directors, stockholders, representatives, assigns, successors, partners, employees and attorneys, of and from any and all past and present claims, liabilities or obligations, and any cause and causes of action, suits, debts, dues, sums of money, accounts, liabilities, covenants, contracts, controversies, agreements, damages, expenses and claims and demands whatsoever, of any kind, at law or in equity, which he ever had, now has or which his heirs, representatives, successors, executors or assigns can, shall or may have, known or unknown, from the beginning of time to the date of this Release, other than and expressly excluding (i) any and all claims, liabilities, causes of action or obligations arising under this Agreement, the Employment Agreement, the Escrow Agreement or, that certain Phantom Agreement (the "Phantom Agreement") in the form attached hereto as Exhibit F, being executed and delivered by EPA to DP at the Effective Time and (ii) any and all claims, liabilities, causes of action or obligations in the nature of contribution and relating to any document, instrument or agreement, or set of facts, for or in respect of which DP and any of the parties otherwise released pursuant hereto are jointly, or jointly and severally, obligated, including the Carrollton Bank Indebtedness. SE is an intended third party of this Section 7.02.

7.03    Release by EC. EC, for itself and its successors, administrators and assigns, does hereby fully release, remise and forever discharge DP and his representatives, heirs and attorneys, of and from any and all past and present claims, liabilities or obligations, and any cause and causes of action, suits, debts, dues, sums of money, accounts, liabilities, covenants, contracts, controversies, agreements, damages, expenses and claims and demands whatsoever, of any kind, at law or in equity, which it ever had, now has or which its successors or assigns can, shall or may have, known or unknown, from the beginning of time to the date of this Release, other than and expressly excluding (i) any and all claims, liabilities, causes of action or obligations arising under this Agreement, the Employment Agreement, the Escrow Agreement or the Phantom Agreement, and (ii) any and all claims, liabilities, causes of action or obligations in the nature of contribution and relating to any document, instrument or agreement, or set of facts, for or in respect of which EC and any of the parties otherwise released pursuant hereto are jointly, or jointly and severally obligated, including the Carrollton Bank Indebtedness.

ARTICLE VIII

TERMINATION; REMEDIES

8.01    Termination Prior to Exercise Date. This Agreement may be terminated and abandoned at any time only upon the mutual written consent of all of the parties hereto.

8.02    Remedies. In the event of any breach of this Agreement by a party, the non-breaching party shall have the right to all remedies provided under the terms hereof or available at law or in equity. The breaching party shall also be liable for all reasonable attorney's fees incurred by the non-breaching party in enforcement of its rights hereunder. The parties further agree that the DP Shares are unique and special, that monetary damages would not

MD_DOCS_A #1232975 v6

adequately compensate EC as a result of a breach of any of the terms and conditions of this Agreement by DP or EPA, and that EC, in addition to any other remedies available at law or in equity, shall be entitled to the remedy of specific performance and injunctive relief.

      8.03   Set-Off. If and in the event of any breach by either DP or JP of this Agreement or the other documents executed and delivered in connection herewith (the "Transaction Documents"), DP does agree that EPA shall have, among any other rights available at law or equity, or otherwise, the right to, and EC shall have the right to cause EPA to, effect a corresponding set-off against the obligations of EPA and/or EC under the Employment Agreement and/or the Phantom Agreement being entered into on even date herewith, by and between EC and DP; provided, however that if and insofar as any such breach results from any fact or circumstance applicable to the business or operations of EPA on or prior to the date hereof, and DP had no knowledge of such fact or circumstance at the time of execution and delivery of this Agreement and the other Transaction Documents, then the amount of the set-off to be applied shall instead be one-half (1/2) of the amount it would otherwise have been, in order to give recognition to the heretofore equal ownership of EPA, as between DP and EC.

<div align="center">ARTICLE IX</div>

<div align="center">MISCELLANEOUS PROVISIONS</div>

      9.01   Amendment and Modification. This Agreement may be amended, modified or supplemented only by written agreement among all of the parties hereto.

      9.02   Waiver of Compliance: Consents. Any failure of EC to comply with any obligation, covenant, agreement or condition herein may be waived by DP, and any failure of DP to comply with any obligation, covenant, agreement or condition herein may be waived by EC. Any such waiver must be in a writing executed by the party to be charged.

      9.03   Assignment. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors, heirs, executors and assigns; provided, however, that DP may not assign this Agreement in whole or in part, or any of his respective rights, interest or obligations hereunder, without the prior written consent of EC. EC may, without the prior consent of DP, assign its rights hereunder (but not its obligations) to any affiliated person or entity, including any subsidiary of EC.

      9.04   Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Maryland (without regard to its conflicts of laws provisions).

      9.05   Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument and shall become a binding agreement when one or more of the counterparts have been signed by each of the parties and delivered to each of the other parties.

MD_DOCS_A #1232975 v6

9.06    Brokers and Finders.  The parties each represent and warrant to the others that they have not employed any broker of finder or incurred any liability for brokerage fees, commissions or finder fees in connection with the transactions contemplated by this Agreement and each agrees to indemnify and hold the other harmless on account of any loss, damage, liability or expenses, including reasonable attorneys fees, incurred by reason of a breach of its representation and warranty.

9.07    Neutral Construction; Headings.  This Agreement is a product of negotiations between the parties and the provisions hereof shall be interpreted neutrally without giving any effort to the identity of, or placing any greater burden of proof on, the party drafting or preparing the Agreement.  The headings in this Agreement are for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

9.08    Notices.  All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered by hand or mailed by registered or certified mail (return receipt requested), postage prepaid or by express courier or delivery service, to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

| If to EC: | Eisner Communications, Inc.<br>509 South Exeter Street<br>Baltimore, Maryland 21202<br>Attn: Chris Clarke |
| --- | --- |
| With a copy to: | Ballard Spahr Andrews & Ingersoll, LLP<br>300 East Lombard Street, 18th Floor<br>Baltimore, Maryland 21202<br>Attn: Douglas M. Fox, Esquire |
| If to EPA: | Eisner Petrou & Associates, Inc.<br>509 South Exeter Street<br>Baltimore, Maryland 21202<br>Attn: Steve Eisner |
| If to DP: | David Petrou<br>927 Fifth Street, N.W.<br>Washington, D.C. 20005 |

With a copy to:      Malizia Spidi & Fisch, PC
                          1100 New York Avenue, NW
                          Suite 340 West
                          Washington, D.C. 20005
                          Attn: Richard Fisch, Esq.

9.09   <u>Entire Agreement</u>. This Agreement, including the exhibits, schedules, other documents and instruments referred to herein embodies the entire Agreement and understanding of the parties hereto in respect of the subject matter contained herein. This Agreement supersedes all prior agreements and understandings, whether written or oral, between the parties with respect to such subject matter.

9.10   <u>Expenses</u>. Each party hereto shall be responsible for and shall pay its own expenses with respect to this Agreement and consummation of the transaction contemplated hereby.

9.11   <u>Jurisdiction</u>. Any action or proceeding seeking to enforce any provision of or based on any right arising out of, this Agreement may be brought against any of the parties hereto in the courts of the State of Maryland, or, if it has or can acquire jurisdiction, in the United States District Court of the Northern District of Maryland, and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound, have duly executed this Operating and Retirement Agreement as of the day and year first above written.

EISNER PETROU & ASSOCIATES, INC.

By: _____
Name: Steven C. Eisner
Title: Chairman of the Board

By: _____
Name: David Petrou
Title: President

_____
David Petrou, individually

EISNER COMMUNICATIONS, INC.

By: _____
Name: Steven C Eisner
Title: President CEO


## LIMITED JOINDER OF STEVEN EISNER

The undersigned, Steven Eisner, an individual resident of the State of Maryland, does hereby join in and to the foregoing Operating and Retirement Agreement solely for the purposes of assuming and agreeing to the provisions of Section 4.04 thereof.


Dated: As of August 31, 2004

_____

_____
Steven Eisner, individually

**EXHIBIT C**

EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement"), is made as of the 31st day of August, 2004, by and between EISNER PETROU & ASSOCIATES, INC., a Maryland corporation (hereinafter referred to as the "Company"), and DAVID PETROU (hereinafter referred to as the "Employee").

WHEREAS, the Company desires to employ the Employee under the terms and conditions hereof.

NOW THEREFORE, in consideration of the mutual covenants herein contained, the parties agree as follows:

1.      Employment. The Company hereby employs the Employee and the Employee hereby accepts such employment upon the terms and conditions herein set forth.

2.      Term. The term of Employee's employment under this Agreement (the "Employment Period") shall begin (or shall be deemed to have begun) on July 31, 2004, and end July 31, 2005, unless earlier terminated as herein provided.

3.      Compensation. For all services rendered by the Employee under this Agreement, compensation shall be paid to the Employee as follows:

(a)      The Employee shall be paid a salary during the Employment Period of One Hundred Seventy-Five Thousand Dollars ($175,000.00), per annum, payable in installments in accordance with the Company's normal payroll procedures as in effect from time to time; and

(b)      In addition to his salary as described above, the Employee shall be paid a royalty in an amount equal to ten percent (10%) times the revenue collected from Additional DP Client Work during the period commencing on the date of this Agreement and continuing until June 30, 2007. "Additional DP Client Work" means additional public relations work performed by the Company and procured by the Employee, which is either new work in new areas of business from existing clients (other than Eisner Communications, Inc., a Maryland corporation ("EC")), or new work from new clients, where in each case the Employee was the procuring cause of the work. Without limiting the generality of the foregoing, Additional DP Client Work does not include any current business "in house" nor does it include any new business from existing clients that is related or similar in any respect to current or prior business from such clients. Such royalty shall be paid to by the Company to the Employee within thirty (30) days after collection by the Company. The Company shall have no obligation hereunder or otherwise to support the Employee in his efforts to sell or obtain Additional DP Client Work, financially or otherwise.

MD_DOCS_A #1232975 v6                    C - 1

4.    Benefits; Vacation. During the Employment Period and as otherwise provided herein, Employee shall be entitled to participate in any and all employee welfare and health benefit plans (including but not limited to life insurance, health and medical, dental, and disability plans) and other employee benefit plans, including but not limited to qualified pension plans, established by the Company from time to time for the benefit of employees of the Company, consistent with past procedures of the Company and as amended or revised from time to time. Employee shall be required to comply with the conditions attendant to coverage by all such plans and shall comply with and be entitled to benefits only in accordance with the terms and conditions of such plans as they may be amended from time to time. Nothing herein contained shall be construed as requiring the Company to establish or continue any particular benefit plan in discharge of its obligations under this Employment Agreement. Employee is entitled to vacation time during the Employment Period, with pay, in accordance with Company policy.

5.    Duties/Expenses. The Employee shall nominally be the "President" of the Company and his duties as such shall generally be limited to new client development and such other duties as shall be reasonably requested of him from time to time by the Board of Directors of the Company; provided, however, that the Employee shall not be required to attend meetings at the Company's Baltimore, Maryland office more than one day per month. Notwithstanding the fact that the Employee is the President of the Company, the Employee may not execute any deed, mortgage, bond, contract or other instrument which binds the Company to perform under such deed, mortgage, bond, contract or other instrument, except in cases where the execution thereof has been authorized in writing by the Board of Directors of the Company. In addition, and without limiting the generality of the foregoing, the Employee will not have access to the financial books and records of the Company, except that the Company agrees to provide certifications to the Employee from time to time (not more often than semi-annually) as to those financial matters of the Company which are relevant to the performance by the Company of its payment obligations under Section 3(b) above. The Employee will generally report to work at the Company's Washington, D.C. Base of Operations (as such is defined in that certain Operating the Retirement Agreement by and among the Employee, the Company and EC, of even date herewith (the "Operating Agreement")); and the employee recognizes that the Company shall have no responsibility to establish or maintain the Washington D.C. Base of Operations except to the extent specifically provided in Section 1.05 of the Operating Agreement. In addition, the Company will reimburse Employee for out-of-pocket business expenses otherwise incurred by Employee only if either (i) the incurrence of such expenses was approved in writing by the Employer in advance, or (ii) to the extent of any Excess Amount (as defined in Section 1.05 of the Operating Agreement). The Employee acknowledges that the Company has no obligation hereunder, or otherwise, to approve or authorize the incurrence of any expenses contemplated by clause (i) above. The Employee may terminate his employment under this Agreement upon not less than fourteen (14) days written notice to the Board of Directors of the Company.

6.    Termination. The Company's obligations under this Agreement shall terminate upon the earlier of: (x) July 31, 2005 and (y) death of the Employee. The Employee's employment status and continued affiliation with the Company may be earlier terminated by the Company at any time upon written notice by the Company to the Employee following a material

breach by the Employee of this Agreement or the Operating Agreement, as determined in good faith by the Board of Directors of the Company and, if and in the event that such breach may be remedied, following a period of not less than thirty (30) days to remedy such breach. Upon any such earlier termination of the Employee's employment status, the Company's obligations under this Agreement will terminate, except that any remaining payment obligations under Section 3(a) hereof (and any COBRA benefits insofar as required by applicable law), but no other obligations of the Company hereunder, shall remain in full force and effect, as through the Employment Period had continued until July 31, 2005.

7.    Non-Solicitation.  Until March 31, 2006, the Employee will not in any way: (a) solicit or persuade any officer, employee, consultant or agent of the Company to leave the services of the Company for any reason, or hire any such individuals who were employees of the Company at the time of such solicitation or hiring; or (b) solicit or persuade any customer, prospective customer, licensee, vendor, consultant, referral source or other account of the Company to reduce or discontinue purchasing any products or services from the Company or providing any products or services to the Company.

8.    Confidentiality/Conduct.  The Employee will at all times (but prior to, during and after the Employment Period) treat the business and financial information of EPA and its clients in the strictest confidence in accordance with regular business practices and will not disclose any such information to any third parties under any circumstances; and Employee will not engage in any unethical or unprofessional conduct, perform any act, which reflects negatively on the Company or any person or entity affiliated with the Company in any way.

9.    Waiver of Breach.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach by any party.

10.    Right of Set-Off.  All obligations for payment hereunder shall be subject to a right of set-off as contemplated by the Operating Agreement, and particularly Section 8.03 thereof.

11.    No Assignment.  The relationship between the parties hereto is personal and neither the rights nor the obligations of any party hereto may be assigned, delegated or transferred, without the prior written approval of the other party.

12.    Notices.  Any notices referred to herein shall be deemed sufficiently given when hand delivered and receipted, or when sent by registered or certified mail, return receipt requested, to the Company at its principal office, and to Employee at his resident address as furnished to the Company. A written acknowledgment of receipt shall also serve as proof of sufficient notice.

13.    Severability.  The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

14.    Governing Law.  This Agreement will in all respects be construed under and governed by the laws of the State of Maryland.

15.    Counterparts.  This Agreement and any amendments hereto may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

16.    Entire Agreement.  This Agreement constitutes the full and complete understanding of the parties and supersedes and replaces any and all prior understandings, arrangements or agreements with respect to the matters contained herein that may, at any date prior to the date hereof, have been made between the parties hereto or on behalf of any of them. This Agreement may not be changed or modified in any way except by a writing executed by each of the parties hereto.

IN WITNESS WHEREOF, the parties have executed this Employment Agreement the date and year first above written.

ATTEST:                                COMPANY:

                                       EISNER PETROU & ASSOCIATES, INC.

                                       By:_____
_____           Name:  Steven C. Eisner
                                           Title:  Chairman of the Board

WITNESS:                               EMPLOYEE:

_____        _____
                                       David Petrou

<u>Guaranty of Eisner Communications, Inc.</u>

       Eisner Communications, Inc., a Maryland corporation, does hereby guaranty the payment and performance of Eisner Petrou & Associates, Inc. to David Petrou under the foregoing instrument, subject to all of the terms and conditions applicable thereto and to that end does hereby cause this Guaranty to be duly executed and delivered as of the year and date first written above.

       Eisner Communications, Inc.

       By:_____

       Name:_____

       Title:_____

EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement"), is made as of the 31st day of August, 2004, by and between EISNER PETROU & ASSOCIATES, INC., a Maryland corporation (hereinafter referred to as the "Company"), and DAVID PETROU (hereinafter referred to as the "Employee").

WHEREAS, the Company desires to employ the Employee under the terms and conditions hereof.

NOW THEREFORE, in consideration of the mutual covenants herein contained, the parties agree as follows:

1. Employment. The Company hereby employs the Employee and the Employee hereby accepts such employment upon the terms and conditions herein set forth.

2. Term. The term of Employee's employment under this Agreement (the "Employment Period") shall begin (or shall be deemed to have begun) on July 31, 2004, and end July 31, 2005, unless earlier terminated as herein provided.

3. Compensation. For all services rendered by the Employee under this Agreement, compensation shall be paid to the Employee as follows:

(a)    The Employee shall be paid a salary during the Employment Period of One Hundred Seventy-Five Thousand Dollars ($175,000.00), per annum, payable in installments in accordance with the Company's normal payroll procedures as in effect from time to time; and

(b)    In addition to his salary as described above, the Employee shall be paid a royalty in an amount equal to ten percent (10%) times the revenue collected from Additional DP Client Work during the period commencing on the date of this Agreement and continuing until June 30, 2007. "Additional DP Client Work" means additional public relations work performed by the Company and procured by the Employee, which is either new work in new areas of business from existing clients (other than Eisner Communications, Inc., a Maryland corporation ("EC")), or new work from new clients, where in each case the Employee was the procuring cause of the work. Without limiting the generality of the foregoing, Additional DP Client Work does not include any current business "in house" nor does it include any new business from existing clients that is related or similar in any respect to current or prior business from such clients. Such royalty shall be paid to by the Company to the Employee within thirty (30) days after collection by the Company. The Company shall have no obligation hereunder or otherwise to support the Employee in his efforts to sell or obtain Additional DP Client Work, financially or otherwise.

4. Benefits; Vacation. During the Employment Period and as otherwise provided herein, Employee shall be entitled to participate in any and all employee welfare and health benefit plans (including but not limited to life insurance, health and medical, dental, and disability plans) and other employee benefit plans, including but not limited to qualified pension plans, established by the Company from time to time for the benefit of employees of the Company, consistent with past

procedures of the Company and as amended or revised from time to time. Employee shall be required to comply with the conditions attendant to coverage by all such plans and shall comply with and be entitled to benefits only in accordance with the terms and conditions of such plans as they may be amended from time to time. Nothing herein contained shall be construed as requiring the Company to establish or continue any particular benefit plan in discharge of its obligations under this Employment Agreement. Employee is entitled to vacation time during the Employment Period, with pay, in accordance with Company policy.

     5. Duties/Expenses. The Employee shall nominally be the "President" of the Company and his duties as such shall generally be limited to new client development and such other duties as shall be reasonably requested of him from time to time by the Board of Directors of the Company; provided, however, that the Employee shall not be required to attend meetings at the Company's Baltimore, Maryland office more than one day per month. Notwithstanding the fact that the Employee is the President of the Company, the Employee may not execute any deed, mortgage, bond, contract or other instrument which binds the Company to perform under such deed, mortgage, bond, contract or other instrument, except in cases where the execution thereof has been authorized in writing by the Board of Directors of the Company. In addition, and without limiting the generality of the foregoing, the Employee will not have access to the financial books and records of the Company, except that the Company agrees to provide certifications to the Employee from time to time (not more often than semi-annually) as to those financial matters of the Company which are relevant to the performance by the Company of its payment obligations under Section 3(b) above. The Employee will generally report to work at the Company's Washington, D.C. Base of Operations (as such is defined in that certain Operating the Retirement Agreement by and among the Employee, the Company and EC, of even date herewith (the "Operating Agreement")); and the employee recognizes that the Company shall have no responsibility to establish or maintain the Washington D.C. Base of Operations except to the extent specifically provided in Section 1.05 of the Operating Agreement. In addition, the Company will reimburse Employee for out-of-pocket business expenses otherwise incurred by Employee only if either (i) the incurrence of such expenses was approved in writing by the Employer in advance, or (ii) to the extent of any Excess Amount (as defined in Section 1.05 of the Operating Agreement). The Employee acknowledges that the Company has no obligation hereunder, or otherwise, to approve or authorize the incurrence of any expenses contemplated by clause (i) above. The Employee may terminate his employment under this Agreement upon not less than fourteen (14) days written notice to the Board of Directors of the Company.

     6. Termination. The Company's obligations under this Agreement shall terminate upon the earlier of: (x) July 31, 2005 and (y) death of the Employee. The Employee's employment status and continued affiliation with the Company may be earlier terminated by the Company at any time upon written notice by the Company to the Employee following a material breach by the Employee of this Agreement or the Operating Agreement, as determined in good faith by the Board of Directors of the Company and, if and in the event that such breach may be remedied, following a period of not less than thirty (30) days to remedy such breach. Upon any such earlier termination of the Employee's employment status, the Company's obligations under this Agreement will terminate, except that any remaining payment obligations under Section 3(a) hereof (and any COBRA benefits insofar as required by applicable law), but no other obligations of the Company hereunder, shall remain in full force and effect, as through the Employment Period had continued until July 31, 2005.

7.  Non-Solicitation.  Until March 31, 2006, the Employee will not in any way: (a) solicit or persuade any officer, employee, consultant or agent of the Company to leave the services of the Company for any reason, or hire any such individuals who were employees of the Company at the time of such solicitation or hiring; or (b) solicit or persuade any customer, prospective customer, licensee, vendor, consultant, referral source or other account of the Company to reduce or discontinue purchasing any products or services from the Company or providing any products or services to the Company.

8.  Confidentiality/Conduct.  The Employee will at all times (but prior to, during and after the Employment Period) treat the business and financial information of EPA and its clients in the strictest confidence in accordance with regular business practices and will not disclose any such information to any third parties under any circumstances; and Employee will not engage in any unethical or unprofessional conduct, perform any act, which reflects negatively on the Company or any person or entity affiliated with the Company in any way.

9.  Waiver of Breach.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach by any party.

10. Right of Set-Off.  All obligations for payment hereunder shall be subject to a right of set-off as contemplated by the Operating Agreement, and particularly Section 8.03 thereof.

11. No Assignment.  The relationship between the parties hereto is personal and neither the rights nor the obligations of any party hereto may be assigned, delegated or transferred, without the prior written approval of the other party.

12. Notices.  Any notices    referred to herein shall be deemed sufficiently given when hand delivered and receipted, or when sent by registered or certified mail, return receipt requested, to the Company at its principal office, and to Employee at his resident address as furnished to the Company.  A written acknowledgment of receipt shall also serve as proof of sufficient notice.

13. Severability.  The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

14. Governing Law.  This Agreement will in all respects be construed under and governed by the laws of the State of Maryland.

15. Counterparts.  This Agreement and any amendments hereto may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

16. Entire Agreement.  This Agreement constitutes the full and complete understanding of the parties and supersedes and replaces any and all prior understandings, arrangements or agreements with respect to the matters contained herein that may, at any date prior to the date hereof, have been made between the parties hereto or on behalf of any of them.  This Agreement

may not be changed or modified in any way except by a writing executed by each of the parties hereto.

IN WITNESS WHEREOF, the parties have executed this Employment Agreement the date and year first above written.

ATTEST:                                         COMPANY:

                                                EISNER PETROU & ASSOCIATES, INC.

_____               By:_____
                                                Name:  Steven C. Eisner
                                                Title:  Chairman of the Board

WITNESS:                                        EMPLOYEE:

_____               _____
                                                David Petrou

Guaranty of Eisner Communications, Inc.

Eisner Communications, Inc., a Maryland corporation, does hereby guaranty the payment and performance of Eisner Petrou & Associates, Inc. to David Petrou under the foregoing instrument, subject to all of the terms and conditions applicable thereto and to that end does hereby cause this Guaranty to be duly executed and delivered as of the year and date first written above.

Eisner Communications, Inc.

By: _____

Name: _____Steven C Gisner_____

Title: _____President  CEO_____

# EXHIBIT
## <u>B</u>

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $350,000.00 | 10–31–2002 | 10–31–2003 | 8002120 | | 880001409 | EM | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** Eisner Petrou & Associates, Inc.  
509 South Exeter Street  
Baltimore, MD  21201

**Lender:** Carrollton Bank  
P.O. Box 24129  
Baltimore, MD  21227–0629

---

**Principal Amount:  $350,000.00**          **Initial Rate:  5.250%**          **Date of Note:  October 31, 2002**

**PROMISE TO PAY.** Eisner Petrou & Associates, Inc. ("Borrower") promises to pay to Carrollton Bank ("Lender"), or order, in lawful money of the United States of America, the principal amount of Three Hundred Fifty Thousand & 00/100 Dollars ($350,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

**PAYMENT.** Borrower will pay this loan on demand. Payment in full is due immediately upon Lender's demand. If no demand is made, Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on October 31, 2003. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning November 30, 2002, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to accrued unpaid interest, then to principal, and any remaining amount to any unpaid collection costs and late charges. The annual interest rate for this Note is computed on a 365/360 basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an index which is Lender's Prime Rate (the "Index"). This is the rate of interest announced from time to time by Lender as its "Prime Rate." Borrower and each other party liable under this Note in any capacity, whether as maker, endorser, surety, guarantor or otherwise, acknowledges and agrees that the Prime Rate is a reference used by Lender in determining interest rates on certain loans and is not intended to be the lowest rate of interest charged on any extension of credit to any customer. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each month on the first business day of the month. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 4.250% per annum. The interest rate to be applied to the unpaid principal balance of this Note will be at a rate of 1.000 percentage point over the Index, resulting in an initial rate of 5.250% per annum.** NOTICE: Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

**PREPAYMENT.** Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Carrollton Bank, 344 N. Charles Street Baltimore, MD  21201.

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged **5.000% of the regularly scheduled payment.**

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, Lender, at its option, may, if permitted under applicable law, increase the variable interest rate on this Note to 5.250 percentage points over the Index. The interest rate will not exceed the maximum rate permitted by applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, or a trustee or receiver is appointed for Borrower or for all or a substantial portion of the assets of Borrower, or Borrower makes a general assignment for the benefit of Borrower's creditors, or Borrower files for bankruptcy, or an involuntary bankruptcy petition is filed against Borrower and such involuntary petition remains undismissed for sixty (60) days.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note. In the event of a death, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

**Change In Ownership.** Any change in ownership of twenty–five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same

# PROMISSORY NOTE
## (Continued)

Loan No: 8002120

Page 2

provision of this Note within the preceding twelve (12) months, it may be cured (and no event of default will have occurred) if Borrower, after receiving written notice from Lender demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance on this Note and all accrued unpaid interest, together with all other applicable fees, costs and charges, if any, immediately due and payable, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Subject to any limits under applicable law, upon default, Borrower agrees to pay Lender's attorneys' fees and all of Lender's other collection expenses, whether or not there is a lawsuit, including without limitation legal expenses for bankruptcy proceedings.

**GOVERNING LAW. This Note will be governed by, construed and enforced in accordance with federal law and the laws of the State of Maryland. This Note has been accepted by Lender in the State of Maryland.**

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of the City of Baltimore, State of Maryland.

**CONFESSED JUDGMENT. UPON THE OCCURRENCE OF A DEFAULT, BORROWER HEREBY AUTHORIZES ANY ATTORNEY DESIGNATED BY LENDER OR ANY CLERK OF ANY COURT OF RECORD TO APPEAR FOR BORROWER IN ANY COURT OF RECORD AND CONFESS JUDGMENT WITHOUT PRIOR HEARING AGAINST BORROWER IN FAVOR OF LENDER FOR, AND IN THE AMOUNT OF, THE UNPAID BALANCE OF THE PRINCIPAL AMOUNT OF THIS NOTE, ALL INTEREST ACCRUED AND UNPAID THEREON, ALL OTHER AMOUNTS PAYABLE BY BORROWER TO LENDER UNDER THE TERMS OF THIS NOTE OR ANY OTHER AGREEMENT, DOCUMENTS, INSTRUMENT EVIDENCING, SECURING OR GUARANTYING THE OBLIGATIONS EVIDENCED BY THIS NOTE, COSTS OF SUIT, AND ATTORNEYS' FEES OF FIFTEEN PERCENT (15%) OF THE UNPAID BALANCE OF THE PRINCIPAL AMOUNT OF THIS NOTE AND INTEREST THEN DUE HEREUNDER.**

**Borrower hereby releases, to the extent permitted by applicable law, all errors and all rights of exemption, appeal, stay of execution, inquisition, and other rights to which Borrower may otherwise be entitled under the laws of the United States or of any state or possession of the United States now in force and which may hereafter be enacted. The authority and power to appear for and enter judgment against Borrower shall not be exhausted by one or more exercises thereof or by any imperfect exercise thereof and shall not be extinguished by any judgment entered pursuant thereto. Such authority may be exercised on one or more occasions or from time to time in the same or different jurisdictions as often as Lender shall deem necessary or desirable, for all of which this Note shall be a sufficient warrant.**

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note may be requested orally by Borrower or as provided in this paragraph. All oral requests shall be confirmed in writing on the day of the request. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following persons currently are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of their authority: **Steven M. Elsner, Chairman & CEO of Elsner Petrou & Associates, Inc.; David M. Petrou, President & COO of Elsner Petrou & Associates, Inc.; and Steven Blum, Chief Financial Officer.** Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs. Lender will have no obligation to advance funds under this Note if: (A) Borrower or any guarantor is in default under the terms of this Note or any agreement that Borrower or any guarantor has with Lender, including any agreement made in connection with the signing of this Note; (B) Borrower or any guarantor ceases doing business or is insolvent; (C) any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of this Note or any other loan with Lender; (D) Borrower has applied funds provided pursuant to this Note for purposes other than those authorized by Lender; or (E) Lender in good faith believes itself insecure.

**CONSENT TO JURISDICTION.** Borrower irrevocably submits to the jurisdiction of any state or federal court sitting in the State of Maryland over any suit, action, or proceeding arising out of or relating to this Note. Borrower irrevocably waives, to the fullest extent permitted by law, any objection that Borrower may now or hereafter have to the laying of venue of any such suit, action, or proceeding brought in any such court and any claim that any such suit, action, or proceeding brought in any such court has been brought in an inconvenient forum. Final judgment in any such suit, action, or proceeding brought in any such court shall be conclusive and binding upon Borrower and may be enforced in any court in which Borrower is subject to jurisdiction by a suit upon such judgment provided that service of process is effected upon Borrower as provided in this Note or as otherwise permitted by applicable law.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES..** Please notify us if we report any inaccurate information about your account(s) to a consumer reporting agency. Your written notice describing the specific inaccuracy(ies) should be sent to us at the following address: Carrollton Bank, P.O. Box 24129, Baltimore, MD 21227-0629

**GENERAL PROVISIONS.** This Note is payable on demand. The inclusion of specific default provisions or rights of Lender shall not preclude Lender's right to declare payment of this Note on its demand. If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Borrower does not agree or intend to pay, and Lender does not agree or intend to contract for, charge, collect, take, reserve or receive (collectively referred to herein as "charge or collect"), any amount in the nature of interest or in the nature of a fee for this loan, which would in any way or event (including demand, prepayment, or acceleration) cause Lender to charge or collect more for this loan than the maximum Lender would be permitted to charge or collect by federal law or the law of the State of Maryland (as applicable). Any such excess interest or unauthorized fee shall, instead of anything stated to the contrary, be applied first to reduce the principal balance of this loan, and when the principal has been paid in full, be refunded to Borrower. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made.

**APPLICABLE LENDING LAW.** This loan is being made under the terms and provisions of Subtitle 9 of Title 12 of the Maryland Commercial Law Article.

**PROMISSORY NOTE**
(Continued)

Loan No: 8002120                                                                          Page 3

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

THIS NOTE IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS NOTE IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

BORROWER:

EISNER PETROU & ASSOCIATES, INC.

By: _____ (Seal)          By: _____ (Seal)
Steven M. Eisner, Chairman & CEO of Eisner Petrou          David M. Petrou, President & COO of Eisner Petrou
& Associates, Inc.                                                   & Associates, Inc.

LASER PRO Lending, Ver. 3.16.30.07  Copr. Harland Financial Solutions, Inc. 1997, 2002.  All Rights Reserved.  – MD  C:\CFIW\CFI\LPL\D20.FC  TR-446  PR-6

# EXHIBIT
# <u>C</u>

# CORPORATE RESOLUTION TO BORROW / GRANT COLLATERAL / SUBORDINATE DEBT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $350,000.00 | 10-31-2002 | 10-31-2003 | 8002120 | | 880001409 | EM | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Corporation:** Eisner Petrou & Associates, Inc.
509 South Exeter Street
Baltimore, MD 21201

**Lender:** Carrollton Bank
P.O. Box 24129
Baltimore, MD 21227-0629

**WE, THE UNDERSIGNED, DO HEREBY CERTIFY THAT:**

**THE CORPORATION'S EXISTENCE.** The complete and correct name of the Corporation is Eisner Petrou & Associates, Inc. ("Corporation"). The Corporation is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the District of Columbia. The Corporation is duly authorized to transact business in all other states in which the Corporation is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which the Corporation is doing business. Specifically, the Corporation is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. The Corporation has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. The Corporation maintains an office at 509 South Exeter Street, Baltimore, MD 21201. Unless the Corporation has designated otherwise in writing, the principal office is the office at which the Corporation keeps its books and records. The Corporation will notify Lender prior to any change in the location of the Corporation's state of organization or any change in the Corporation's name. The Corporation shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to the Corporation and the Corporation's business activities.

**RESOLUTIONS ADOPTED.** At a meeting of the Directors of the Corporation, or if the Corporation is a close corporation having no Board of Directors then at a meeting of the Corporation's shareholders, duly called and held on ____________________, at which a quorum was present and voting, or by other duly authorized action in lieu of a meeting, the resolutions set forth in this Resolution were adopted.

**OFFICERS.** The following named persons are officers of Eisner Petrou & Associates, Inc.:

| NAMES | TITLES | AUTHORIZED | ACTUAL SIGNATURES |
|---|---|---|---|
| Steven M. Eisner | Chairman & CEO | Y | X ____________ |
| David M. Petrou | President & COO | Y | X ____________ |

**ACTIONS AUTHORIZED.** Any two (2) of the authorized persons listed above may enter into any agreements of any nature with Lender, and those agreements will bind the Corporation. Specifically, but without limitation, any two (2) of such authorized persons are authorized, empowered, and directed to do the following for and on behalf of the Corporation:

**Borrow Money.** To borrow, as a cosigner or otherwise, from time to time from Lender, on such terms as may be agreed upon between the Corporation and Lender, such sum or sums of money as in their judgment should be borrowed, without limitation.

**Execute Notes.** To execute and deliver to Lender the promissory note or notes, or other evidence of the Corporation's credit accommodations, on Lender's forms, at such rates of interest and on such terms as may be agreed upon, evidencing the sums of money so borrowed or any of the Corporation's indebtedness to Lender, and also to execute and deliver to Lender one or more renewals, extensions, modifications, refinancings, consolidations, or substitutions for one or more of the notes, any portion of the notes, or any other evidence of credit accommodations.

**Grant Security.** To mortgage, pledge, transfer, endorse, hypothecate, or otherwise encumber and deliver to Lender any property now or hereafter belonging to the Corporation or in which the Corporation now or hereafter may have an interest, including without limitation all real property and all personal property (tangible or intangible) of the Corporation, as security for the payment of any loans or credit accommodations so obtained, any promissory notes so executed (including any amendments to or modifications, renewals, and extensions of such promissory notes), or any other or further indebtedness of the Corporation to Lender at any time owing, however the same may be evidenced. Such property may be mortgaged, pledged, transferred, endorsed, hypothecated or encumbered at the time such loans are obtained or such indebtedness is incurred, or at any other time or times, and may be either in addition to or in lieu of any property theretofore mortgaged, pledged, transferred, endorsed, hypothecated or encumbered.

**Execute Security Documents.** To execute and deliver to Lender the forms of mortgage, deed of trust, pledge agreement, hypothecation agreement, and other security agreements and financing statements which Lender may require and which shall evidence the terms and conditions under and pursuant to which such liens and encumbrances, or any of them, are given; and also to execute and deliver to Lender any other written instruments, any chattel paper, or any other collateral, of any kind or nature, which Lender may deem necessary or proper in connection with or pertaining to the giving of the liens and encumbrances. Notwithstanding the foregoing, any one of the above authorized persons may execute, deliver, or record financing statements.

**Subordination.** To subordinate, in all respects, any and all present and future indebtedness, obligations, liabilities, claims, rights, and demands of any kind which may be owed, now or hereafter, from any person or entity to the Corporation to all present and future indebtedness, obligations, liabilities, claims, rights, and demands of any kind which may be owed, now or hereafter, from such person or entity to Lender ("Subordinated Indebtedness"), together with subordination by the Corporation of any and all security interests of any kind, whether now existing or hereafter acquired, securing payment or performance of the Subordinated Indebtedness; all on such subordination terms as may be agreed upon between the Corporation's Officers and Lender and in such amounts as in their judgment should be subordinated.

**Negotiate Items.** To draw, endorse, and discount with Lender all drafts, trade acceptances, promissory notes, or other evidences of indebtedness payable to or belonging to the Corporation or in which the Corporation may have an interest, and either to receive cash for the same or to cause such proceeds to be credited to the Corporation's account with Lender, or to cause such other disposition of the proceeds derived therefrom as they may deem advisable.

**Further Acts.** In the case of lines of credit, to designate additional or alternate individuals as being authorized to request advances under such lines, and in all cases, to do and perform such other acts and things, to pay any and all fees and costs, and to execute and deliver such other documents and agreements, **including agreements confessing judgment against the Corporation**, as the officers may in their discretion deem reasonably necessary or proper in order to carry into effect the provisions of this Resolution. The following persons currently are authorized to request advances and authorize payments under the line of credit until Lender receives from the Corporation, at Lender's address shown above,

## CORPORATE RESOLUTION TO BORROW / GRANT COLLATERAL / SUBORDINATE DEBT

**Loan No: 8002120**                              **(Continued)**                              **Page 2**

written notice of revocation of their authority: **Steven M. Eisner, Chairman & CEO of Eisner Petrou & Associates, Inc.; David M. Petrou, President & COO of Eisner Petrou & Associates, Inc.; and Steven Blum, Chief Financial Officer.**

**ASSUMED BUSINESS NAMES.** The Corporation has filed or recorded all documents or filings required by law relating to all assumed business names used by the Corporation. Excluding the name of the Corporation, the following is a complete list of all assumed business names under which the Corporation does business: **None.**

**NOTICES TO LENDER.** The Corporation will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (A) change in the Corporation's name; (B) change in the Corporation's assumed business name(s); (C) change in the management of the Corporation; (D) change in the authorized signer(s); (E) change in the Corporation's principal office address; (F) change in the Corporation's state of organization; (G) conversion of the Corporation to a new or different type of business entity; or (H) change in any other aspect of the Corporation that directly or indirectly relates to any agreements between the Corporation and Lender. No change in the Corporation's name or state of organization will take effect until after Lender has received notice

**CERTIFICATION CONCERNING OFFICERS AND RESOLUTIONS.** The officers named above are duly elected, appointed, or employed by or for the Corporation, as the case may be, and occupy the positions set opposite their respective names. This Resolution now stands of record on the books of the Corporation, is in full force and effect, and has not been modified or revoked in any manner whatsoever.

**NO CORPORATE SEAL.** The Corporation has no corporate seal, and therefore, no seal is affixed to this Resolution.

**CONTINUING VALIDITY.** Any and all acts authorized pursuant to this Resolution and performed prior to the passage of this Resolution are hereby ratified and approved. This Resolution shall be continuing, shall remain in full force and effect and Lender may rely on it until written notice of its revocation shall have been delivered to and received by Lender at Lender's address shown above (or such addresses as Lender may designate from time to time). Any such notice shall not affect any of the Corporation's agreements or commitments in effect at the time notice is given.

**IN TESTIMONY WHEREOF, We have hereunto set our hand and attest that the signatures set opposite the names listed above are their genuine signatures.**

We each have read all the provisions of this Resolution, and we each personally and on behalf of the Corporation certify that all statements and representations made in this Resolution are true and correct. This Corporate Resolution to Borrow / Grant Collateral / Subordinate Debt is dated _____.

THIS RESOLUTION IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS RESOLUTION IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

CERTIFIED TO AND ATTESTED BY:

X _____ (Seal)
   Steven M. Eisner, Chairman & CEO

X _____ (Seal)
   David M. Petrou, President & COO

NOTE: If the officers signing this Resolution are designated by the foregoing document as one of the officers authorized to act on the Corporation's behalf, it is advisable to have this Resolution signed by at least one non-authorized officer of the Corporation.

LASER PRO Lending, Ver. 5.18.30.07  Copr. Harland Financial Solutions, Inc. 1997, 2002.  All Rights Reserved.  - DC/MD  C:\CFI\W\CFI\LPL\C10.FC  TR-446  PR-6

# EXHIBIT
# <u>D</u>

Irvin Needs to See?

# COMMERCIAL GUARANTY

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer EM | Initials |
|---|---|---|---|---|---|---|---|
| References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations. | | | | | | | |

**Borrower:** Elsner Petrou & Associates, Inc.
509 South Exeter Street
Baltimore, MD 21201

**Lender:** Carrollton Bank
P.O. Box 24129
Baltimore, MD 21227-0629

**Guarantor:** David M. Petrou
2810 R Street NW
Washington, DC 20007

**AMOUNT OF GUARANTY. The amount of this Guaranty is Unlimited.**

**CONTINUING UNLIMITED GUARANTY. For good and valuable consideration, David M. Petrou ("Guarantor") absolutely and unconditionally guarantees and promises to pay to Carrollton Bank ("Lender") or its order, on demand, in legal tender of the United States of America, the Indebtedness (as that term is defined below) of Elsner Petrou & Associates, Inc. ("Borrower") to Lender on the terms and conditions set forth in this Guaranty. Under this Guaranty, the liability of Guarantor is unlimited and the obligations of Guarantor are continuing.**

**INDEBTEDNESS GUARANTEED.** The Indebtedness guaranteed by this Guaranty includes any and all of Borrower's indebtedness to Lender and is used in the most comprehensive sense and means and includes any and all of Borrower's liabilities, obligations and debts to Lender, now existing or hereinafter incurred or created, including, without limitation, all loans, advances, interest, costs, debts, overdraft indebtedness, credit card indebtedness, lease obligations, other obligations, and liabilities of Borrower, or any of them, and any present or future judgments against Borrower, or any of them; and whether any such Indebtedness is voluntarily or involuntarily incurred, due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined; whether Borrower may be liable individually or jointly with others, or primarily or secondarily, or as guarantor or surety; whether recovery on the Indebtedness may be or may become barred or unenforceable against Borrower for any reason whatsoever; and whether the Indebtedness arises from transactions which may be voidable on account of infancy, insanity, ultra vires, or otherwise.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to advances or new Indebtedness created after actual receipt by Lender of Guarantor's written revocation. For this purpose and without limitation, the term "new Indebtedness" does not include Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. This Guaranty will continue to bind Guarantor for all Indebtedness incurred by Borrower or committed by Lender prior to receipt of Guarantor's written notice of revocation, including any extensions, renewals, substitutions or modifications of the Indebtedness. All renewals, extensions, substitutions, and modifications of the Indebtedness granted after Guarantor's revocation, are contemplated under this Guaranty and, specifically will not be considered to be new Indebtedness. This Guaranty shall bind Guarantor's estate as to Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. **It is anticipated that fluctuations may occur in the aggregate amount of Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of Indebtedness, even to zero dollars ($0.00), prior to Guarantor's written revocation of this Guaranty shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the guaranteed Indebtedness remains unpaid and even though the Indebtedness guaranteed may from time to time be zero dollars ($0.00).**

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, **without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time:** (A) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the

# COMMERCIAL GUARANTY
## (Continued)

Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

In addition to the waivers set forth herein, if now or hereafter Borrower is or shall become insolvent and the Indebtedness shall not at all times until paid be fully secured by collateral pledged by Borrower, Guarantor hereby forever waives and gives up in favor of Lender and Borrower, and Lender's and Borrower's respective successors, any claim or right to payment Guarantor may now have or hereafter have or acquire against Borrower, by subrogation or otherwise, so that at no time shall Guarantor be or become a "creditor" of Borrower within the meaning of 11 U.S.C. section 547(b), or any successor provision of the Federal bankruptcy laws.

Guarantor also waives any and all rights or defenses arising by reason of (1) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (2) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (3) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any Collateral for the Indebtedness; or (4) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness of Borrower to Lender which is not barred by any applicable statute of limitations. Guarantor acknowledges and agrees that Guarantor's obligations under this Guaranty shall apply to and continue with respect to any amount paid to Lender which is subsequently recovered from Lender for any reason whatsoever (including without limitation as a result of bankruptcy, insolvency or fraudulent conveyance proceeding), notwithstanding the fact that all or a part of the Indebtedness may have been previously paid, or this Guaranty may have been terminated, or both.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**Guarantor's Understanding With Respect To Waivers.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**Subordination of Borrower's Debts to Guarantor.** Guarantor agrees that the Indebtedness of Borrower to Lender, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness of Borrower to Lender. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to execute and file financing statements and continuation statements and to execute such other documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**Miscellaneous Provisions.** The following miscellaneous provisions are a part of this Guaranty:

**Amendments.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Guarantor agrees that if Lender hires an attorney to help enforce this Guaranty, Guarantor will pay, subject to any limits under applicable law, Lender's attorneys' fees and all of Lender's other collection expenses, whether or not there is a lawsuit and including without limitation additional legal expenses for bankruptcy proceedings.

**Caption Headings.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**Governing Law. This Guaranty will be governed by, construed and enforced in accordance with federal law and the laws of the State of Maryland. This Guaranty has been accepted by Lender in the State of Maryland.**

**Choice of Venue.** If there is a lawsuit, Guarantor agrees upon Lender's request to submit to the jurisdiction of the courts of the City of Baltimore, State of Maryland.

**Integration.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any Loan indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**Notices.** Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall

## COMMERCIAL GUARANTY
### (Continued)

Loan No: 8002120                                                                                                    Page 3

be effective when actually delivered, if hand delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their heirs, personal representatives, successors and assigns.

**Definitions.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means Eisner Petrou & Associates, Inc., and all other persons and entities signing the Note in whatever capacity.

**Guarantor.** The word "Guarantor" means each and every person or entity signing this Guaranty, including without limitation David M. Petrou.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Indebtedness.** The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

**Lender.** The word "Lender" means Carrollton Bank, its successors and assigns.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED OCTOBER 31, 2002.**

**THIS GUARANTY IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS GUARANTY IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.**

GUARANTOR:

X _____ (Seal)
David M. Petrou, Individually

# EXHIBIT
# <u>E</u>

# SUBORDINATION AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $350,000.00 | 10-31-2002 | 10-31-2003 | 8002120 | | 880001409 | EM | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Elsner Petrou & Associates, Inc.
509 South Exeter Street
Baltimore, MD 21201

**Lender:** Carrollton Bank
P.O. Box 24129
Baltimore, MD 21227-0629

**Creditor:** David M. Petrou
2810 R Street NW
Washington, DC 20007

---

**THIS SUBORDINATION AGREEMENT dated October 31, 2002, is made and executed among Elsner Petrou & Associates, Inc.; 509 South Exeter Street; Baltimore, MD 21201 ("Borrower"); David M. Petrou, 2810 R Street NW, Washington, DC 20007 ("Creditor"); and Carrollton Bank, P.O. Box 24129, Baltimore, MD 21227-0629 ("Lender").**

**CURRENT INDEBTEDNESS OWING TO CREDITOR.** As of the date of this Agreement, Borrower is indebted to Creditor in the **aggregate amount of $97,851.11.** This amount is the total indebtedness of every kind from Borrower to Creditor.

**REQUESTED FINANCIAL ACCOMMODATIONS.** Borrower and Creditor each want Lender to provide financial accommodations to Borrower in the form of (A) new credit or loan advances, (B) an extension of time to pay or other compromises regarding all or part of Borrower's present indebtedness to Lender, or (C) other benefits to Borrower. Borrower and Creditor each represent and acknowledge to Lender that Creditor will benefit as a result of these financial accommodations from Lender to Borrower, and Creditor acknowledges receipt of valuable consideration for entering into this Agreement. **Based on the representations and acknowledgments contained in this Agreement, Borrower and Creditor agree with Lender as follows:**

**SUBORDINATED INDEBTEDNESS.** The words "Subordinated Indebtedness" as used in this Agreement mean the following specific indebtedness from **Borrower to Creditor**, including all renewals, extensions, modifications and substitutions for the indebtedness, including principal, interest, and all costs and attorneys' fees, relating to the indebtedness: **$97,851.11.**

**SUPERIOR INDEBTEDNESS.** The words "Superior Indebtedness" as used in this Agreement mean and include all present and future indebtedness, obligations, liabilities, claims, rights, and demands of any kind which may be now or hereafter owing from **Borrower to Lender.** The term "Superior Indebtedness" is used in its broadest sense and includes without limitation all principal, all interest, all costs, attorneys' fees, all sums paid for the purpose of protecting Lender's rights in security (such as paying for insurance on collateral if the owner fails to do so), all contingent obligations of Borrower (such as a guaranty), all obligations arising by reason of Borrower's accounts with Lender (such as an overdraft on a checking account), and all other obligations of Borrower to Lender, secured or unsecured, of any nature whatsoever.

**SUBORDINATION.** All Subordinated Indebtedness of Borrower to Creditor is and shall be subordinated in all respects to all Superior Indebtedness of Borrower to Lender. If Creditor holds one or more Security Interests, whether now existing or hereafter acquired, in any of Borrower's real property or personal property, Creditor also subordinates all Creditor's Security Interests to all Security Interests held by Lender, whether now existing or hereafter acquired.

**PAYMENTS TO CREDITOR.** Except as provided below, Borrower will not make and Creditor will not accept, at any time while any Superior Indebtedness is owing to Lender, (A) any payment upon any Subordinated Indebtedness, (B) any advance, transfer, or assignment of assets to Creditor in any form whatsoever that would reduce at any time or in any way the amount of Subordinated Indebtedness, or (C) any transfer of any assets as security for the Subordinated Indebtedness. Notwithstanding the foregoing, Borrower may make regularly scheduled payments of interest only to Creditor so long as Borrower is not in default under any agreement between Lender and Borrower. Creditor may not accelerate any amounts owed to Creditor without Lender's prior written consent.

In the event of any distribution, division, or application, whether partial or complete, voluntary or involuntary, by operation of law or otherwise, of all or any part of Borrower's assets, or the proceeds of Borrower's assets, in whatever form, to creditors of Borrower or upon any indebtedness of Borrower, whether by reason of the liquidation, dissolution or other winding-up of Borrower, or by reason of any execution sale, receivership, insolvency, or bankruptcy proceeding, assignment for the benefit of creditors, proceedings for reorganization, or readjustment of Borrower or Borrower's properties, then and in such event, (A) the Superior Indebtedness shall be paid in full before any payment is made upon the Subordinated Indebtedness, and (B) all payments and distributions, of any kind or character and whether in cash, property, or securities, which shall be payable or deliverable upon or in respect of the Subordinated Indebtedness shall be paid or delivered directly to Lender for application in payment of the amounts then due on the Superior Indebtedness until the Superior Indebtedness shall have been paid in full.

In order that Lender may establish its right to prove claims and recover for its own account dividends based on the Subordinated Indebtedness, Creditor does hereby assign all its right, title, and interest in such claims to Lender. Creditor further agrees to supply such information and evidence, provide access to and copies of such of Creditor's records as may pertain to the Subordinated Indebtedness, and execute such instruments as may be required by Lender to enable Lender to enforce all such claims and collect all dividends, payments, or other disbursements which may be made on account of the Subordinated Indebtedness. For such purposes, Creditor hereby irrevocably authorizes Lender in its discretion to make and present for or on behalf of Creditor such proofs of claims on account of the Subordinated Indebtedness as Lender may deem expedient and proper and to vote such claims in any such proceeding and to receive and collect any and all dividends, payments, or other disbursements made thereon in whatever form the same may be paid or issued and to apply the same on account of the Superior Indebtedness.

Should any payment, distribution, security, or proceeds thereof be received by Creditor at any time on the Subordinated Indebtedness contrary to the terms of this Agreement, Creditor immediately will deliver the same to Lender in precisely the form received (except for the endorsement or assignment of Creditor if necessary), for application on or to secure the Superior Indebtedness, whether it is due or not due, and until so delivered the same shall be held in trust by Creditor as property of Lender. In the event Creditor fails to make any such endorsement or assignment, Lender, or any of its officers on behalf of Lender, is hereby irrevocably authorized by Creditor to make the same.

**CREDITOR'S NOTES.** Creditor agrees to deliver to Lender, at Lender's request, all notes of Borrower to Creditor, or other evidence of the Subordinated Indebtedness, now held or hereafter acquired by Creditor, while this Agreement remains in effect. At Lender's request, Borrower also will execute and deliver to Creditor a promissory note evidencing any book account or claim now or hereafter owed by Borrower to Creditor, which note also shall be delivered by Creditor to Lender. Creditor agrees not to sell, assign, pledge or otherwise transfer any of such notes except subject to all the terms and conditions of this Agreement.

**CREDITOR'S REPRESENTATIONS AND WARRANTIES.** Creditor represents and warrants to Lender that: (A) no representations or agreements of any kind have been made to Creditor which would limit or qualify in any way the terms of this Agreement; (B) this Agreement is executed at Borrower's request and not at the request of Lender; (C) Lender has made no representation to Creditor as to the creditworthiness of Borrower; and

# SUBORDINATION AGREEMENT
## (Continued)

(D) Creditor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Creditor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Creditor's risks under this Agreement, and Creditor further agrees that Lender shall have no obligation to disclose to Creditor information or material acquired by Lender in the course of its relationship with Borrower.

**CREDITOR'S WAIVERS.** Creditor waives any right to require Lender: (A) to make, extend, renew, or modify any loan to Borrower or to grant any other financial accommodations to Borrower whatsoever; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Superior Indebtedness or of any nonpayment related to any Security Interests, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Superior Indebtedness, or in connection with the creation of new or additional Superior Indebtedness; (C) to resort for payment or to proceed directly or at once against any person, including Borrower; (D) to proceed directly against or exhaust any Security Interests held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, at any time, with respect to any matter whatsoever.

**LENDER'S RIGHTS.** Lender may take or omit any and all actions with respect to the Superior Indebtedness or any Security Interests for the Superior Indebtedness without affecting whatsoever any of Lender's rights under this Agreement. In particular, without limitation, Lender may, without notice of any kind to Creditor, (A) make one or more additional secured or unsecured loans to Borrower; (B) repeatedly alter, compromise, renew, extend, accelerate, or otherwise change the time for payment or other terms of the Superior Indebtedness or any part thereof, including increases and decreases of the rate of interest on the Superior Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) take and hold Security Interests for the payment of the Superior Indebtedness, and exchange, enforce, waive, and release any such Security Interests, with or without the substitution of new collateral; (D) release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or guarantors on any terms or manner Lender chooses; (E) determine how, when and what application of payments and credits, shall be made on the Superior Indebtedness; (F) apply such security and direct the order or manner of sale thereof, as Lender in its discretion may determine; and (G) assign this Agreement in whole or in part.

**DEFAULT BY BORROWER.** If Borrower becomes insolvent or bankrupt, this Agreement shall remain in full force and effect. Any default by Borrower under the terms of the Subordinated Indebtedness also shall constitute an event of default under the terms of the Superior Indebtedness in favor of Lender.

**DURATION AND TERMINATION.** This Agreement will take effect when received by Lender, without the necessity of any acceptance by Lender, in writing or otherwise, and will remain in full force and effect until Creditor shall notify Lender in writing at the address shown above to the contrary. Any such notice shall not affect the Superior Indebtedness owed Lender by Borrower at the time of such notice, nor shall such notice affect Superior Indebtedness thereafter granted in compliance with a commitment made by Lender to Borrower prior to receipt of such notice, nor shall such notice affect any renewals of or substitutions for any of the foregoing. Such notice shall affect only indebtedness of Borrower to Lender arising after receipt of such notice and not arising from financial assistance granted by Lender to Borrower in compliance with Lender's obligations under a commitment. Any notes lodged with Lender pursuant to the section titled "Creditor's Notes" above need not be returned until this Agreement has no further force or effect.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Creditor agrees that if Lender hires an attorney to help enforce this Agreement, Creditor will pay, subject to any limits under applicable law, Lender's attorneys' fees and all of Lender's other collection expenses, whether or not there is a lawsuit and including without limitation additional legal expenses for bankruptcy proceedings.

**Authority.** The person who signs this Agreement as or on behalf of Creditor represents and warrants that he or she has authority to execute this Agreement and to subordinate the Subordinated Indebtedness and the Creditor's security interests in Borrower's property, if any.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Jurisdiction.** Creditor irrevocably submits to the jurisdiction of any state or federal court sitting in the State of Maryland over any suit, action, or proceeding arising out of or relating to this Agreement. Creditor irrevocably waives, to the fullest extent permitted by law, any objection that Creditor may now or hereafter have to the laying of venue of any such suit, action, or proceeding brought in any such court and any claim that any such suit, action, or proceeding brought in any such court has been brought in an inconvenient forum. Final judgment in any such suit, action, or proceeding brought in any such court shall be conclusive and binding upon Creditor and may be enforced in any court in which Creditor is subject to jurisdiction by a suit upon such judgment provided that service of process is effected upon Creditor as provided in this Agreement or as otherwise permitted by applicable law.

**Governing Law.** This Agreement will be governed by, construed and enforced in accordance with federal law and the laws of the State of Maryland. This Agreement has been accepted by Lender in the State of Maryland.

**Choice of Venue.** If there is a lawsuit, Creditor agrees upon Lender's request to submit to the jurisdiction of the courts of the City of Baltimore, State of Maryland.

**Interpretation.** In all cases where there is more than one Creditor, then all words used in this Agreement in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Creditor named in this Agreement or when this Agreement is executed by more than one, the words "Creditor" shall mean all and any one or more of them.

**Successors and Assigns.** This Agreement shall be understood to be for the benefit of Lender and for such other person or persons as may from time to time become or be the holder or owner of any of the Indebtedness or any interest therein, and this Agreement shall be transferable to the same extent and with the same force and effect as any such Indebtedness may be transferable.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Creditor, shall constitute a waiver of any of Lender's rights or of any of Creditor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated

## SUBORDINATION AGREEMENT
### (Continued)

to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Subordination Agreement, as this Subordination Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Subordination Agreement from time to time.

**Borrower.** The word "Borrower" means Eisner Petrou & Associates, Inc., and all other persons and entities signing the Note in whatever capacity.

**Creditor.** The word "Creditor" means David M. Petrou.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means Carrollton Bank, its successors and assigns.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

**Subordinated Indebtedness.** The words "Subordinated Indebtedness" mean the indebtedness described in the section of this Agreement titled "Subordinated Indebtedness".

**Superior Indebtedness.** The words "Superior Indebtedness" mean the indebtedness described in the section of this Agreement titled "Superior Indebtedness".

BORROWER AND CREDITOR EACH ACKNOWLEDGE HAVING READ ALL THE PROVISIONS OF THIS SUBORDINATION AGREEMENT, AND BORROWER AND CREDITOR EACH AGREE TO ITS TERMS. THIS AGREEMENT IS DATED OCTOBER 31, 2002.

THIS AGREEMENT IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS AGREEMENT IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

BORROWER:

EISNER PETROU & ASSOCIATES, INC.

By: _____ (Seal)
    Steven M. Eisner, Chairman & CEO of Eisner Petrou
    & Associates, Inc.

By: _____ (Seal)
    David M. Petrou, President & COO of Eisner Petrou
    & Associates, Inc.

CREDITOR:

X _____ (Seal)
    David M. Petrou, Individually

LASER PRO Lending, Ver. 5.18.20.07  Copr. Harland Financial Solutions, Inc. 1997, 2002.  All Rights Reserved.  - MD  C:\CFI\W\OFI\LPL\F10.FC  TR-446  PR-6

# EXHIBIT
# <u>F</u>

# SUBORDINATION AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $350,000.00 | 10-31-2002 | 10-31-2003 | 8002120 | | 880001409 | EM | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Elsner Petrou & Associates, Inc.
509 South Exeter Street
Baltimore, MD 21201

**Lender:** Carrollton Bank
P.O. Box 24129
Baltimore, MD 21227-0629

**Creditor:** Elsner Communications, Inc.
509 South Exeter Street
Baltimore, MD 21201

---

**THIS SUBORDINATION AGREEMENT dated October 31, 2002, is made and executed among Elsner Petrou & Associates, Inc.; 509 South Exeter Street; Baltimore, MD 21201 ("Borrower"); Elsner Communications, Inc.; 509 South Exeter Street; Baltimore, MD 21201 ("Creditor"); and Carrollton Bank, P.O. Box 24129, Baltimore, MD 21227-0629 ("Lender").**

**CURRENT INDEBTEDNESS OWING TO CREDITOR.** As of the date of this Agreement, Borrower is indebted to Creditor in the **aggregate amount of $100,000.00.** This amount is the total indebtedness of every kind from Borrower to Creditor.

**REQUESTED FINANCIAL ACCOMMODATIONS.** Borrower and Creditor each want Lender to provide financial accommodations to Borrower in the form of (A) new credit or loan advances, (B) an extension of time to pay or other compromises regarding all or part of Borrower's present indebtedness to Lender, or (C) other benefits to Borrower. Borrower and Creditor each represent and acknowledge to Lender that Creditor will benefit as a result of these financial accommodations from Lender to Borrower, and Creditor acknowledges receipt of valuable consideration for entering into this Agreement. **Based on the representations and acknowledgments contained in this Agreement, Borrower and Creditor agree with Lender as follows:**

**SUBORDINATED INDEBTEDNESS.** The words "Subordinated Indebtedness" as used in this Agreement mean all present and future indebtedness, obligations, liabilities, claims, rights, and demands of any kind which may be now or hereafter owing from **Borrower to Creditor.** The term "Subordinated Indebtedness" is used in its broadest sense and includes without limitation all principal, all interest, all costs, attorneys' fees, all sums paid for the purpose of protecting the rights of a holder of security, all contingent obligations of Borrower (such as a guaranty), and all other obligations, secured or unsecured, of any nature whatsoever.

**SUPERIOR INDEBTEDNESS.** The words "Superior Indebtedness" as used in this Agreement mean and include all present and future indebtedness, obligations, liabilities, claims, rights, and demands of any kind which may be now or hereafter owing from **Borrower to Lender.** The term "Superior Indebtedness" is used in its broadest sense and includes without limitation all principal, all interest, all costs, attorneys' fees, all sums paid for the purpose of protecting Lender's rights in security (such as paying for insurance on collateral if the owner fails to do so), all contingent obligations of Borrower (such as a guaranty), all obligations arising by reason of Borrower's accounts with Lender (such as an overdraft on a checking account), and all other obligations of Borrower to Lender, secured or unsecured, of any nature whatsoever.

**SUBORDINATION.** All Subordinated Indebtedness of Borrower to Creditor is and shall be subordinated in all respects to all Superior Indebtedness of Borrower to Lender. If Creditor holds one or more Security Interests, whether now existing or hereafter acquired, in any of Borrower's real property or personal property, Creditor also subordinates all Creditor's Security Interests to all Security Interests held by Lender, whether now existing or hereafter acquired.

**PAYMENTS TO CREDITOR.** Except as provided below, Borrower will not make and Creditor will not accept, at any time while any Superior Indebtedness is owing to Lender, (A) any payment upon any Subordinated Indebtedness, (B) any advance, transfer, or assignment of assets to Creditor in any form whatsoever that would reduce at any time or in any way the amount of Subordinated Indebtedness, or (C) any transfer of any assets as security for the Subordinated Indebtedness. Notwithstanding the foregoing, Borrower may make regularly scheduled payments of interest only to Creditor so long as Borrower is not in default under any agreement between Lender and Borrower. Creditor may not accelerate any amounts owed to Creditor without Lender's prior written consent.

In the event of any distribution, division, or application, whether partial or complete, voluntary or involuntary, by operation of law or otherwise, of all or any part of Borrower's assets, or the proceeds of Borrower's assets, in whatever form, to creditors of Borrower or upon any indebtedness of Borrower, whether by reason of the liquidation, dissolution or other winding-up of Borrower, or by reason of any execution sale, receivership, insolvency, or bankruptcy proceeding, assignment for the benefit of creditors, proceedings for reorganization, or readjustment of Borrower or Borrower's properties, then and in such event, (A) the Superior Indebtedness shall be paid in full before any payment is made upon the Subordinated Indebtedness, and (B) all payments and distributions, of any kind or character and whether in cash, property, or securities, which shall be payable or deliverable upon or in respect of the Subordinated Indebtedness shall be paid or delivered directly to Lender for application in payment of the amounts then due on the Superior Indebtedness until the Superior Indebtedness shall have been paid in full.

In order that Lender may establish its right to prove claims and recover for its own account dividends based on the Subordinated Indebtedness, Creditor does hereby assign all its right, title, and interest in such claims to Lender. Creditor further agrees to supply such information and evidence, provide access to and copies of such of Creditor's records as may pertain to the Subordinated Indebtedness, and execute such instruments as may be required by Lender to enable Lender to enforce all such claims and collect all dividends, payments, or other disbursements which may be made on account of the Subordinated Indebtedness. For such purposes, Creditor hereby irrevocably authorizes Lender in its discretion to make and present for or on behalf of Creditor such proofs of claims on account of the Subordinated Indebtedness as Lender may deem expedient and proper and to vote such claims in any such proceeding and to receive and collect any and all dividends, payments, or other disbursements made thereon in whatever form the same may be paid or issued and to apply the same on account of the Superior Indebtedness.

Should any payment, distribution, security, or proceeds thereof be received by Creditor at any time on the Subordinated Indebtedness contrary to the terms of this Agreement, Creditor immediately will deliver the same to Lender in precisely the form received (except for the endorsement or assignment of Creditor if necessary), for application on or to secure the Superior Indebtedness, whether it is due or not due, and until so delivered the same shall be held in trust by Creditor as property of Lender. In the event Creditor fails to make any such endorsement or assignment, Lender, or any of its officers on behalf of Lender, is hereby irrevocably authorized by Creditor to make the same.

**CREDITOR'S NOTES.** Creditor agrees to deliver to Lender, at Lender's request, all notes of Borrower to Creditor, or other evidence of the Subordinated Indebtedness, now held or hereafter acquired by Creditor, while this Agreement remains in effect. At Lender's request, Borrower also will execute and deliver to Creditor a promissory note evidencing any book account or claim now or hereafter owed by Borrower to Creditor, which note also shall be delivered by Creditor to Lender. Creditor agrees not to sell, assign, pledge or otherwise transfer any of such notes except subject to all the terms and conditions of this Agreement.

**CREDITOR'S REPRESENTATIONS AND WARRANTIES.** Creditor represents and warrants to Lender that: (A) no representations or agreements of

# SUBORDINATION AGREEMENT
## (Continued)

any kind have been made to Creditor which would limit or qualify in any way the terms of this Agreement; (B)  this Agreement is executed at Borrower's request and not at the request of Lender; (C)  Lender has made no representation to Creditor as to the creditworthiness of Borrower; and (D)  Creditor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Creditor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Creditor's risks under this Agreement, and Creditor further agrees that Lender shall have no obligation to disclose to Creditor information or material acquired by Lender in the course of its relationship with Borrower.

**CREDITOR'S WAIVERS.** Creditor waives any right to require Lender: (A)  to make, extend, renew, or modify any loan to Borrower or to grant any other financial accommodations to Borrower whatsoever; (B)  to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Superior Indebtedness or of any nonpayment related to any Security Interests, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Superior Indebtedness, or in connection with the creation of new or additional Superior Indebtedness; (C)  to resort for payment or to proceed directly or at once against any person, including Borrower; (D)  to proceed directly against or exhaust any Security Interests held by Lender from Borrower, any other guarantor, or any other person; (E)  to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F)  to pursue any other remedy within Lender's power; or (G)  to commit any act or omission of any kind, at any time, with respect to any matter whatsoever.

**LENDER'S RIGHTS.** Lender may take or omit any and all actions with respect to the Superior Indebtedness or any Security Interests for the Superior Indebtedness without affecting whatsoever any of Lender's rights under this Agreement. In particular, without limitation, Lender may, without notice of any kind to Creditor, (A)  make one or more additional secured or unsecured loans to Borrower; (B)  repeatedly alter, compromise, renew, extend, accelerate, or otherwise change the time for payment or other terms of the Superior Indebtedness or any part thereof, including increases and decreases of the rate of interest on the Superior Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) take and hold Security Interests for the payment of the Superior Indebtedness, and exchange, enforce, waive, and release any such Security Interests, with or without the substitution of new collateral; (D)  release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or guarantors on any terms or manner Lender chooses; (E)  determine how, when and what application of payments and credits, shall be made on the Superior Indebtedness; (F)  apply such security and direct the order or manner of sale thereof, as Lender in its discretion may determine; and (G)  assign this Agreement in whole or in part.

**DEFAULT BY BORROWER.** If Borrower becomes insolvent or bankrupt, this Agreement shall remain in full force and effect.  In the event of a corporate reorganization or corporate arrangement of Borrower under the provisions of the Bankruptcy Code, as amended, this Agreement shall remain in full force and effect and the court having jurisdiction over the reorganization or arrangement is hereby authorized to preserve such priority and subordination provided under this Agreement in approving any such plan of reorganization or arrangement.  Any default by Borrower under the terms of the Subordinated Indebtedness also shall constitute an event of default under the terms of the Superior Indebtedness in favor of Lender.

**DURATION AND TERMINATION.** This Agreement will take effect when received by Lender, without the necessity of any acceptance by Lender, in writing or otherwise, and will remain in full force and effect until Creditor shall notify Lender in writing at the address shown above to the contrary. Any such notice shall not affect the Superior Indebtedness owed Lender by Borrower at the time of such notice, nor shall such notice affect Superior Indebtedness thereafter granted in compliance with a commitment made by Lender to Borrower prior to receipt of such notice, nor shall such notice affect any renewals of or substitutions for any of the foregoing.  Such notice shall affect only indebtedness of Borrower to Lender arising after receipt of such notice and not arising from financial assistance granted by Lender to Borrower in compliance with Lender's obligations under a commitment.  Any notes lodged with Lender pursuant to the section titled "Creditor's Notes" above need not be returned until this Agreement has no further force or effect.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.**  This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement.  No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.**  Creditor agrees that if Lender hires an attorney to help enforce this Agreement, Creditor will pay, subject to any limits under applicable law, Lender's attorneys' fees and all of Lender's other collection expenses, whether or not there is a lawsuit and including without limitation additional legal expenses for bankruptcy proceedings.

**Authority.**  The person who signs this Agreement as or on behalf of Creditor represents and warrants that he or she has authority to execute this Agreement and to subordinate the Subordinated Indebtedness and the Creditor's security interests in Borrower's property, if any.

**Caption Headings.**  Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Jurisdiction.**  Creditor irrevocably submits to the jurisdiction of any state or federal court sitting in the State of Maryland over any suit, action, or proceeding arising out of or relating to this Agreement.  Creditor irrevocably waives, to the fullest extent permitted by law, any objection that Creditor may now or hereafter have to the laying of venue of any such suit, action, or proceeding brought in any such court and any claim that any such suit, action, or proceeding brought in any such court has been brought in an inconvenient forum.  Final judgment in any such suit, action, or proceeding brought in any such court shall be conclusive and binding upon Creditor and may be enforced in any court in which Creditor is subject to jurisdiction by a suit upon such judgment provided that service of process is effected upon Creditor as provided in this Agreement or as otherwise permitted by applicable law.

**Governing Law.  This Agreement will be governed by, construed and enforced in accordance with federal law and the laws of the State of Maryland.  This Agreement has been accepted by Lender in the State of Maryland.**

**Choice of Venue.**  If there is a lawsuit, Creditor agrees upon Lender's request to submit to the jurisdiction of the courts of the City of Baltimore, State of Maryland.

**Interpretation.**  In all cases where there is more than one Creditor, then all words used in this Agreement in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Creditor named in this Agreement or when this Agreement is executed by more than one , the words "Creditor" shall mean all and any one or more of them.

**Successors and Assigns.**  This Agreement shall be understood to be for the benefit of Lender and for such other person or persons as may from time to time become or be the holder or owner of any of the Indebtedness or any interest therein, and this Agreement shall be transferable to the same extent and with the same force and effect as any such Indebtedness may be transferable.

**No Waiver by Lender.**  Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender.  No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right.  A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement.  No prior waiver by Lender, nor any course of dealing between Lender and Creditor, shall constitute a waiver of any of Lender's rights or of any of Creditor's obligations as to any future transactions.  Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing

## SUBORDINATION AGREEMENT
### (Continued)

| Loan No: 8002120 | | Page 3 |
|---|---|---|

consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Subordination Agreement, as this Subordination Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Subordination Agreement from time to time.

**Borrower.** The word "Borrower" means Eisner Petrou & Associates, Inc., and all other persons and entities signing the Note in whatever capacity.

**Creditor.** The word "Creditor" means Eisner Communications, Inc.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means Carrollton Bank, its successors and assigns.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

**Subordinated Indebtedness.** The words "Subordinated Indebtedness" mean the indebtedness described in the section of this Agreement titled "Subordinated Indebtedness".

**Superior Indebtedness.** The words "Superior Indebtedness" mean the indebtedness described in the section of this Agreement titled "Superior Indebtedness".

BORROWER AND CREDITOR EACH ACKNOWLEDGE HAVING READ ALL THE PROVISIONS OF THIS SUBORDINATION AGREEMENT, AND BORROWER AND CREDITOR EACH AGREE TO ITS TERMS. THIS AGREEMENT IS DATED OCTOBER 31, 2002.

THIS AGREEMENT IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS AGREEMENT IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

**BORROWER:**

EISNER PETROU & ASSOCIATES, INC.

By: _____ (Seal)
Steven M. Eisner, Chairman & CEO of Eisner Petrou
& Associates, Inc.

By: _____ (Seal)
David M. Petrou, President & COO of Eisner Petrou
& Associates, Inc.

**CREDITOR:**

EISNER COMMUNICATIONS, INC.

By: _____ (Seal)
Authorized Signer for Eisner Communications, Inc.

By: _____ (Seal)
Authorized Signer for Eisner Communications, Inc.

# EXHIBIT
# <u>G</u>

# AGREEMENT TO PROVIDE INSURANCE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $350,000.00 | 10-31-2002 | 10-31-2003 | 8002120 | | 880001409 | EM | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Eisner Petrou & Associates, Inc.
509 South Exeter Street
Baltimore, MD 21201

**Lender:** Carrollton Bank
P.O. Box 24129
Baltimore, MD 21227-0629

**Grantor:** David M. Petrou
2810 R Street NW
Washington, DC 20007

---

**INSURANCE REQUIREMENTS.** Grantor, David M. Petrou ("Grantor"), understands that insurance coverage is required in connection with the extending of a loan or the providing of other financial accommodations to Eisner Petrou & Associates, Inc. ("Borrower") by Lender. These requirements are set forth in the security documents for the loan. The following minimum insurance coverages must be provided on the following described collateral (the "Collateral"):

**Collateral:** **2810 R. Street Northwest, Washington, DC 20007.**
**Type:** Fire and extended coverage.
**Amount:** Full Insurable Value.
**Basis:** Replacement value.
**Endorsements:** Standard mortgagee's clause with stipulation that coverage will not be cancelled or diminished without a minimum of 15 days prior written notice to Lender, and without disclaimer of the insurer's liability for failure to give such notice.
**Latest Delivery Date:** By the loan closing date.

**INSURANCE COMPANY.** Grantor may obtain insurance from any insurance company Grantor may choose that is acceptable to Lender. Grantor understands that credit may not be denied solely because insurance was not purchased through Lender.

**FLOOD INSURANCE.** Flood Insurance for the Collateral securing this loan is described as follows:

**Real Estate at 2810 R. Street Northwest, Washington, DC 20007.**
The Collateral securing this loan is not currently located in an area identified as having special flood hazards. Therefore, no special flood hazard insurance is necessary at this time. Should the Collateral at any time be deemed to be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Collateral is located in a special flood hazard area, for the full unpaid balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan. Flood insurance may be purchased under the National Flood Insurance Program or from private insurers.

**FAILURE TO PROVIDE INSURANCE.** Grantor agrees to deliver to Lender, on the latest delivery date stated above, evidence of the required insurance as provided above, with an effective date of October 31, 2002, or earlier. Grantor acknowledges and agrees that if Grantor fails to provide any required insurance or fails to continue such insurance in force, Grantor may do so at Grantor's expense as provided in the applicable security document. The cost of any such insurance, at the option of Lender, shall be added to the indebtedness as provided in the security document. GRANTOR ACKNOWLEDGEs THAT IF LENDER SO PURCHASES ANY SUCH INSURANCE, THE INSURANCE WILL PROVIDE LIMITED PROTECTION AGAINST PHYSICAL DAMAGE TO THE COLLATERAL, UP TO AN AMOUNT EQUAL TO THE LESSER OF (1) THE UNPAID BALANCE OF THE DEBT, EXCLUDING ANY UNEARNED FINANCE CHARGES, OR (2) THE VALUE OF THE COLLATERAL; HOWEVER, GRANTOR'S EQUITY IN THE COLLATERAL MAY NOT BE INSURED. IN ADDITION, THE INSURANCE MAY NOT PROVIDE ANY PUBLIC LIABILITY OR PROPERTY DAMAGE INDEMNIFICATION AND MAY NOT MEET THE REQUIREMENTS OF ANY FINANCIAL RESPONSIBILITY LAWS.

**AUTHORIZATION.** For purposes of insurance coverage on the Collateral, Grantor authorizes Lender to provide to any person (including any insurance agent or company) all information Lender deems appropriate, whether regarding the Collateral, the loan or other financial accommodations, or both.

**GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS AGREEMENT TO PROVIDE INSURANCE AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED OCTOBER 31, 2002.**

**THIS AGREEMENT IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS AGREEMENT IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.**

**GRANTOR:**

X _______________________________ **(Seal)**
**David M. Petrou, Individually**

## AGREEMENT TO PROVIDE INSURANCE
### (Continued)

Loan No: 8002120

Page 2

---

**FOR LENDER USE ONLY**
**INSURANCE VERIFICATION**

DATE: _____

PHONE _____

_____

AGENT'S NAME: _____

AGENCY: _____

INSURANCE COMPANY: _____

POLICY NUMBER:

EFFECTIVE DATES: _____

COMMENTS: _____
_____

# EXHIBIT
# <u>H</u>

# NOTICE OF INSURANCE REQUIREMENTS

| Principal | Loan Date 10–31–2002 | Maturity | Loan No 8002120 | Call / Coll | Account 880001409 | Officer EM | Initials |
|---|---|---|---|---|---|---|---|

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Eisner Petrou & Associates, Inc.
509 South Exeter Street
Baltimore, MD 21201

**Lender:** Carrollton Bank
P.O. Box 24129
Baltimore, MD 21227–0629

**Grantor:** David M. Petrou
2810 R Street NW
Washington, DC 20007

---

**TO:** ATTN: Insurance Agent

,

**DATE:** October 31, 2002

**RE:** Policy Number(s):

Insurance Companies/Company:

Dear Insurance Agent:

Eisner Petrou & Associates, Inc. ("Borrower"), is obtaining a loan from Carrollton Bank. Please send appropriate evidence of Insurance to Carrollton Bank, together with the requested endorsements, on the following property, which Grantor, David M. Petrou ("Grantor") is giving as security for the loan.

**Collateral:** 2810 R. Street Northwest, Washington, DC 20007.
**Type:** Fire and extended coverage.
**Amount:** Full Insurable Value.
**Basis:** Replacement value.
**Endorsements:** Standard mortgagee's clause with stipulation that coverage will not be cancelled or diminished without a minimum of 15 days prior written notice to Lender, and without disclaimer of the insurer's liability for failure to give such notice.
**Latest Delivery Date:** By the loan closing date.

**GRANTOR:**

X _(Seal)_
David M. Petrou, Individually

**RETURN TO:**

P.O. Box 24129
Baltimore, MD 21227–0629

LASER PRO Lending, Ver. 5.18.30.07  Copr. Harland Financial Solutions, Inc. 1997, 2002.  All Rights Reserved.
– MD  C:\CFPWIN\CFI\LPL\I11.FC  TR-445  PR-6

# NOTICE OF INSURANCE REQUIREMENTS

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| | 10-31-2002 | | 8002120 | | 880001409 | EM | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Grantor:** Eisner Petrou & Associates, Inc.
509 South Exeter Street
Baltimore, MD 21201

**Lender:** Carrollton Bank
P.O. Box 24129
Baltimore, MD 21227-0629

---

TO:    ATTN: Insurance Agent                                            DATE: October 31, 2002

RE:    Policy Number(s):

       Insurance Companies/Company:

Dear Insurance Agent:

Grantor, Eisner Petrou & Associates, Inc. ("Grantor") is obtaining a loan from Carrollton Bank.  Please send appropriate evidence of insurance to Carrollton Bank, together with the requested endorsements, on the following property, which Grantor is giving as security for the loan.

**Collateral:**  **All Inventory and Equipment.**
**Type:** All risks, including fire, theft and liability.
**Amount:** Full insurable Value.
**Basis:** Replacement value.
**Endorsements:** Lender loss payable clause with stipulation that coverage will not be cancelled or diminished without a minimum of 15 days prior written notice to Lender.
**Latest Delivery Date:** By the loan closing date.

**GRANTOR:**

EISNER PETROU & ASSOCIATES, INC.

By: _____ (Seal)
    Steven M. Eisner, Chairman & CEO of Eisner Petrou
    & Associates, Inc.

By: _____ (Seal)
    David M. Petrou, President & COO of Eisner Petrou
    & Associates, Inc.

RETURN TO:

P.O. Box 24129
Baltimore, MD 21227-0629

LASER PRO Lending, Ver. 5.18.30.07  Copr. Harland Financial Solutions, Inc. 1997, 2003.  All Rights Reserved.
- MD C:\CFI\W\CFILPL\I11.FC  TR-446  PR-6

# EXHIBIT
## I

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $350,000.00 | 10-31-2002 | 10-31-2003 | 8002120 | | 880001409 | EM | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:**   Elsner Petrou & Associates, Inc.
509 South Exeter Street
Baltimore, MD 21201

**Lender:**   Carrollton Bank
P.O. Box 24129
Baltimore, MD 21227-0629

THIS BUSINESS LOAN AGREEMENT dated October 31, 2002, is made and executed between Elsner Petrou & Associates, Inc. ("Borrower") and Carrollton Bank ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement ("Loan"). Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement, and (B) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.** This Agreement shall be effective as of October 31, 2002, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until October 31, 2003.

**ADVANCE AUTHORITY.** The following persons currently are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of their authority: **Steven M. Elsner, Chairman & CEO of Elsner Petrou & Associates, Inc.; David M. Petrou, President & COO of Elsner Petrou & Associates, Inc.; and Steven Blum, Chief Financial Officer.**

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) Security Agreements granting to Lender security interests in the Collateral; (3) financing statements and all other documents perfecting Lender's Security Interests; (4) evidence of insurance as required below; (5) guaranties; (6) subordinations; (7) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

**Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

**Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any indebtedness exists:

**Organization.** Borrower is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the District of Columbia. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 509 South Exeter Street, Baltimore, MD 21201. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: **None.**

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of Borrower's articles of incorporation or organization, or bylaws, or any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the

# BUSINESS LOAN AGREEMENT
## (Continued)

period of Borrower's ownership of Borrower's Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

> **Annual Statements.** As soon as available, but in no event later than thirty (30) days after the end of each fiscal year, Borrower's balance sheet and income statement for the year ended, compiled by a certified public accountant satisfactory to Lender.

> **Interim Statements.** As soon as available, but in no event later than thirty (30) days after the end of each fiscal quarter, Borrower's balance sheet and profit and loss statement for the period ended, prepared by Borrower.

> **Tax Returns.** As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Federal and other governmental tax returns, prepared by a professional accountant satisfactory to Lender.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least fifteen (15) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
|---|---|
| David M. Petrou | Unlimited |
| Steven C. Eisner | Unlimited |

**Subordination.** Prior to disbursement of any Loan proceeds, deliver to Lender subordination agreements on Lender's forms, executed by Borrower's creditors named below, subordinating all of Borrower's indebtedness to such creditors, or such lesser amounts as may be agreed to by Lender in writing, and any security interests in collateral securing that indebtedness to the Loans and security interests of Lender.

# BUSINESS LOAN AGREEMENT
## (Continued)

| Name of Creditor | Total Amount of Debt |
|---|---|
| David M. Petrou | $97,851.11 |
| Eisner Communications, Inc. | $100,000.00 |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Compliance Certificates.** Unless waived in writing by Lender, provide Lender at least annually, with a certificate executed by Borrower's chief financial officer, or other officer or person acceptable to Lender, certifying that the representations and warranties set forth in this Agreement are true and correct as of the date of the certificate and further certifying that, as of the date of the certificate, no Event of Default exists under this Agreement.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; or (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, or (3) pay any dividends on Borrower's stock (other than dividends payable in its stock), provided, however that notwithstanding the foregoing, but only so long as no Event of Default has occurred and is continuing or would result from the payment of dividends, if Borrower is a "Subchapter S Corporation" (as defined in the Internal Revenue Code of 1986, as amended), Borrower may pay cash dividends on its stock to its shareholders from time to time in amounts necessary to enable the shareholders to pay income taxes and make estimated income tax payments to satisfy their liabilities under federal and state law which arise solely from their status as Shareholders of a Subchapter S Corporation because of their ownership of shares of Borrower's stock, or purchase or retire any of Borrower's outstanding shares or

# BUSINESS LOAN AGREEMENT
## (Continued)

alter or amend Borrower's capital structure.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, or a trustee or receiver is appointed for Borrower or for all or a substantial portion of the assets of Borrower, or Borrower makes a general assignment for the benefit of Borrower's creditors, or Borrower files for bankruptcy, or an involuntary bankruptcy petition is filed against Borrower and such involuntary petition remains undismissed for sixty (60) days.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness. In the event of a death, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

**Change in Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured (and no Event of Default will have occurred) if Borrower or Grantor, as the case may be, after receiving written notice from Lender demanding cure of such default: (1) cure the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all sums owing in connection with the Loans, including all principal, interest, and all other fees, costs and charges, if any, will become immediately due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees that if Lender hires an attorney to help enforce this Agreement, Borrower will pay, subject to any limits under applicable law, Lender's attorneys' fees and all of Lender's other collection expenses, whether or not there is a lawsuit and including without limitation additional legal expenses for bankruptcy proceedings.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Jurisdiction.** Borrower irrevocably submits to the jurisdiction of any state or federal court sitting in the State of Maryland over any

# BUSINESS LOAN AGREEMENT
## (Continued)

suit, action, or proceeding arising out of or relating to this Agreement. Borrower irrevocably waives, to the fullest extent permitted by law, any objection that Borrower may now or hereafter have to the laying of venue of any such suit, action, or proceeding brought in any such court and any claim that any such suit, action, or proceeding brought in any such court has been brought in an inconvenient forum. Final judgment in any such suit, action, or proceeding brought in any such court shall be conclusive and binding upon Borrower and may be enforced in any court in which Borrower is subject to jurisdiction by a suit upon such judgment provided that service of process is effected upon Borrower as provided in this Agreement or as otherwise permitted by applicable law.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law. This Agreement will be governed by, construed and enforced in accordance with federal law and the laws of the State of Maryland. This Agreement has been accepted by Lender in the State of Maryland.**

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of the City of Baltimore, State of Maryland.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, if hand delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements contained by or on behalf of Borrower shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The word "Borrower" means Eisner Petrou & Associates, Inc., and all other persons and entities signing the Note in whatever capacity.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien,

# BUSINESS LOAN AGREEMENT
Loan No: 8002120 | (Continued) | Page 6

equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, and their personal representatives, successors and assigns.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means Carrollton Bank, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note executed by Eisner Petrou & Associates, Inc. in the principal amount of $350,000.00 dated October 31, 2002, together with all modifications of and renewals, replacements, and substitutions for the note or credit agreement.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED OCTOBER 31, 2002.

THIS AGREEMENT IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS AGREEMENT IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

BORROWER:

EISNER PETROU & ASSOCIATES, INC.

By: _____ (Seal)
Steven M. Eisner, Chairman & CEO of Eisner Petrou
& Associates, Inc.

By: _____ (Seal)
David M. Petrou, President & COO of Eisner Petrou
& Associates, Inc.

# BUSINESS LOAN AGREEMENT
## (Continued)

Loan No: 8002120                                                                 Page 7

LENDER:

CARROLLTON BANK

By: _____          (Seal)
    Authorized Signer

LASER PRO Lending, Ver. 5.18.30.07  Copr. Harland Financial Solutions, Inc. 1997, 2003.  All Rights Reserved.  - MD  C:\CFI\W\CFI\LPL\C40.FC  TR-446  PR-8

# EXHIBIT

# <u>J</u>

# COMMERCIAL GUARANTY

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer EM | Initials |
|---|---|---|---|---|---|---|---|
| References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations. | | | | | | | |

**Borrower:** Elsner Petrou & Associates, Inc.
509 South Exeter Street
Baltimore, MD 21201

**Lender:** Carrollton Bank
P.O. Box 24129
Baltimore, MD 21227-0629

**Guarantor:** Steven C. Elsner
207 Longwood Road
Baltimore, MD 21210

**AMOUNT OF GUARANTY. The amount of this Guaranty is Unlimited.**

**CONTINUING UNLIMITED GUARANTY. For good and valuable consideration, Steven C. Elsner ("Guarantor") absolutely and unconditionally guarantees and promises to pay to Carrollton Bank ("Lender") or its order, on demand, in legal tender of the United States of America, the Indebtedness (as that term is defined below) of Elsner Petrou & Associates, Inc. ("Borrower") to Lender on the terms and conditions set forth in this Guaranty. Under this Guaranty, the liability of Guarantor is unlimited and the obligations of Guarantor are continuing.**

**INDEBTEDNESS GUARANTEED.** The Indebtedness guaranteed by this Guaranty includes any and all of Borrower's indebtedness to Lender and is used in the most comprehensive sense and means and includes any and all of Borrower's liabilities, obligations and debts to Lender, now existing or hereinafter incurred or created, including, without limitation, all loans, advances, interest, costs, debts, overdraft indebtedness, credit card indebtedness, lease obligations, other obligations, and liabilities of Borrower, or any of them, and any present or future judgments against Borrower, or any of them; and whether any such Indebtedness is voluntarily or involuntarily incurred, due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined; whether Borrower may be liable individually or jointly with others, or primarily or secondarily, or as guarantor or surety; whether recovery on the Indebtedness may be or may become barred or unenforceable against Borrower for any reason whatsoever; and whether the Indebtedness arises from transactions which may be voidable on account of infancy, insanity, ultra vires, or otherwise.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to advances or new Indebtedness created after actual receipt by Lender of Guarantor's written revocation. For this purpose and without limitation, the term "new Indebtedness" does not include Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. This Guaranty will continue to bind Guarantor for all Indebtedness incurred by Borrower or committed by Lender prior to receipt of Guarantor's written notice of revocation, including any extensions, renewals, substitutions or modifications of the Indebtedness. All renewals, extensions, substitutions, and modifications of the Indebtedness granted after Guarantor's revocation, are contemplated under this Guaranty and, specifically will not be considered to be new Indebtedness. This Guaranty shall bind Guarantor's estate as to Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. **It is anticipated that fluctuations may occur in the aggregate amount of Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of Indebtedness, even to zero dollars ($0.00), prior to Guarantor's written revocation of this Guaranty shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the guaranteed Indebtedness remains unpaid and even though the Indebtedness guaranteed may from time to time be zero dollars ($0.00).**

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, **without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time:** (A) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the

indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the indebtedness or in connection with the creation of new or additional loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

In addition to the waivers set forth herein, if now or hereafter Borrower is or shall become insolvent and the indebtedness shall not at all times until paid be fully secured by collateral pledged by Borrower, Guarantor hereby forever waives and gives up in favor of Lender and Borrower, and Lender's and Borrower's respective successors, any claim or right to payment Guarantor may now have or hereafter have or acquire against Borrower, by subrogation or otherwise, so that at no time shall Guarantor be or become a "creditor" of Borrower within the meaning of 11 U.S.C. section 547(b), or any successor provision of the Federal bankruptcy laws.

Guarantor also waives any and all rights or defenses arising by reason of (1) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the indebtedness; (2) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the indebtedness; (3) any right to claim discharge of the indebtedness on the basis of unjustified impairment of any Collateral for the indebtedness; or (4) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding indebtedness of Borrower to Lender which is not barred by any applicable statute of limitations. Guarantor acknowledges and agrees that Guarantor's obligations under this Guaranty shall apply to and continue with respect to any amount paid to Lender which is subsequently recovered from Lender for any reason whatsoever (including without limitation as a result of bankruptcy, insolvency or fraudulent conveyance proceeding), notwithstanding the fact that all or a part of the indebtedness may have been previously paid, or this Guaranty may have been terminated, or both.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**Guarantor's Understanding With Respect To Waivers.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**Subordination of Borrower's Debts to Guarantor.** Guarantor agrees that the indebtedness of Borrower to Lender, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the indebtedness of Borrower to Lender. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to execute and file financing statements and continuation statements and to execute such other documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**Miscellaneous Provisions.** The following miscellaneous provisions are a part of this Guaranty:

**Amendments.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Guarantor agrees that if Lender hires an attorney to help enforce this Guaranty, Guarantor will pay, subject to any limits under applicable law, Lender's attorneys' fees and all of Lender's other collection expenses, whether or not there is a lawsuit and including without limitation additional legal expenses for bankruptcy proceedings.

**Caption Headings.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**Governing Law. This Guaranty will be governed by, construed and enforced in accordance with federal law and the laws of the State of Maryland. This Guaranty has been accepted by Lender in the State of Maryland.**

**Choice of Venue.** If there is a lawsuit, Guarantor agrees upon Lender's request to submit to the jurisdiction of the courts of the City of Baltimore, State of Maryland.

**Integration.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any Loan indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**Notices.** Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall

# COMMERCIAL GUARANTY
## (Continued)

be effective when actually delivered, if hand delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their heirs, personal representatives, successors and assigns.

**Definitions.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means Eisner Petrou & Associates, Inc., and all other persons and entities signing the Note in whatever capacity.

**Guarantor.** The word "Guarantor" means each and every person or entity signing this Guaranty, including without limitation Steven C. Eisner.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Indebtedness.** The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

**Lender.** The word "Lender" means Carrollton Bank, its successors and assigns.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED OCTOBER 31, 2002.

THIS GUARANTY IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS GUARANTY IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

GUARANTOR:

X _____ (Seal)
Steven C. Eisner, Individually

# EXHIBIT

# <u>K</u>

# COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $350,000.00 | 10-31-2002 | 10-31-2003 | 8002120 | | 880001409 | EM | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Grantor:** Elsner Petrou & Associates, Inc.
509 South Exeter Street
Baltimore, MD 21201

**Lender:** Carrollton Bank
P.O. Box 24129
Baltimore, MD 21227-0629

**THIS COMMERCIAL SECURITY AGREEMENT dated October 31, 2002, is made and executed between Elsner Petrou & Associates, Inc. ("Grantor") and Carrollton Bank ("Lender").**

GRANT OF SECURITY INTEREST. **For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.**

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

**All Inventory, Chattel Paper, Accounts, Equipment and General Intangibles**

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A) All accessions, attachments, accessories, tools, parts, supplies, replacements and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

Despite any other provision of this Agreement, Lender is not granted, and will not have, a nonpurchase money security interest in household goods, to the extent such a security interest would be prohibited by applicable law. In addition, if because of the type of any Property, Lender is required to give a notice of the right to cancel under Truth in Lending for the Indebtedness, then Lender will not have a security interest in such Collateral unless and until such a notice is given.

**CROSS-COLLATERALIZATION.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

**Perfection of Security Interest.** Grantor agrees to execute financing statements and to take whatever other actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper if not delivered to Lender for possession by Lender. **This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.**

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management of the Corporation Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its certificate or articles of incorporation and bylaws do not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any Account becomes subject to a security interest in favor of Lender, the Account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Accounts. There shall be no

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, including the sales of Inventory, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of Maryland, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis acceptable to Lender and issued by a company or companies acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least fifteen (15) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until default and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Until otherwise notified by Lender, Grantor may collect any of the Collateral consisting of accounts. At any time and even though no Event of Default exists, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for application to the Indebtedness. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; or (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution or termination of Grantor's existence as a going business, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment is curable and if Grantor has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured (and no event of default will have occurred) if Grantor, after receiving written notice from Lender demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Maryland Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Without notice to Grantor, Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral, and to collect the Rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness and Grantor hereby consents to the appointment of such a receiver. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount and whether or not such receivership is incidental to a proposed sale of the Collateral or otherwise. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees that if Lender hires an attorney to help enforce this Agreement, Grantor will pay, subject to any limits under applicable law, Lender's attorneys' fees and all of Lender's other collection expenses, whether or not there is a lawsuit and including without limitation additional legal expenses for bankruptcy proceedings.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law. This Agreement will be governed by, construed and enforced in accordance with federal law and the laws of the State of Maryland. This Agreement has been accepted by Lender in the State of Maryland.**

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of the City of Baltimore, State of Maryland.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, if hand delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney–in–fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their heirs, personal representatives, successors and assigns. If ownership of the Collateral becomes

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

Loan No: 8002120                                                                                                    Page 5

vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Account.** The word "Account" means a trade account, account receivable, other receivable, or other right to payment for goods sold or services rendered owing to Grantor (or to a third party grantor acceptable to Lender).

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means Eisner Petrou & Associates, Inc., and all other persons and entities signing the Note in whatever capacity.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99–499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means Eisner Petrou & Associates, Inc..

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by–products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means Carrollton Bank, its successors and assigns.

**Note.** The word "Note" means the Note executed by Eisner Petrou & Associates, Inc. in the principal amount of $350,000.00 dated October 31, 2002, together with all modifications of and renewals, replacements, and substitutions for the note or credit agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED OCTOBER 31, 2002.**

**THIS AGREEMENT IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS AGREEMENT IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.**

GRANTOR:

EISNER PETROU & ASSOCIATES, INC.

By: _____ (Seal)
Steven M. Eisner, Chairman & CEO of Eisner Petrou
& Associates, Inc.

By: _____ (Seal)
David M. Petrou, President & COO of Eisner Petrou
& Associates, Inc.

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

Loan No: 8002120                                                                 Page 6

LENDER:

CARROLLTON BANK

X _____
  Authorized Signer

LASER PRO Lending, Ver. 5.18.20.07 Copr. Harland Financial Solutions, Inc. 1997, 2002.  All Rights Reserved.  - MD  C:\CFI\W\CFI\LPL\E40.FC  TR-448  PR-6

# EXHIBIT
# <u>L</u>

# AGREEMENT TO PROVIDE INSURANCE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $350,000.00 | 10-31-2002 | 10-31-2003 | 8002120 | | 880001409 | EM | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Grantor:** Eisner Petrou & Associates, Inc.
509 South Exeter Street
Baltimore, MD 21201

**Lender:** Carrollton Bank
P.O. Box 24129
Baltimore, MD 21227-0629

**INSURANCE REQUIREMENTS.** Grantor, Eisner Petrou & Associates, Inc. ("Grantor"), understands that insurance coverage is required in connection with the extending of a loan or the providing of other financial accommodations to Grantor by Lender. These requirements are set forth in the security documents for the loan. The following minimum insurance coverages must be provided on the following described collateral (the "Collateral"):

**Collateral:** **All Inventory and Equipment.**
**Type:** All risks, including fire, theft and liability.
**Amount:** Full Insurable Value.
**Basis:** Replacement value.
**Endorsements:** Lender loss payable clause with stipulation that coverage will not be cancelled or diminished without a minimum of 15 days prior written notice to Lender.
**Latest Delivery Date:** By the loan closing date.

**INSURANCE COMPANY.** Grantor may obtain insurance from any insurance company Grantor may choose that is acceptable to Lender. Grantor understands that credit may not be denied solely because insurance was not purchased through Lender.

**FAILURE TO PROVIDE INSURANCE.** Grantor agrees to deliver to Lender, on the latest delivery date stated above, proof of the required insurance as provided above, with an effective date of October 31, 2002, or earlier. Grantor acknowledges and agrees that if Grantor fails to provide any required insurance or fails to continue such insurance in force, Grantor may do so at Grantor's expense as provided in the applicable security document. The cost of any such insurance, at the option of Lender, shall be added to the indebtedness as provided in the security document. GRANTOR ACKNOWLEDGEs THAT IF LENDER SO PURCHASES ANY SUCH INSURANCE, THE INSURANCE WILL PROVIDE LIMITED PROTECTION AGAINST PHYSICAL DAMAGE TO THE COLLATERAL, UP TO AN AMOUNT EQUAL TO THE LESSER OF (1) THE UNPAID BALANCE OF THE DEBT, EXCLUDING ANY UNEARNED FINANCE CHARGES, OR (2) THE VALUE OF THE COLLATERAL; HOWEVER, GRANTOR'S EQUITY IN THE COLLATERAL MAY NOT BE INSURED. IN ADDITION, THE INSURANCE MAY NOT PROVIDE ANY PUBLIC LIABILITY OR PROPERTY DAMAGE INDEMNIFICATION AND MAY NOT MEET THE REQUIREMENTS OF ANY FINANCIAL RESPONSIBILITY LAWS.

**AUTHORIZATION.** For purposes of insurance coverage on the Collateral, Grantor authorizes Lender to provide to any person (including any insurance agent or company) all information Lender deems appropriate, whether regarding the Collateral, the loan or other financial accommodations, or both.

**GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS AGREEMENT TO PROVIDE INSURANCE AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED OCTOBER 31, 2002.**

**THIS AGREEMENT IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS AGREEMENT IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.**

**GRANTOR:**

**EISNER PETROU & ASSOCIATES, INC.**

**By:** ______________________ **(Seal)**
**Steven M. Eisner, Chairman & CEO of Eisner Petrou & Associates, Inc.**

**By:** ______________________ **(Seal)**
**David M. Petrou, President & COO of Eisner Petrou & Associates, Inc.**

**FOR LENDER USE ONLY**
**INSURANCE VERIFICATION**

DATE: ______________________ PHONE ______________________

AGENT'S NAME: ______________________
AGENCY: ______________________
INSURANCE COMPANY: ______________________
POLICY NUMBER:
EFFECTIVE DATES: ______________________

COMMENTS: ______________________

LASER PRO Lending, Ver. 5.18.30.07 Copr. Harland Financial Solutions, Inc. 1997, 2002. All Rights Reserved. - MD C:\CFIWI\CFI\LPL\I10.FC TR-446 PR-6

# EXHIBIT
# M

# DISBURSEMENT REQUEST AND AUTHORIZATION

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $350,000.00 | 10-31-2002 | 10-31-2003 | 8002120 | | 880001409 | EM | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Elsner Petrou & Associates, Inc.
509 South Exeter Street
Baltimore, MD 21201

**Lender:** Carrollton Bank
P.O. Box 24129
Baltimore, MD 21227-0629

**LOAN TYPE.** This is a Variable Rate Nondisclosable Revolving Line of Credit Loan to a Corporation for $350,000.00 due on October 31, 2003. The reference rate (Prime Rate as published in the Wall Street Journal. When a range of rates has been published, the lower of the rates will be used., currently 4.250%) is added to the margin of 1.000%, resulting in an initial rate of 5.250.

**PRIMARY PURPOSE OF LOAN.** The primary purpose of this loan is for:

☐ **Personal, Family, or Household Purposes or Personal Investment.**

☒ **Business (Including Real Estate Investment).**

**SPECIFIC PURPOSE.** The specific purpose of this loan is: Working capital line of credit.

**REAL ESTATE DOCUMENTS.** If any party to this transaction is granting a security interest in any real property to Lender and Elsner Petrou & Associates, Inc. is not also a party to the real estate document or documents (the "Real Estate Documents") granting such security interest, Borrower agrees to perform and comply with the Real Estate Documents just as if Borrower has signed as a direct and original party to the Real Estate Documents. This means Borrower agrees to all the representations and warranties made in the Real Estate Documents. In addition, Borrower agrees to perform and comply strictly with all the terms, obligations and covenants to be performed by either Borrower or any Grantor or Trustor, or both, as those words are defined in the Real Estate Documents. Lender need not tell Borrower about any action or inaction Lender takes in connection with the Real Estate Documents. Borrower assumes the responsibility for being and keeping informed about the property. Borrower also waives any defenses that may arise because of any action or inaction of Lender, including without limitation any failure of Lender to realize upon the property, or any delay by Lender in realizing upon the property.

**FLOOD INSURANCE.** Some of the property that will secure the loan is not located in an area that has been identified by the Director of the Federal Emergency Management Agency as an area having special flood hazards. Therefore, although flood insurance may be available for the property, no special flood hazard insurance is required by law for this loan.

**DISBURSEMENT INSTRUCTIONS.** Borrower understands that no loan proceeds will be disbursed until all of Lender's conditions for making the loan have been satisfied. Please disburse the loan proceeds of $350,000.00 as follows:

| | |
|---|---|
| **Undisbursed Funds:** | $350,000.00 |
| **Note Principal:** | $350,000.00 |

**CHARGES PAID IN CASH.** Borrower has paid or will pay in cash as agreed the following charges:

| | |
|---|---|
| **Prepaid Finance Charges Paid in Cash:** | $0.00 |
| **Other Charges Paid in Cash:** | $395.00 |
| $250.00 Recording IDOT | |
| $125.00 Property & Judgement Report | |
| $20.00 UCC Recording | |
| **Total Charges Paid in Cash:** | $395.00 |

**FINANCIAL CONDITION. BY SIGNING THIS AUTHORIZATION, BORROWER REPRESENTS AND WARRANTS TO LENDER THAT THE INFORMATION PROVIDED ABOVE IS TRUE AND CORRECT AND THAT THERE HAS BEEN NO MATERIAL ADVERSE CHANGE IN BORROWER'S FINANCIAL CONDITION AS DISCLOSED IN BORROWER'S MOST RECENT FINANCIAL STATEMENT TO LENDER. THIS AUTHORIZATION IS DATED OCTOBER 31, 2002.**

**THIS AGREEMENT IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS AGREEMENT IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.**

**BORROWER:**

**EISNER PETROU & ASSOCIATES, INC.**

By: ______________________ (Seal)
Steven M. Eisner, Chairman & CEO of Eisner Petrou & Associates, Inc.

By: ______________________ (Seal)
David M. Petrou, President & COO of Eisner Petrou & Associates, Inc.

LASER PRO Lending, Ver. 5.18.30.07 Copr. Harland Financial Solutions, Inc. 1997, 2002. All Rights Reserved. - MD C:\CFIW\CFI\LPL\I20.FC TR-446 PR-6

# EXHIBIT

## <u>N</u>

# NOTICE OF FINAL AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $350,000.00 | 10-31-2002 | 10-31-2003 | 8002120 | | 880001409 | EM | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Eisner Petrou & Associates, Inc.
509 South Exeter Street
Baltimore, MD 21201

**Lender:** Carrollton Bank
P.O. Box 24129
Baltimore, MD 21227-0629

**BY SIGNING THIS DOCUMENT EACH PARTY REPRESENTS AND AGREES THAT: (A) THE WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES, (B) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (C) THE WRITTEN LOAN AGREEMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.**

**As used in this Notice, the following terms have the following meanings:**

**Loan.** The term "Loan" means the following described loan: a Variable Rate Nondisclosable Revolving Line of Credit Loan to a Corporation for $350,000.00 due on October 31, 2003. The reference rate (Prime Rate as published in the Wall Street Journal. When a range of rates has been published, the lower of the rates will be used., currently 4.250%) is added to the margin of 1.000%, resulting in an initial rate of 5.250.

**Loan Agreement.** The term "Loan Agreement" means one or more promises, promissory notes, agreements, undertakings, security agreements, deeds of trust or other documents, or commitments, or any combination of those actions or documents, relating to the Loan, including without limitation the following:

## LOAN DOCUMENTS

Corporate Resolution: Eisner Petrou & Associates, Inc.
Promissory Note
MD Commercial Guaranty: David M. Petrou
Subordination Agreement
Subordination Agreement
DC Deed of Trust for Real Property located at 2810 R. Street Northwest, Washington, DC 20007
Agreement to Provide Insurance: Real Property located at 2810 R. Street Northwest, Washington, DC 20007; owned by Petrou
Notice of Insurance Requirements: ,
Notice of Insurance Requirements: Real Property located at 2810 R. Street Northwest, Washington, DC 20007
Business Loan Agreement
MD Commercial Guaranty: Steven C. Eisner
MD Commercial Security Agreement: All Inventory, Chattel Paper, Accounts, Equipment and General Intangibles; owned by Eisner Petrou & Associates, Inc.
DC Revised National UCC FS: All Inventory, Chattel Paper, Accounts, Equipment and General Intangi
Agreement to Provide Insurance: All Inventory, Chattel Paper, Accounts, Equipment and General Intangibles; owned by Eisner Petrou & Associates, Inc.
Disbursement Request and Authorization
Notice of Final Agreement

**Parties.** The term "Parties" means Carrollton Bank and any and all entities or individuals who are obligated to repay the loan or have pledged property as security for the Loan, including without limitation the following:

**Borrower:** Eisner Petrou & Associates, Inc.
**Grantor(s):** Eisner Petrou & Associates, Inc.
**Grantor(s):** David M. Petrou
**Guarantor 1:** David M. Petrou
**Guarantor 2:** Steven C. Eisner

**Each Party who signs below, other than Carrollton Bank, acknowledges, represents, and warrants to Carrollton Bank that it has received, read and understood this Notice of Final Agreement. This Notice is dated October 31, 2002.**

THIS NOTICE IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS NOTICE IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

BORROWER:

EISNER PETROU & ASSOCIATES, INC.

By: ______________________(Seal)
Steven M. Eisner, Chairman & CEO of Eisner Petrou & Associates, Inc.

By: ______________________(Seal)
David M. Petrou, President & COO of Eisner Petrou & Associates, Inc.

GRANTOR:

X______________________(Seal)
David M. Petrou, Individually

# NOTICE OF FINAL AGREEMENT
## (Continued)

Loan No: 8002120                                                                                                    Page 2

**GUARANTOR:**

X _____ (Seal)
David M. Petrou, Individually

**GUARANTOR:**

X _____ (Seal)
Steven C. Eisner, Individually

**LENDER:**

CARROLLTON BANK

X _____
Authorized Signer

LASER PRO Lending, Ver. 5.16.30.07  Copr. Harland Financial Solutions, Inc. 1997, 2008.  All Rights Reserved.  - MD  C:\CFW\CFI\LPL\J21.FC  TR-446  PR-6

# EXHIBIT

# <u>O</u>

RECORDATION REQUESTED BY:
Carrollton Bank
P.O. Box 24129
Baltimore, MD 21227-0629

WHEN RECORDED MAIL TO:
Carrollton Bank
P.O. Box 24129
Baltimore, MD 21227-0629

SEND TAX NOTICES TO:
Carrollton Bank
P.O. Box 24129
Baltimore, MD 21227-0629

SPACE ABOVE THIS LINE IS FOR RECORDER'S USE ONLY

## DEED OF TRUST

### THIS IS A HOME EQUITY CREDIT LINE DEED OF TRUST.

### DEFAULT ON PAYMENTS MAY RESULT IN

### THE LOSS OF YOUR HOME.

THIS DEED OF TRUST is dated October 31, 2002, among David M. Petrou, whose address is 2810 R Street NW, Washington, DC 20007 ("Grantor"); Carrollton Bank, whose address is P.O. Box 24129, Baltimore, MD 21227-0629 (referred to below sometimes as "Lender" and sometimes as "Beneficiary"); and John A. Giovanazi, whose address is 344 North Charles Street, Baltimore, MD 21201 and Gary C. Paul, whose address is 344 North Charles Street, Baltimore , MD 21201 (referred to below as "Trustee").

CONVEYANCE AND GRANT. For valuable consideration, Grantor hereby grants unto Trustee in Trust for the benefit of Lender as Beneficiary all of Grantor's existing and future right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; and all rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, (the "Real Property") located in the District of Columbia:

See Schedule "A", which is attached to this Deed of Trust and made a part of this Deed of Trust as if fully set forth herein.

The Real Property or its address is commonly known as 2810 R. Street Northwest, Washington, DC 20007.

REVOLVING LINE OF CREDIT. Specifically, in addition to the amounts specified in the Indebtedness definition, and without limitation, this Deed of Trust secures a guaranty of a revolving line of credit, which obligates Lender to make advances to Borrower so long as Borrower complies with all the terms of the Note.

Grantor presently assigns to Lender (also known as Beneficiary in this Deed of Trust) all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property. In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

THIS DEED OF TRUST, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PERFORMANCE OF A GUARANTY FROM GRANTOR TO LENDER, AND DOES NOT DIRECTLY SECURE THE OBLIGATIONS DUE LENDER UNDER THE NOTE AND (B) PERFORMANCE OF ANY AND ALL OBLIGATIONS UNDER THIS DEED OF TRUST. THIS DEED OF TRUST IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

GRANTOR'S REPRESENTATIONS AND WARRANTIES. Grantor warrants that: (a) Grantor has the full \power, right, and authority to enter into this Deed of Trust and to hypothecate the Property; (b) the provisions of this Deed of Trust do not conflict with, or result in a default under any agreement or other instrument binding upon Grantor and do not result in a violation of any law, regulation, court decree or order applicable to Grantor; (c) Grantor has established adequate means of obtaining from Borrower on a continuing basis information about Borrower's financial condition; and (d) Lender has made no representation to Grantor about Borrower (including without limitation the creditworthiness of Borrower).

PAYMENT AND PERFORMANCE. Except as otherwise provided in this Deed of Trust, Grantor shall strictly perform all of Grantor's obligations under the Guaranty and under this Deed of Trust.

POSSESSION AND MAINTENANCE OF THE PROPERTY. Lender and Grantor agree that Borrower's and Grantor's possession and use of the Property shall be governed by the following provisions:

Possession and Use. Until the occurrence of an Event of Default, Grantor may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) collect the Rents from the Property.

Duty to Maintain. Grantor shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

Compliance With Environmental Laws. Grantor represents and warrants to Lender that: (1) During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the

Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Deed of Trust. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Deed of Trust or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or should have been known to Grantor. The provisions of this section of the Deed of Trust, including the obligation to indemnify, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Deed of Trust and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Grantor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Deed of Trust.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans With Disabilities Act. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are necessary to protect and preserve the Property.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Deed of Trust:

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, special taxes, assessments, charges (including water and sewer), fines and impositions levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of all liens having priority over or equal to the interest of Lender under this Deed of Trust, except for the lien of taxes and assessments not due, except for the Existing Indebtedness referred to below, and except as otherwise provided in this Deed of Trust.

**Right to Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and reasonable attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials and the cost exceeds $5,000.00. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Deed of Trust.

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a fair value basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Grantor shall also procure and maintain comprehensive general liability insurance in such coverage amounts as Lender may request with Trustee and Lender being named as additional insureds in such liability insurance policies. Additionally, Grantor shall maintain such other insurance, including but not limited to hazard, business interruption, and boiler insurance, as Lender may require. Policies shall be written in form, amounts, coverages and basis acceptable to Lender and issued by a company or companies acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least fifteen (15) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Property is located in a special flood hazard area, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property if the estimated cost of repair or

replacement exceeds $5,000.00. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Deed of Trust. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Deed of Trust, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**Unexpired Insurance at Sale.** Any unexpired insurance shall inure to the benefit of, and pass to, the purchaser of the Property covered by this Deed of Trust at any trustee's sale or other sale held under the provisions of this Deed of Trust, or at any foreclosure sale of such Property.

**Compliance with Existing Indebtedness.** During the period in which any Existing Indebtedness described below is in effect, compliance with the insurance provisions contained in the instrument evidencing such Existing Indebtedness shall constitute compliance with the insurance provisions under this Deed of Trust, to the extent compliance with the terms of this Deed of Trust would constitute a duplication of insurance requirement. If any proceeds from the insurance become payable on loss, the provisions in this Deed of Trust for division of proceeds shall apply only to that portion of the proceeds not payable to the holder of the Existing Indebtedness.

**Grantor's Report on Insurance.** Upon request of Lender, however not more than once a year, Grantor shall furnish to Lender a report on each existing policy of insurance showing: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured, the then current replacement value of such property, and the manner of determining that value; and (5) the expiration date of the policy. Grantor shall, upon request of Lender, have an independent appraiser satisfactory to Lender determine the cash value replacement cost of the Property.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Grantor fails to comply with any provision of this Deed of Trust or any Related Documents, including but not limited to Grantor's failure to comply with any obligation to maintain Existing Indebtedness in good standing as required below, or to discharge or pay when due any amounts Grantor is required to discharge or pay under this Deed of Trust or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; or (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note. The Deed of Trust also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Deed of Trust:

**Title.** Grantor warrants specially that: (a) Grantor holds good and marketable title to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in the Existing Indebtedness section below or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Deed of Trust, and (b) Grantor has the full right, power, and authority to execute and deliver this Deed of Trust to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Trustee or Lender under this Deed of Trust, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Deed of Trust shall survive the execution and delivery of this Deed of Trust, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full.

**EXISTING INDEBTEDNESS.** The following provisions concerning Existing Indebtedness are a part of this Deed of Trust:

**Existing Lien.** The lien of this Deed of Trust securing the Indebtedness may be secondary and inferior to an existing lien. Grantor expressly covenants and agrees to pay, or see to the payment of, the Existing Indebtedness and to prevent any default on such indebtedness, any default under the instruments evidencing such indebtedness, or any default under any security documents for such indebtedness.

**No Modification.** Grantor shall not enter into any agreement with the holder of any mortgage, deed of trust, or other security agreement which has priority over this Deed of Trust by which that agreement is modified, amended, extended, or renewed without the prior written consent of Lender. Grantor shall neither request nor accept any future advances under any such security agreement without the prior written consent of Lender.

**CONDEMNATION.** The following provisions relating to condemnation proceedings are a part of this Deed of Trust:

**Proceedings.** If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.** If all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award shall mean the award after payment of all reasonable costs, expenses, and attorneys' fees incurred by Trustee or Lender in connection with the condemnation.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Deed of Trust:

**Current Taxes, Fees and Charges.** Upon request by Lender, Grantor shall execute such documents in addition to this Deed of Trust and take

whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Deed of Trust, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Deed of Trust.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Deed of Trust or upon all or any part of the Indebtedness secured by this Deed of Trust; (2) a specific tax on Borrower which Borrower is authorized or required to deduct from payments on the Indebtedness secured by this type of Deed of Trust; (3) a tax on this type of Deed of Trust chargeable against the Lender or the holder of the Note; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Borrower.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Deed of Trust, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Deed of Trust as a security agreement are a part of this Deed of Trust:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Grantor shall execute financing statements and take whatever other action is requested by Lender to perfect and continue Lender's security interest in the Rents and Personal Property. In addition to recording this Deed of Trust in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Deed of Trust as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place convenient to Lender and make it available to Lender promptly following Lender's request to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Deed of Trust may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Deed of Trust.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Deed of Trust:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Borrower's and Grantor's obligations under the Note, this Deed of Trust, and the Related Documents, and (2) the liens and security interests created by this Deed of Trust on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-in-Fact.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Grantor shall strictly perform all of Grantor's obligations under the Guaranty and otherwise performs all the obligations imposed upon Grantor under this Deed of Trust, Lender shall execute and deliver to Trustee a request for full reconveyance and shall execute and deliver to Grantor suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Any reconveyance fee required by law shall be paid by Grantor, if permitted by applicable law.

**EVENTS OF DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Deed of Trust:

**Payment Default.** Borrower fails to make any payment when due under the Note Indebtedness or Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Borrower or Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Deed of Trust or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower or Grantor.

**Default Under the Guaranty.** Failure by Grantor to comply with any term, obligation, covenant or condition contained in the Guaranty.

**Compliance Default.** Failure to comply with any other term, obligation, covenant or condition contained in this Deed of Trust, the Note or in any of the Related Documents. If such a failure is curable and if Borrower or Grantor has not been given a notice of a breach of the same provision of this Deed of Trust within the preceding twelve (12) months, it may be cured (and no Event of Default will have occurred) if Borrower or Grantor, after Lender sends written notice demanding cure of such failure: (a) cures the failure within fifteen (15) days; or (b) if the cure requires more than fifteen (15) days, immediately initiates steps sufficient to cure the failure and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**Default on Other Payments.** Failure of Grantor within the time required by this Deed of Trust to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or Grantor or on Borrower's or Grantor's behalf under this Deed of Trust or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Deed of Trust or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The dissolution or termination of Borrower's or Grantor's existence as a going business, the insolvency of Borrower or

# DEED OF TRUST
## (Continued)

Grantor, the appointment of a receiver for any part of Borrower's or Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower or Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self–help, repossession or any other method, by any creditor of Borrower or Grantor or by any governmental agency against any property securing the Indebtedness. This includes a garnishment of any of Borrower's or Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower or Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower or Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Breach of Other Agreement.** Any breach by Borrower or Grantor under the terms of any other agreement between Borrower or Grantor and Lender that is not remedied within any grace period provided therein, including without limitation any agreement concerning any indebtedness or other obligation of Borrower or Grantor to Lender, whether existing now or later.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness. In the event of a death, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

**Adverse Change.** A material adverse change occurs in Borrower's or Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Existing Indebtedness.** The payment of any installment of principal or any interest on the Existing Indebtedness is not made within the time required by the promissory note evidencing such indebtedness, or a default occurs under the instrument securing such indebtedness and is not cured during any applicable grace period in such instrument, or any suit or other action is commenced to foreclose any existing lien on the Property.

**Right to Cure.** If such a failure is curable and if Borrower or Grantor has not been given a notice of a breach of the same provision of this Deed of Trust within the preceding twelve (12) months, it may be cured (and no Event of Default will have occurred) if Borrower or Grantor, after Lender sends written notice demanding cure of such failure: (a) cures the failure within fifteen (15) days; or (b) if the cure requires more than fifteen (15) days, immediately initiates steps sufficient to cure the failure and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND OBLIGATIONS OF GRANTOR AND CONSEQUENCES OF DEFAULT.** Grantor's rights under this Deed of Trust include the right to use and occupy the Property and to receive the Rents, until an Event of Default shall occur and Lender takes such steps as are necessary to terminate such rights, such as foreclosure. Upon payment in full of the Indebtedness, Lender shall release and satisfy this Deed of Trust. Should Grantor default: (A) Grantor is entitled under Section 45–715 of the D.C. Code to be given written notice of Lender's intention to foreclose at least thirty (30) days in advance of the date of such sale; (B) Grantor may also have the right under Section 45–715.1 of the D.C. Code to cure Grantor's default and prevent sale or other disposition of the Property by tendering in the form of cash, cashier's check or certified check all sums necessary to bring the Indebtedness current, including any reasonable late charges, with the exception of any amounts due by operation of any acceleration clause that may be included in the Note or in this Deed of Trust, and performing any other other obligation which Grantor would have been bound to perform in the absence of an Event of Default or acceleration. The right to cure may not be exercised more than one (1) time in any two (2) consecutive calendar years. Grantor's obligations include the obligations to pay in a timely manner any sums due under the Note and this Deed of Trust, including any deficiency which may remain after foreclosure, and to comply in a timely manner with all the covenants and agreements set forth in the Note and this Deed of Trust, and all extensions, renewals and modifications of the Note and this Deed of Trust. If an Event of Default occurs, all sums outstanding under the Note and this Deed of Trust may be declared immediately due and payable in full, and the Property may be foreclosed upon. **Grantor's failure to cure any Event of Default in a timely manner prior to the Foreclose sale will result in the loss of Grantor's home at the foreclosure sale.**

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Deed of Trust, at any time thereafter, Trustee or Lender may exercise any one or more of the following rights and remedies:

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Deed of Trust, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**Accelerate Indebtedness.** Lender shall have the right at its option, after giving all required notices of default and after passage of any grace period, to declare the entire Indebtedness immediately due and payable, including any prepayment penalty which Borrower would be required to pay.

**Foreclosure.** At the request of the holder of the Note, Trustee shall have the power and it shall be Trustee's duty to sell the Property or any part thereof at public auction, in such manner, and at such time and place, upon such terms and conditions, and upon such public notice as Trustee may deem best for the interest of all concerned consisting of advertisement in a newspaper of general circulation in the District of Columbia for at least five (5) times over the ten (10) calendar days prior to the sale, or for such other period as applicable law may require, and in case of default of any purchaser, to re–sell the same with postponement of sale or re–sale and upon such public notice thereof as Trustee may determine, and upon compliance by the purchaser with the terms of sale, and upon judicial approval as may be required by law, convey the Property to and at the cost of the purchaser, who shall not be liable to see to the application of the purchase money. The proceeds of sale shall be applied by Trustee as follows: (a) first, to pay all proper advertising expenses, auctioneer's allowance, the expenses, if any, required to correct any irregularity in the title, premium for Trustee's bond, auditor's fee, attorneys' fees, and all other expenses of sale incurred in or about the protection and execution of this Deed of Trust, and all moneys advanced for taxes, assessments, insurance, and with interest thereon at the rate provided in the Note, and all taxes and assessments due upon the Property at time of sale, and to retain as compensation a commission of five percent (5%) on the amount of the sale or sales; (b) second, to pay the whole amount then remaining unpaid on the Indebtedness; (c) third, to pay liens of record against the Property according to their priority of lien and to the extent that funds remaining in Trustee's hands are available; and (d) last, to pay the remainder of the proceeds, if any, to Grantor, Grantor's heirs, personal representatives, successors or assigns upon the delivery and surrender to the purchaser of possession of the Property, less costs and expenses of obtaining possession.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

# DEED OF TRUST
## (Continued)

**Collect Rents.** Lender shall have the right, without notice to Borrower or Grantor to take possession of and manage the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Grantor irrevocably designates Lender as Grantor's attorney–in–fact to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Tenancy at Will.** If Grantor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Grantor, Grantor shall become a tenant at will of Lender or the purchaser of the Property and shall, at Lender's option, either (1) pay a reasonable rental for the use of the Property, or (2) vacate the Property immediately upon the demand of Lender.

**Other Remedies.** Trustee or Lender shall have any other right or remedy provided in this Deed of Trust or the Note or by law.

**Notice of Sale.** Unless otherwise required by law, Trustee or Lender shall give Grantor written notice of any sale of the Real Property at least thirty (30) days in advance of the intended date of the sale. The notice will be sent by certified mail, return receipt requested, to Grantor's last known address.

**Sale of the Property.** To the extent permitted by applicable law, Borrower and Grantor hereby waives any and all rights to have the Property marshalled. In exercising its rights and remedies, the Trustee or Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Deed of Trust, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including reasonable attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post–judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees, title insurance, and fees for the Trustee, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**Rights of Trustee.** Trustee shall have all of the rights and duties of Lender as set forth in this section.

**POWERS AND OBLIGATIONS OF TRUSTEE.** The following provisions relating to the powers and obligations of Trustee are part of this Deed of Trust:

**Powers of Trustee.** In addition to all powers of Trustee arising as a matter of law, Trustee shall have the power to take the following actions with respect to the Property upon the written request of Lender and Grantor: (a) join in preparing and filing a map or plat of the Real Property, including the dedication of streets or other rights to the public; (b) join in granting any easement or creating any restriction on the Real Property; and (c) join in any subordination or other agreement affecting this Deed of Trust or the interest of Lender under this Deed of Trust.

**Obligations to Notify.** Trustee shall not be obligated to notify any other party of a pending sale under any other trust deed or lien, or of any action or proceeding in which Grantor, Lender, or Trustee shall be a party, unless the action or proceeding is brought by Trustee.

**Trustee.** Trustee shall meet all qualifications required for Trustee under applicable law. In addition to the rights and remedies set forth above, with respect to all or any part of the Property, the Trustee shall have the right to foreclose by notice and sale, and Lender shall have the right to foreclose by judicial foreclosure, in either case in accordance with and to the full extent provided by applicable law.

**Successor Trustee.** Lender, at Lender's option, at any time hereafter and without prior notice and without specifying any reason, may from time to time appoint a successor Trustee to any Trustee appointed under this Deed of Trust by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of Deeds for the District of Columbia. The instrument shall contain, in addition to all other matters required by applicable law, the names of the original Lender, Trustee, and Grantor, the book and page where this Deed of Trust is recorded, and the name and address of the successor trustee, and the instrument shall be executed and acknowledged by Lender or its successors in interest. The successor trustee, without conveyance of the Property, shall succeed to all the title, power, and duties conferred upon the Trustee in this Deed of Trust and by applicable law. This procedure for substitution of Trustee shall govern to the exclusion of all other provisions for substitution.

**Power to Act Separately.** If more than one Trustee is named in this Deed of Trust, any Trustee may act alone, without the joinder of any other Trustee, to exercise any or all the powers given to the Trustees collectively in this Deed of Trust or by applicable law.

**NOTICES.** Any notice required to be given under this Deed of Trust, including without limitation any notice of default and any notice of sale shall be given in writing, and shall be effective when mailed by certified mail postage prepaid, directed to the addresses shown near the beginning of this Deed of Trust. All copies of notices of foreclosure from the holder of any lien which has priority over this Deed of Trust shall be sent to Lender's address, as shown near the beginning of this Deed of Trust. Any party may change its address for notices under this Deed of Trust by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Deed of Trust:

**Amendments.** This Deed of Trust, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Deed of Trust. No alteration of or amendment to this Deed of Trust shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Annual Reports.** If the Property is used for purposes other than Grantor's residence, Grantor shall furnish to Lender, upon request, a certified statement of net operating income received from the Property during Grantor's previous fiscal year in such form and detail as Lender shall require.

"Net operating income" shall mean all cash receipts from the Property less all cash expenditures made in connection with the operation of the Property.

**Caption Headings.** Caption headings in this Deed of Trust are for convenience purposes only and are not to be used to interpret or define the provisions of this Deed of Trust.

**Merger.** There shall be no merger of the interest or estate created by this Deed of Trust with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Governing Law. This Deed of Trust will be governed by, construed and enforced in accordance with federal law and the laws of the State of Maryland, except and only to the extent of procedural matters related to the perfection and enforcement of Lender's rights and remedies against the Property, which matters shall be governed by the laws of the District of Columbia. However, in the event that the enforceability or validity of any provision of this Deed of Trust is challenged or questioned, such provision shall be governed by whichever applicable state or federal law would uphold or would enforce such challenged or questioned provision. The loan transaction which is evidenced by the Note and this Deed of Trust has been applied for, considered, approved and made, and all necessary loan documents have been accepted by Lender in the State of Maryland.**

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of the City of Baltimore, State of Maryland.

**Joint and Several Liability.** All obligations of Borrower and Grantor under this Deed of Trust shall be joint and several, and all references to Grantor shall mean each and every Grantor, and all references to Borrower shall mean each and every Borrower. This means that each Borrower and Grantor signing below is responsible for all obligations in this Deed of Trust.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Deed of Trust unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Deed of Trust shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Deed of Trust. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Deed of Trust, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Deed of Trust to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Deed of Trust. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Deed of Trust shall not affect the legality, validity or enforceability of any other provision of this Deed of Trust.

**Successors and Assigns.** Subject to any limitations stated in this Deed of Trust on transfer of Grantor's interest, this Deed of Trust shall be binding upon and inure to the benefit of the parties, their heirs, personal representatives, successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Deed of Trust and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Deed of Trust or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Deed of Trust.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Deed of Trust. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Deed of Trust shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Beneficiary.** The word "Beneficiary" means Carrollton Bank, and its successors and assigns.

**Borrower.** The word "Borrower" means Eisner Petrou & Associates, Inc., and all other persons and entities signing the Note in whatever capacity.

**Deed of Trust.** The words "Deed of Trust" mean this Deed of Trust among Grantor, Lender, and Trustee.

**Default.** The word "Default" means the Default set forth in this Deed of Trust in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99–499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Deed of Trust in the events of default section of this Deed of Trust.

**Existing Indebtedness.** The words "Existing Indebtedness" mean the indebtedness described in the Existing Liens provision of this Deed of Trust.

**Grantor.** The word "Grantor" means David M. Petrou.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Grantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by–products or any fraction thereof and asbestos.

# DEED OF TRUST
## (Continued)

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all obligations of Grantor under the Guaranty, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the obligations under the Guaranty and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Trustee or Lender to enforce Grantor's obligations under this Deed of Trust, together with interest on such amounts as provided in this Deed of Trust.

**Lender.** The word "Lender" means Carrollton Bank, its successors and assigns.

**Note.** The word "Note" means the promissory note dated October 31, 2002, **in the original principal amount of $350,000.00** from Borrower to Lender, together with all modifications of and renewals, replacements, and substitutions for the promissory note or agreement.

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Deed of Trust.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

**Trustee.** The word "Trustee" means John A. Giovanazi, whose address is 344 North Charles Street, Baltimore , MD  21201 and Gary C. Paul, whose address is 344 North Charles Street, Baltimore , MD  21201 and any substitute or successor trustees.

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS DEED OF TRUST, AND GRANTOR AGREES TO ITS TERMS.

THIS DEED OF TRUST IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS DEED OF TRUST IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

GRANTOR:

X _____ (Seal)
David M. Petrou, Individually
2810 R Street NW
Washington, DC  20007

Signed, acknowledged and delivered in the presence of:

X _____
Witness

X _____
Witness

---

## INDIVIDUAL ACKNOWLEDGMENT

~~DISTRICT OF COLUMBIA~~ State of Maryland    )
                                               ) SS
                                               )

I, __Lisa K Miles__ , a Notary Public in and for the ~~District of Columbia~~ State of Maryland, do hereby certify that David M. Petrou, who is personally well known to me as the person who executed the Deed of Trust bearing the date of October 31, 2002, personally appeared before me in the District of Columbia and acknowledged said Deed of Trust to be his or her act and deed, and that he or she executed said Deed of Trust for the purposes therein contained.

Witness my hand and official seal this ____11____ day of __December__ , 20 02 .

_____
Notary Public

(Notarial Seal)

My commission expires __Oct. 1, 2004__

LISA K MILES
Notary Public State of Maryland
My Commission Expires
October 1, 2004

**DEED OF TRUST**
**(Continued)**

## REQUEST FOR FULL RECONVEYANCE
(To be used only when obligations have been paid in full)

To: _____, Trustee

The undersigned is the legal owner and holder of all Indebtedness secured by this Deed of Trust. All sums secured by this Deed of Trust have been fully paid and satisfied. You are hereby directed, upon payment to you of any sums owing to you under the terms of this Deed of Trust or pursuant to any applicable statute, to cancel the Note secured by this Deed of Trust (which is delivered to you together with this Deed of Trust), and to reconvey, without warranty, to the parties designated by the terms of this Deed of Trust, the estate now held by you under this Deed of Trust. Please mail the reconveyance and Related Documents to:

_____.

Date: _____

Beneficiary: _____

By: _____

Its: _____

**DEED OF TRUST**
**(Continued)**

Loan No: 8002120

Page 10

GRANTOR:

X _____ (Seal)
David M. Petrou, Individually
2810 R Street NW
Washington, DC 20007

Signed, acknowledged and delivered in the presence of:

X _____
Witness

X _____
Witness

TRUSTEE:

X _____
John A. Giovanazi, Individually
344 North Charles Street
Baltimore , MD 21201

X _____
Gary C. Paul, Individually
344 North Charles Street
Baltimore , MD 21201

Signed, acknowledged and delivered in the presence of:

X _____
Witness

X _____
Witness

LENDER:

CARROLLTON BANK

X _____
Authorized Signer
P.O. Box 24129
Baltimore, MD 21227-0629

LASER PRO Lending, Ver. 5.18.30.07  Copr. Harland Financial Solutions, Inc. 1997, 2002.  All Rights Reserved.  - DC/MD  C:\CFI\W\CFI\LPL\G01.FC  TR-446  PR-6

Schedule A

Report Number: 968325
Client Number: 1892
Customer: Petrou, David M.

The following described land and premises, with the improvements, easements and appurtenances thereunto belonging, situate, lying and being in the District of Columbia, namely:

Part of Square One Hundred Fourteen (114) in Georgetown, now Square Twelve Hundred Eighty-four (1284) in the City of Washington described in accordance with survey recorded in Survey Book 169 at Page 439 as follows:

Beginning for the same at a point in the South line of R. Street (formerly Road Street) distant 102.853 feet West of the West line of 28th Street, formerly Montgomery Street, said point being the center of the partition wall between premises 2808 and 2810 R Street, and thence South along said center line of said wall and a South prolongation thereof 60 feet; thence West, 34.286 feet; thence North 60 feet to the said South line of R Street; and thence East, 34.286 feet to the beginning.

NOTE: At the date hereof the above described land is designated on the Records of the Assessor for the District of Columbia for assessments and taxation purposes as Lot Eight Hundred Twenty-two (822) in Square Twelve Hundred Eighty-four (1284).

Subject to right of way of granted the Chesapeake and Potomac Telephone Company by Deed dated March 11, 1957 and recorded in Liber 10842, Folio 329, among the Land Record of the District of Columbia.

# EXHIBIT

## P



**EPA**
Eisner Petrou
AND ASSOCIATES

David M. Petrou, APR
President &
Chief Operating Officer

927 Fifteenth St., N.W.
Suite 900
Washington, DC 20005
Tel  202.682.3100   Fax  202.682.9028
email: david.petrou@eisnerpetrou.com

509 South Exeter St.
Baltimore, Maryland 21202
Tel  410.843.3100   Fax 410.752.3550
www.eisnerpetrou.com

**October 15, 2003**

**Ms. Lori Ratzburg**
**Assistant Vice President**
**Carrollton Bank**
**344 Charles Street ( Suite 300 )**
**Baltimore, Maryland 21201-4301**

Dear Lori:

While, of course, I was sorry to hear that your colleague, Eleni Monios, has moved on from Carrollton Bank, how very nice to be "reunited" with *you*! The long relationship we've had with you, Bob Altieri and Carrollton is something all of us in the management of Eisner Petrou and Associates have genuinely valued over the years and look forward to continuing for a long, *successful* time to come.

I am in receipt of the documents you sent to me on October 9 and I will take a careful look at them. Before I do sign and return them to you, however, I would ask that you review the attached letter from Eleni, dated last December 18.

Certainly, EPA continues to rebuild and there's still a way to go until we return to the solid years of profitability of the mid-nineties. However, as you're probably aware from conversations with Steve Blum, I'm enormously proud that we dug in our heels, made tremendous cuts in our operating expenses ( reducing staff by *nearly 50%*; cutting our space and rent in Baltimore by half and other meaningful lowering of ongoing costs ) and dramatically *increased* revenues. What has that all meant? As Bob knows from our monthly P & L statements, *EPA has maintained ongoing profitability since August 1, 2002* and has done so in a still less-than-robust economy.

And although we haven't yet restored the net worth of the corporation to the levels prior to the world economic slump, a few facts need to be pointed out: the loans, now nearly at parity that Eisner Communications and the Petrou family made to the corporation, if converted to "capital investment," would immediately change the picture of our balance sheet. Further, at my and Steve Eisner's request, Richard Fisch—our corporate counsel from Malizia, Spidi & Fisch here in Washington—did a careful analysis of corporate assets, which include the July 11, 1988 contract with Eisner, providing exclusivity on *all* public relations revenues from *both companies* for EPA, and demonstrated a "fair market value" of the corporation well in excess of $2 million.

More to the immediate point, I'm sure you've heard the good news from Eisner Communications that both corporations just won the important integrated Werner Ladder account ( they're the number one retailer of ladders in America ), which will give EPA a fixed monthly retainer of between $15,000 and $25,000. We're also awaiting final word from the Procurement Office of the University of Baltimore—cross your fingers!—and are presenting to a *major* national prospect on October 29. All of which led Steve Eisner and I to spend three hours on the phone yesterday, considering projections of EPA which show the possibility of securing an increase in estimated annual income by *over half a million dollars* in the next thirty days. And that's before we even plug in a new business number for 2004!

Member, PR Agency Network

Baltimore • Boston • Chicago • Dallas • Los Angeles • Miami • New York • Washington, D.C.

Ms. Lori Ratzburg
October 15, 2003
Page Two


Based on these <u>facts</u>, as well as the letter attached, I would ask that you call me at your convenience next week so that you or Bob and I can discuss the need for any continuing the 3rd lien Indemnity Deed of Trust on my residence at 2810 R Street. After all, the final fact is that Steve Eisner's signature guarantees one-half of Eisner Petrou's line of credit as well!

I look forward to hearing from you, Lori, and send along my very best wishes to you and Bob as well.

Sincerely,

David M. Petrou

Enclosure



# EXHIBIT
# <u>Q</u>

October 21, 2003

Mr. David M. Petrou, President
Eisner Petrou and Associates
927 Fifteenth Street., NW
Suite 900
Washington DC  20005

Re: your letter of October 15, 2003.

Dear Mr. Petrou:

Thank you for your letter.  We certainly are pleased to hear of the progress that EPA
continues to make toward rebuilding a sound balance sheet and generating consistently
favorable operating results.  While it is clear that you have taken steps in the right
direction, it is just as clear that the current condition of the balance sheet and the rather
recent incidences of large operating losses do not allow Carrollton Bank to continue
providing EPA with financing without the properly executed and recorded Indemnity
Deed of Trust.

When, last year, after large losses, your company expressed a need for additional
funding, Carrollton demonstrated its commitment to the relationship by increasing the
operating line of credit to $350,000.  A very large factor for us in determining whether to
continue to provide a line of credit in any amount was your willingness to provide the
IDOT.

The documents that Lori provided for your execution are merely our effort to correct an
error, to complete the agreed upon transaction.  I apparently must clearly state that
without the properly executed and recorded IDOT, promptly delivered to the bank, a
formal request for full repayment of outstanding balances will be forthcoming.

I am sorry that our introduction had to be in this manner, but please consider my insertion
of myself into the conversation as an indication of the seriousness of the matter from our
perspective.

Very truly yours,

John A. Giovanazi
Senior Vice President
Chief Lending Officer

# EXHIBIT

## R



**EPA**

Eisner Petrou
AND ASSOCIATES

David M. Petrou, APR
President &
Chief Operating Officer

927 Fifteenth St., N.W.
Suite 900
Washington, DC 20005
Tel  202.682.3100   Fax  202.682.9028
email: david.petrou@eisnerpetrou.com

509 South Exeter St.
Baltimore, Maryland 21202
Tel  410.843.3100   Fax  410.752.3550
www.eisnerpetrou.com

*John,*
*FYI*
*yp*

October 23, 2003

Ms. Lori A. Ratzburg
Assistant Vice President
Carrollton Bank
344 North Charles Street ( Ste. 300 )
Washington, D.C. 21201-4301

Dear Lori:

I am in receipt of your letter of October 9, along with the enclosed documents for execution.  And
following a very pleasant conversation with John Giovanazi at your office, I'm returning those
documents with my signatures and notarization, where required.

Again, let me reiterate that I will do everything reasonable as president and chief operating officer—
as well as co-owner of Eisner Petrou with Eisner Communications—to continue monitoring costs and
increasing revenues that will ensure the continuing profitability of EPA.  As I mentioned in my
original response of October 15, I'm enormously proud that while larger, more established
corporations than mine continue awash in red ink, Eisner Petrou has *maintained profitability since
August, 2002.*

Beyond that fact, with the very recent addition of some $200,000 projected annually from Werner
Ladders, approximately $120,000 from the University of Baltimore over the next twelve months and
the reasonably *possible* prospect of winning The American Zoo and Aquarium Association following
our final presentation next Wednesday morning ( not to mention the *unknown* new business
prospects over the fourteen months ahead ), I expect a level of profitability for the corporation, with
a corresponding pay down of our  credit line with Carrollton, to warrant a  serious review of the
need for continuing this lien.  Certainly, the projected profitability, coupled with *Eisner
Communications' fifty percent responsibility for the debt,* should then require no more than the
signatures of the two stockholder representatives, which is *our bond.*

As always, it's a real pleasure to deal with our partners at Carrollton Bank.  Please know how much
I genuinely value our ongoing business relationship.

With warm regards to you, John and, of course, my friend Bob Altieri.

Sincerely,

David M. Petrou

David M. Petrou

Enclosures

cc:  Richard Fisch, Esq.

*Read by*
*file*

Member, PR Agency Network
Baltimore • Boston • Chicago • Dallas • Los Angeles • Miami • New York • Washington, D.C.

# EXHIBIT
# <u>S</u>

RECORDATION REQUESTED BY:
Carrollton Bank
P.O. Box 24129
Baltimore, MD 21227-0629

WHEN RECORDED MAIL TO:
Carrollton Bank
P.O. Box 24129
Baltimore, MD 21227-0629

SEND TAX NOTICES TO:
Carrollton Bank
P.O. Box 24129
Baltimore, MD 21227-0629

SPACE ABOVE THIS LINE IS FOR RECORDER'S USE ONLY

## DEED OF TRUST

### THIS IS A HOME EQUITY CREDIT LINE DEED OF TRUST.

### DEFAULT ON PAYMENTS MAY RESULT IN

### THE LOSS OF YOUR HOME.

THIS DEED OF TRUST is dated October 31, 2002, among David M. Petrou, whose address is 2810 R Street NW, Washington, DC 20007 ("Grantor"); Carrollton Bank, whose address is P.O. Box 24129, Baltimore, MD 21227-0629 (referred to below sometimes as "Lender" and sometimes as "Beneficiary"); and John A. Giovanazi, whose address is 344 North Charles Street, Baltimore , MD 21201 and Gary C. Paul, whose address is 344 North Charles Street, Baltimore , MD 21201 (referred to below as "Trustee").

CONVEYANCE AND GRANT. For valuable consideration, Grantor hereby grants unto Trustee in Trust for the benefit of Lender as Beneficiary all of Grantor's existing and future right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; and all rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, **(the "Real Property") located in the District of Columbia:**

See Schedule "A", which is attached to this Deed of Trust and made a part of this Deed of Trust as if fully set forth herein.

The Real Property or its address is commonly known as 2810 R. Street Northwest, Washington, DC 20007.

REVOLVING LINE OF CREDIT. Specifically, in addition to the amounts specified in the Indebtedness definition, and without limitation, this Deed of Trust secures a guaranty of a revolving line of credit, which obligates Lender to make advances to Borrower so long as Borrower complies with all the terms of the Note.

Grantor presently assigns to Lender (also known as Beneficiary in this Deed of Trust) all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property. In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

THIS DEED OF TRUST, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PERFORMANCE OF A GUARANTY FROM GRANTOR TO LENDER, AND DOES NOT DIRECTLY SECURE THE OBLIGATIONS DUE LENDER UNDER THE NOTE AND (B) PERFORMANCE OF ANY AND ALL OBLIGATIONS UNDER THIS DEED OF TRUST. THIS DEED OF TRUST IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

GRANTOR'S REPRESENTATIONS AND WARRANTIES. Grantor warrants that: (a) Grantor has the full \power, right, and authority to enter into this Deed of Trust and to hypothecate the Property; (b) the provisions of this Deed of Trust do not conflict with, or result in a default under any agreement or other instrument binding upon Grantor and do not result in a violation of any law, regulation, court decree or order applicable to Grantor; (c) Grantor has established adequate means of obtaining from Borrower on a continuing basis information about Borrower's financial condition; and (d) Lender has made no representation to Grantor about Borrower (including without limitation the creditworthiness of Borrower).

PAYMENT AND PERFORMANCE. Except as otherwise provided in this Deed of Trust, Grantor shall strictly perform all of Grantor's obligations under the Guaranty and under this Deed of Trust.

POSSESSION AND MAINTENANCE OF THE PROPERTY. Lender and Grantor agree that Borrower's and Grantor's possession and use of the Property shall be governed by the following provisions:

Possession and Use. Until the occurrence of an Event of Default, Grantor may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) collect the Rents from the Property.

Duty to Maintain. Grantor shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

Compliance With Environmental Laws. Grantor represents and warrants to Lender that: (1) During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the 

DOCH 2003169017

## DEED OF TRUST
### (Continued)

Page 2

Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Deed of Trust. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Deed of Trust or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or should have been known to Grantor. The provisions of this section of the Deed of Trust, including the obligation to indemnify, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Deed of Trust and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Grantor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Deed of Trust.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans With Disabilities Act. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are necessary to protect and preserve the Property.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Deed of Trust:

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, special taxes, assessments, charges (including water and sewer), fines and impositions levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of all liens having priority over or equal to the interest of Lender under this Deed of Trust, except for the lien of taxes and assessments not due, except for the Existing Indebtedness referred to below, and except as otherwise provided in this Deed of Trust.

**Right to Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and reasonable attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials and the cost exceeds $5,000.00. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Deed of Trust.

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a fair value basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Grantor shall also procure and maintain comprehensive general liability insurance in such coverage amounts as Lender may request with Trustee and Lender being named as additional insureds in such liability insurance policies. Additionally, Grantor shall maintain such other insurance, including but not limited to hazard, business interruption, and boiler insurance, as Lender may require. Policies shall be written in form, amounts, coverages and basis acceptable to Lender and issued by a company or companies acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least fifteen (15) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Property is located in a special flood hazard area, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property if the estimated cost of repair or

replacement exceeds $5,000.00. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Deed of Trust. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Deed of Trust, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**Compliance with Existing Indebtedness.** During the period in which any Existing Indebtedness described below is in effect, compliance with the insurance provisions contained in the instrument evidencing such Existing Indebtedness shall constitute compliance with the insurance provisions under this Deed of Trust, to the extent compliance with the terms of this Deed of Trust would constitute a duplication of insurance requirement. If any proceeds from the insurance become payable on loss, the provisions in this Deed of Trust for division of proceeds shall apply only to that portion of the proceeds not payable to the holder of the Existing Indebtedness.

**Grantor's Report on Insurance.** Upon request of Lender, however not more than once a year, Grantor shall furnish to Lender a report on each existing policy of insurance showing: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured, the then current replacement value of such property, and the manner of determining that value; and (5) the expiration date of the policy. Grantor shall, upon request of Lender, have an independent appraiser satisfactory to Lender determine the cash value replacement cost of the Property.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Grantor fails to comply with any provision of this Deed of Trust or any Related Documents, including but not limited to Grantor's failure to comply with any obligation to maintain Existing Indebtedness in good standing as required below, or to discharge or pay when due any amounts Grantor is required to discharge or pay under this Deed of Trust or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; or (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note. The Deed of Trust also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Deed of Trust:

**Title.** Grantor warrants specially that: (a) Grantor holds good and marketable title to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in the Existing Indebtedness section below or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Deed of Trust, and (b) Grantor has the full right, power, and authority to execute and deliver this Deed of Trust to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Trustee or Lender under this Deed of Trust, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Deed of Trust shall survive the execution and delivery of this Deed of Trust, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full.

**EXISTING INDEBTEDNESS.** The following provisions concerning Existing Indebtedness are a part of this Deed of Trust:

**Existing Lien.** The lien of this Deed of Trust securing the Indebtedness may be secondary and inferior to an existing lien. Grantor expressly covenants and agrees to pay, or see to the payment of, the Existing Indebtedness and to prevent any default on such Indebtedness, any default under the instruments evidencing such indebtedness, or any default under any security documents for such indebtedness.

**No Modification.** Grantor shall not enter into any agreement with the holder of any mortgage, deed of trust, or other security agreement which has priority over this Deed of Trust by which that agreement is modified, amended, extended, or renewed without the prior written consent of Lender. Grantor shall neither request nor accept any future advances under any such security agreement without the prior written consent of Lender.

**CONDEMNATION.** The following provisions relating to condemnation proceedings are a part of this Deed of Trust:

**Proceedings.** If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.** If all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award shall mean the award after payment of all reasonable costs, expenses, and attorneys' fees incurred by Trustee or Lender in connection with the condemnation.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Deed of Trust:

**Current Taxes, Fees and Charges.** Upon request by Lender, Grantor shall execute such documents in addition to this Deed of Trust and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Deed of Trust, including without limitation

## DEED OF TRUST
### (Continued)

Page 4

all taxes, fees, documentary stamps, and other charges for recording or registering this Deed of Trust.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Deed of Trust or upon all or any part of the Indebtedness secured by this Deed of Trust; (2) a specific tax on Borrower which Borrower is authorized or required to deduct from payments on the Indebtedness secured by this type of Deed of Trust; (3) a tax on this type of Deed of Trust chargeable against the Lender or the holder of the Note; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Borrower.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Deed of Trust, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Deed of Trust as a security agreement are a part of this Deed of Trust:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Grantor shall execute financing statements and take whatever other action is requested by Lender to perfect and continue Lender's security interest in the Rents and Personal Property. In addition to recording this Deed of Trust in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Deed of Trust as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place convenient to Lender and make it available to Lender promptly following Lender's request to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Deed of Trust may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Deed of Trust.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Deed of Trust:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Borrower's and Grantor's obligations under the Note, this Deed of Trust, and the Related Documents, and (2) the liens and security interests created by this Deed of Trust on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-In-Fact.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Grantor shall strictly perform all of Grantor's obligations under the Guaranty and otherwise performs all the obligations imposed upon Grantor under this Deed of Trust, Lender shall execute and deliver to Trustee a request for full reconveyance and shall execute and deliver to Grantor suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Any reconveyance fee required by law shall be paid by Grantor, if permitted by applicable law.

**EVENTS OF DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Deed of Trust:

**Payment Default.** Borrower fails to make any payment when due under the Note Indebtedness or Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Borrower or Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Deed of Trust or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower or Grantor.

**Default Under the Guaranty.** Failure by Grantor to comply with any term, obligation, covenant or condition contained in the Guaranty.

**Compliance Default.** Failure to comply with any other term, obligation, covenant or condition contained in this Deed of Trust, the Note or in any of the Related Documents. If such a failure is curable and if Borrower or Grantor has not been given a notice of a breach of the same provision of this Deed of Trust within the preceding twelve (12) months, it may be cured (and no Event of Default will have occurred) if Borrower or Grantor, after Lender sends written notice demanding cure of such failure: (a) cures the failure within fifteen (15) days; or (b) if the cure requires more than fifteen (15) days, immediately initiates steps sufficient to cure the failure and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**Default on Other Payments.** Failure of Grantor within the time required by this Deed of Trust to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or Grantor or on Borrower's or Grantor's behalf under this Deed of Trust or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Deed of Trust or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The dissolution or termination of Borrower's or Grantor's existence as a going business, the insolvency of Borrower or Grantor, the appointment of a receiver for any part of Borrower's or Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower or Grantor.

## DEED OF TRUST
## (Continued)

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or Grantor or by any governmental agency against any property securing the Indebtedness. This includes a garnishment of any of Borrower's or Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower or Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower or Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Breach of Other Agreement.** Any breach by Borrower or Grantor under the terms of any other agreement between Borrower or Grantor and Lender that is not remedied within any grace period provided therein, including without limitation any agreement concerning any Indebtedness or other obligation of Borrower or Grantor to Lender, whether existing now or later.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness. In the event of a death, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

**Adverse Change.** A material adverse change occurs in Borrower's or Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Existing Indebtedness.** The payment of any installment of principal or any interest on the Existing Indebtedness is not made within the time required by the promissory note evidencing such indebtedness, or a default occurs under the instrument securing such Indebtedness and is not cured during any applicable grace period in such instrument, or any suit or other action is commenced to foreclose any existing lien on the Property.

**Right to Cure.** If such a failure is curable and if Borrower or Grantor has not been given a notice of a breach of the same provision of this Deed of Trust within the preceding twelve (12) months, it may be cured (and no Event of Default will have occurred) if Borrower or Grantor, after Lender sends written notice demanding cure of such failure: (a) cures the failure within fifteen (15) days; or (b) if the cure requires more than fifteen (15) days, immediately initiates steps sufficient to cure the failure and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND OBLIGATIONS OF GRANTOR AND CONSEQUENCES OF DEFAULT.** Grantor's rights under this Deed of Trust include the right to use and occupy the Property and to receive the Rents, until an Event of Default shall occur and Lender takes such steps as are necessary to terminate such rights, such as foreclosure. Upon payment in full of the Indebtedness, Lender shall release and satisfy this Deed of Trust. Should Grantor default: (A) Grantor is entitled under Section 45-715 of the D.C. Code to be given written notice of Lender's intention to foreclose at least thirty (30) days in advance of the date of such sale; (B) Grantor may also have the right under Section 45-715.1 of the D.C. Code to cure Grantor's default and prevent sale or other disposition of the Property by tendering in the form of cash, cashier's check or certified check all sums necessary to bring the Indebtedness current, including any reasonable late charges, with the exception of any amounts due by operation of any acceleration clause that may be included in the Note or in this Deed of Trust, and performing any other obligation which Grantor would have been bound to perform in the absence of an Event of Default or acceleration. The right to cure may not be exercised more than one (1) time in any two (2) consecutive calendar years. Grantor's obligations include the obligations to pay in a timely manner any sums due under the Note and this Deed of Trust, including any deficiency which may remain after foreclosure, and to comply in a timely manner with all the covenants and agreements set forth in the Note and this Deed of Trust, and all extensions, renewals and modifications of the Note and this Deed of Trust. If an Event of Default occurs, all sums outstanding under the Note and this Deed of Trust may be declared immediately due and payable in full, and the Property may be foreclosed upon. Grantor's failure to cure any Event of Default in a timely manner prior to the Foreclose sale will result in the loss of Grantor's home at the foreclosure sale.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Deed of Trust, at any time thereafter, Trustee or Lender may exercise any one or more of the following rights and remedies:

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Deed of Trust, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**Accelerate Indebtedness.** Lender shall have the right at its option, after giving all required notices of default and after passage of any grace period, to declare the entire Indebtedness immediately due and payable, including any prepayment penalty which Borrower would be required to pay.

**Foreclosure.** At the request of the holder of the Note, Trustee shall have the power and it shall be Trustee's duty to sell the Property or any part thereof at public auction, in such manner, and at such time and place, upon such terms and conditions, and upon such public notice as Trustee may deem best for the interest of all concerned consisting of advertisement in a newspaper of general circulation in the District of Columbia for at least five (5) times over the ten (10) calendar days prior to the sale, or for such other period as applicable law may require, and in case of default of any purchaser, to re-sell the same with postponement of sale or re-sale and upon such public notice thereof as Trustee may determine, and upon compliance by the purchaser with the terms of sale, and upon judicial approval as may be required by law, convey the Property to and at the cost of the purchaser, who shall not be liable to see to the application of the purchase money. The proceeds of sale shall be applied by Trustee as follows: (a) first, to pay all proper advertising expenses, auctioneer's allowance, the expenses, if any, required to correct any irregularity in the title, premium for Trustee's bond, auditor's fee, attorneys' fees, and all other expenses of sale incurred in or about the protection and execution of this Deed of Trust, and all moneys advanced for taxes, assessments, insurance, and with interest thereon at the rate provided in the Note, and all taxes and assessments due upon the Property at time of sale, and to retain as compensation a commission of five percent (5%) on the amount of the sale or sales; (b) second, to pay the whole amount then remaining unpaid on the Indebtedness; (c) third, to pay liens of record against the Property according to their priority of lien and to the extent that funds remaining in Trustee's hands are available; and (d) last, to pay the remainder of the proceeds, if any, to Grantor, Grantor's heirs, personal representatives, successors or assigns upon the delivery and surrender to the purchaser of possession of the Property, less costs and expenses of obtaining possession.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

**Collect Rents.** Lender shall have the right, without notice to Borrower or Grantor to take possession of and manage the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In

## DEED OF TRUST
### (Continued)

furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Grantor irrevocably designates Lender as Grantor's attorney–in–fact to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Tenancy at Will.** If Grantor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Grantor, Grantor shall become a tenant at will of Lender or the purchaser of the Property and shall, at Lender's option, either (1) pay a reasonable rental for the use of the Property, or (2) vacate the Property immediately upon the demand of Lender.

**Other Remedies.** Trustee or Lender shall have any other right or remedy provided in this Deed of Trust or the Note or by law.

**Notice of Sale.** Unless otherwise required by law, Trustee or Lender shall give Grantor written notice of any sale of the Real Property at least thirty (30) days in advance of the intended date of the sale. The notice will be sent by certified mail, return receipt requested, to Grantor's last known address.

**Sale of the Property.** To the extent permitted by applicable law, Borrower and Grantor hereby waives any and all rights to have the Property marshalled. In exercising its rights and remedies, the Trustee or Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Deed of Trust, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including reasonable attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post–judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees, title insurance, and fees for the Trustee, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**Rights of Trustee.** Trustee shall have all of the rights and duties of Lender as set forth in this section.

**POWERS AND OBLIGATIONS OF TRUSTEE.** The following provisions relating to the powers and obligations of Trustee are part of this Deed of Trust:

**Powers of Trustee.** In addition to all powers of Trustee arising as a matter of law, Trustee shall have the power to take the following actions with respect to the Property upon the written request of Lender and Grantor: (a) join in preparing and filing a map or plat of the Real Property, including the dedication of streets or other rights to the public; (b) join in granting any easement or creating any restriction on the Real Property; and (c) join in any subordination or other agreement affecting this Deed of Trust or the interest of Lender under this Deed of Trust.

**Obligations to Notify.** Trustee shall not be obligated to notify any other party of a pending sale under any other trust deed or lien, or of any action or proceeding in which Grantor, Lender, or Trustee shall be a party, unless the action or proceeding is brought by Trustee.

**Trustee.** Trustee shall meet all qualifications required for Trustee under applicable law. In addition to the rights and remedies set forth above, with respect to all or any part of the Property, the Trustee shall have the right to foreclose by notice and sale, and Lender shall have the right to foreclose by judicial foreclosure, in either case in accordance with and to the full extent provided by applicable law.

**Successor Trustee.** Lender, at Lender's option, at any time hereafter and without prior notice and without specifying any reason, may from time to time appoint a successor Trustee to any Trustee appointed under this Deed of Trust by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of Deeds for the District of Columbia. The instrument shall contain, in addition to all other matters required by applicable law, the names of the original Lender, Trustee, and Grantor, the book and page where this Deed of Trust is recorded, and the name and address of the successor trustee, and the instrument shall be executed and acknowledged by Lender or its successors in interest. The successor trustee, without conveyance of the Property, shall succeed to all the title, power, and duties conferred upon the Trustee in this Deed of Trust and by applicable law. This procedure for substitution of Trustee shall govern to the exclusion of all other provisions for substitution.

**Power to Act Separately.** If more than one Trustee is named in this Deed of Trust, any Trustee may act alone, without the joinder of any other Trustee, to exercise any or all the powers given to the Trustees collectively in this Deed of Trust or by applicable law.

**NOTICES.** Any notice required to be given under this Deed of Trust, including without limitation any notice of default and any notice of sale shall be given in writing, and shall be effective when mailed by certified mail postage prepaid, directed to the addresses shown near the beginning of this Deed of Trust. All copies of notices of foreclosure from the holder of any lien which has priority over this Deed of Trust shall be sent to Lender's address, as shown near the beginning of this Deed of Trust. Any party may change its address for notices under this Deed of Trust by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Deed of Trust:

**Amendments.** This Deed of Trust, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Deed of Trust. No alteration of or amendment to this Deed of Trust shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Annual Reports.** If the Property is used for purposes other than Grantor's residence, Grantor shall furnish to Lender, upon request, a certified statement of net operating income received from the Property during Grantor's previous fiscal year in such form and detail as Lender shall require. "Net operating income" shall mean all cash receipts from the Property less all cash expenditures made in connection with the operation of the Property.

## DEED OF TRUST
### (Continued)

**Caption Headings.** Caption headings in this Deed of Trust are for convenience purposes only and are not to be used to interpret or define the provisions of this Deed of Trust.

**Merger.** There shall be no merger of the interest or estate created by this Deed of Trust with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Governing Law.** This Deed of Trust will be governed by, construed and enforced in accordance with federal law and the laws of the State of Maryland, except and only to the extent of procedural matters related to the perfection and enforcement of Lender's rights and remedies against the Property, which matters shall be governed by the laws of the District of Columbia. However, in the event that the enforceability or validity of any provision of this Deed of Trust is challenged or questioned, such provision shall be governed by whichever applicable state or federal law would uphold or would enforce such challenged or questioned provision. The loan transaction which is evidenced by the Note and this Deed of Trust has been applied for, considered, approved and made, and all necessary loan documents have been accepted by Lender in the State of Maryland.

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of the City of Baltimore, State of Maryland.

**Joint and Several Liability.** All obligations of Borrower and Grantor under this Deed of Trust shall be joint and several, and all references to Grantor shall mean each and every Grantor, and all references to Borrower shall mean each and every Borrower. This means that each Borrower and Grantor signing below is responsible for all obligations in this Deed of Trust.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Deed of Trust unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Deed of Trust shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Deed of Trust. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Deed of Trust, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Deed of Trust to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Deed of Trust. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Deed of Trust shall not affect the legality, validity or enforceability of any other provision of this Deed of Trust.

**Successors and Assigns.** Subject to any limitations stated in this Deed of Trust on transfer of Grantor's interest, this Deed of Trust shall be binding upon and inure to the benefit of the parties, their heirs, personal representatives, successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Deed of Trust and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Deed of Trust or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Deed of Trust.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Deed of Trust. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Deed of Trust shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Beneficiary.** The word "Beneficiary" means Carrollton Bank, and its successors and assigns.

**Borrower.** The word "Borrower" means Eisner Petrou & Associates, Inc. and includes all co-signers and co-makers signing the Note.

**Deed of Trust.** The words "Deed of Trust" mean this Deed of Trust among Grantor, Lender, and Trustee.

**Default.** The word "Default" means the Default set forth in this Deed of Trust in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99–499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Deed of Trust in the events of default section of this Deed of Trust.

**Existing Indebtedness.** The words "Existing Indebtedness" mean the indebtedness described in the Existing Liens provision of this Deed of Trust.

**Grantor.** The word "Grantor" means David M. Petrou.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Grantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by–products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

## DEED OF TRUST
### (Continued)

Page 8

Indebtedness. The word "Indebtedness" means all obligations of Grantor under the Guaranty, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the obligations under the Guaranty and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Trustee or Lender to enforce Grantor's obligations under this Deed of Trust, together with interest on such amounts as provided in this Deed of Trust.

Lender. The word "Lender" means Carrollton Bank, its successors and assigns.

Note. The word "Note" means the promissory note dated October 31, 2002, **in the original principal amount of $350,000.00** from Borrower to Lender, together with all modifications of and renewals, replacements, and substitutions for the promissory note or agreement. NOTICE TO GRANTOR: THE NOTE CONTAINS A VARIABLE INTEREST RATE.

Personal Property. The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

Property. The word "Property" means collectively the Real Property and the Personal Property.

Real Property. The words "Real Property" mean the real property, interests and rights, as further described in this Deed of Trust.

Related Documents. The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

Rents. The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

Trustee. The word "Trustee" means John A. Giovanazi, whose address is 344 North Charles Street, Baltimore , MD 21201 and Gary C. Paul, whose address is 344 North Charles Street, Baltimore , MD 21201 and any substitute or successor trustees.

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS DEED OF TRUST, AND GRANTOR AGREES TO ITS TERMS.

THIS DEED OF TRUST IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS DEED OF TRUST IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

GRANTOR:

X _____ (Seal)
David M. Petrou, Individually
2810 R Street NW
Washington, DC 20007

Signed, acknowledged and delivered in the presence of:

X _____
Witness

X _____
Witness

## INDIVIDUAL ACKNOWLEDGMENT

DISTRICT OF COLUMBIA          )
                             ) SS
                             )

I, SANDY R. GORTON _____, a Notary Public in and for the District of Columbia, do hereby certify that David M. Petrou, who is personally well known to me as the person who executed the Deed of Trust bearing the date of October 31, 2002, personally appeared before me in the District of Columbia and acknowledged said Deed of Trust to be his or her act and deed, and that he or she executed said Deed of Trust for the purposes therein contained.

Witness my hand and official seal this ____23rd____ day of ___October___, 20_02_.

_____
                                        Notary Public

(Notarial Seal)

My commission expires 9/14/2006

## DEED OF TRUST
### (Continued)

## REQUEST FOR FULL RECONVEYANCE
(To be used only when obligations have been paid in full)

To: _____, Trustee

The undersigned is the legal owner and holder of all Indebtedness secured by this Deed of Trust. All sums secured by this Deed of Trust have been fully paid and satisfied. You are hereby directed, upon payment to you of any sums owing to you under the terms of this Deed of Trust or pursuant to any applicable statute, to cancel the Note secured by this Deed of Trust (which is delivered to you together with this Deed of Trust), and to reconvey, without warranty, to the parties designated by the terms of this Deed of Trust, the estate now held by you under this Deed of Trust.  Please mail the reconveyance and Related Documents to:

_____.

Date: _____

Beneficiary: _____

By: _____

Its: _____

DEED OF TRUST
(Continued)

Page 10

GRANTOR:

X _____ (Seal)
David M. Petrou, Individually
2810 R Street NW
Washington, DC  20007

TRUSTEE:

X _____
John A. Giovanazi, Individually
344 North Charles Street
Baltimore , MD  21201

X _____
Gary C. Peal, Individually
344 North Charles Street
Baltimore , MD  21201

LENDER:

CARROLLTON BANK

X _____
Authorized Signer
P.O. Box 24129
Baltimore  MD  21227-0629

LASER PRO Lending, Ver. 3.22.00.004  Copr. Harland Financial Solutions, Inc. 1997, 2002.  All Rights Reserved.  - DC/MD  C:\CFI\N1\CFILPL\G01.FC  TR-146  PR-6

# SECURITY AFFIDAVIT
# CLASS 1 and CLASS 2

I, (We)_____David M. Petrou_____ the owner(s) of the real property
described within certify, subject to criminal penalties for making false
statements pursuant to section 404 of the District of Columbia Theft and
White Collar Crimes Act of 1982, effective December 1, 1982 (D.C. Law 4-
164; D.C. Code 22-2514), that the real property described within is either
Class 1 Property or Class 2 Property, as those classes of property are
established pursuant to section 412a of District of Columbia Real Property
Tax Revision Act of 1974, approved September 3, 1974 (88 Stat.1051 D.C.
Code 47-813), with 5 or fewer units.

_____
(Signature)

_____
(Signature)

Subscribed and sworn to before me this 23rd day of October,
2003.

My commission expires: __4/14/2006__   _____
                                        (Notary Public)
                                        D.C. Notary

ROD Form ADM 14A
Revised 4/98

being in the District of Columbia, namely:

Part of Square One Hundred Fourteen (114) in Georgetown, now Square Twelve Hundred Eighty-four (1284) in the City of Washington described in accordance with survey recorded in Survey Book 169 at page 439, as follows:

BEGINNING for the same at a point in the South line of R Street (formerly Road Street) distant 102.853 feet West of the West line of 28th Street, formerly Montgomery Street, said point being the center of the partition wall between premises 2808 and 2810 R Street, and thence South along said center line of said wall and a South prolongation thereof 60 feet; thence West, 34.286 feet; thence North 60 feet to the said South line of R Street; and thence East, 34.286 feet to the beginning.

NOTE: At the date hereof the above described land is designated on the Records of the Assessor for the District of Columbia for assessments and taxation purposes as Lot Eight Hundred Twenty-two (822) in Square Twelve Hundred Eighty-four (1284).

Subject to right of way granted The Chesapeake and Potomac Telephone Company by Deed dated March 11, 1957 and recorded in Liber 10842, folio 329 among the Land Records of the District of Columbia.

And the said parties of the first part do hereby covenant to warrant specially the property hereby conveyed and to execute such further assurances of said land as may be requisite.



THIS IS TO CERTIFY THAT THIS IS A TRUE COPY

Recorder of Deeds, D.C.

MAY 0 2 2007

# EXHIBIT
# T

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $350,000.00 | 10-28-2003 | 12-31-2003 | 8002120 | | 880001409 | EM | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:**  Eisner Petrou & Associates, Inc.     **Lender:**  Carrollton Bank
509 South Exeter Street                                      P.O. Box 24129
Baltimore, MD 21201                                           Baltimore, MD 21227-0629

---

**Principal Amount: $350,000.00**     **Initial Rate: 5.000%**     **Date of Agreement: October 28, 2003**

**DESCRIPTION OF EXISTING INDEBTEDNESS.** Principal outstanding as of 10/28/03 $350,000.00.

**DESCRIPTION OF COLLATERAL.** All Business Assets & Indemnity Deed of Trust on property known as 2810 R. Street Northwest, Washington DC 20007.

**DESCRIPTION OF CHANGE IN TERMS.** Maturity Date Extended to December 31, 2003.

**PROMISE TO PAY.** Eisner Petrou & Associates, Inc. ("Borrower") promises to pay to Carrollton Bank ("Lender"), or order, in lawful money of the United States of America, the principal amount of Three Hundred Fifty Thousand & 00/100 Dollars ($350,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

**PAYMENT.** Borrower will pay this loan on demand. Payment in full is due immediately upon Lender's demand. If no demand is made, Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on December 31, 2003. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning November 30, 2003, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges. Interest on this Agreement is computed on a 365/360 simple interest basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this Agreement is subject to change from time to time based on changes in an independent index which is the Prime Rate as published in the Wall Street Journal. When a range of rates has been published, the lower of the rates will be used. (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notice to Borrower. Lender will tell Borrower the current interest rate upon Borrower's request. The interest rate change will not occur more often than each month on the first business day of the month. Borrower understands that Lender may make loans based on other rates as well. **The index currently is 4.000% per annum. The interest rate to be applied to the unpaid principal balance of the Note will be at a rate of 1.000 percentage point over the Index, resulting in an initial rate of 5.000% per annum.** NOTICE: Under no circumstances will the interest rate on the Note be more than the maximum rate allowed by applicable law.

**PREPAYMENT.** Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Agreement, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Carrollton Bank, 344 N. Charles Street Baltimore, MD 21201.

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged **5.000% of the regularly scheduled payment.**

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, Lender, at its option, may, if permitted under applicable law, increase the variable interest rate on this Agreement to 5.250 percentage points over the Index. The interest rate will not exceed the maximum rate permitted by applicable law.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Indebtedness.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, or a trustee or receiver is appointed for Borrower or for all or a substantial portion of the assets of Borrower, or Borrower makes a general assignment for the benefit of Borrower's creditors, or Borrower files for bankruptcy, or an involuntary bankruptcy petition is filed against Borrower and such involuntary petition remains undismissed for sixty (60) days.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self–help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness evidenced by this Note. In the event of a death, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

**Change in Ownership.** Any change in ownership of twenty–five percent (25%) or more of the common stock of Borrower.

# CHANGE IN TERMS AGREEMENT
## (Continued)

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured (and no event of default will have occurred) if Borrower, after receiving written notice from Lender demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance on this Agreement and all accrued unpaid interest, together with all other applicable fees, costs and charges, if any, immediately due and payable, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Subject to any limits under applicable law, upon default, Borrower agrees to pay Lender's attorneys' fees and all of Lender's other collection expenses, whether or not there is a lawsuit, including without limitation legal expenses for bankruptcy proceedings.

**GOVERNING LAW. This Agreement will be governed by, construed and enforced in accordance with federal law and the laws of the State of Maryland. This Agreement has been accepted by Lender in the State of Maryland.**

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of the City of Baltimore, State of Maryland.

**CONFESSED JUDGMENT. UPON THE OCCURRENCE OF A DEFAULT, BORROWER HEREBY AUTHORIZES ANY ATTORNEY DESIGNATED BY LENDER OR ANY CLERK OF ANY COURT OF RECORD TO APPEAR FOR BORROWER IN ANY COURT OF RECORD AND CONFESS JUDGMENT WITHOUT PRIOR HEARING AGAINST BORROWER IN FAVOR OF LENDER FOR, AND IN THE AMOUNT OF, THE UNPAID BALANCE OF THE PRINCIPAL AMOUNT OF THIS AGREEMENT, ALL INTEREST ACCRUED AND UNPAID THEREON, ALL OTHER AMOUNTS PAYABLE BY BORROWER TO LENDER UNDER THE TERMS OF THIS AGREEMENT OR ANY OTHER AGREEMENT, DOCUMENTS, INSTRUMENT EVIDENCING, SECURING OR GUARANTYING THE OBLIGATIONS EVIDENCED BY THIS AGREEMENT, COSTS OF SUIT, AND ATTORNEYS' FEES OF FIFTEEN PERCENT (15%) OF THE UNPAID BALANCE OF THE PRINCIPAL AMOUNT OF THIS AGREEMENT AND INTEREST THEN DUE HEREUNDER.**

**Borrower hereby releases, to the extent permitted by applicable law, all errors and all rights of exemption, appeal, stay of execution, inquisition, and other rights to which Borrower may otherwise be entitled under the laws of the United States or of any state or possession of the United States now in force and which may hereafter be enacted. The authority and power to appear for and enter judgment against Borrower shall not be exhausted by one or more exercises thereof or by any imperfect exercise thereof and shall not be extinguished by any judgment entered pursuant thereto. Such authority may be exercised on one or more occasions or from time to time in the same or different jurisdictions as often as Lender shall deem necessary or desirable, for all of which this Agreement shall be a sufficient warrant.**

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

**COLLATERAL.** Borrower acknowledges this Agreement is secured by the following collateral described in the security instrument listed herein, all the terms and conditions of which are hereby incorporated and made a part of this Agreement: inventory, chattel paper, accounts, equipment and general intangibles described in a Commercial Security Agreement dated October 28, 2003.

**LINE OF CREDIT.** This Agreement evidences a revolving line of credit. Advances under this Agreement may be requested orally by Borrower or as provided in this paragraph. All oral requests shall be confirmed in writing on the day of the request. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following persons currently are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of their authority: **Steven M. Eisner, Chairman & CEO of Eisner Petrou & Associates, Inc.; David M. Petrou, President & COO of Eisner Petrou & Associates, Inc.; and Steven Blum, Chief Financial Officer.** Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Agreement at any time may be evidenced by endorsements on this Agreement or by Lender's internal records, including daily computer print-outs. Lender will have no obligation to advance funds under this Agreement if: (A) Borrower or any guarantor is in default under the terms of this Agreement or any agreement that Borrower or any guarantor has with Lender, including any agreement made in connection with the signing of this Agreement; (B) Borrower or any guarantor ceases doing business or is insolvent; (C) any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of this Agreement or any other loan with Lender; (D) Borrower has applied funds provided pursuant to this Agreement for purposes other than those authorized by Lender; or (E) Lender in good faith believes itself insecure.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non–signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**CONSENT TO JURISDICTION.** Borrower irrevocably submits to the jurisdiction of any state or federal court sitting in the State of Maryland over any suit, action, or proceeding arising out of or relating to this Agreement. Borrower irrevocably waives, to the fullest extent permitted by law, any objection that Borrower may now or hereafter have to the laying of venue of any such suit, action, or proceeding brought in any such court and any claim that any such suit, action, or proceeding brought in any such court has been brought in an inconvenient forum. Final judgment in any such suit, action, or proceeding brought in any such court shall be conclusive and binding upon Borrower and may be enforced in any court in which Borrower is subject to jurisdiction by a suit upon such judgment provided that service of process is effected upon Borrower as provided in this Agreement or as otherwise permitted by applicable law.

**SUCCESSORS AND ASSIGNS.** Subject to any limitations stated in this Agreement on transfer of Borrower's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their heirs, personal representatives, successors and assigns. If ownership of the Collateral becomes vested in a person other than Borrower, Lender, without notice to Borrower, may deal with Borrower's successors with reference to this Agreement and the indebtedness by way of forbearance or extension without releasing Borrower from the obligations of this Agreement or liability under the Indebtedness.

NOV-25-2003 12:27 PM        P.01
NOV-25-2003  10:32     CARROLLTON BANK C/L        410 332 0424  P.03/03

Loan No: 8002120

# CHANGE IN TERMS AGREEMENT
## (Continued)

Page 3

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Please notify us if we report any inaccurate information about your account(s) to a consumer reporting agency. Your written notice describing the specific inaccuracy(ies) should be sent to us at the following address: Carrollton Bank, P.O. Box 64123, Baltimore, MD 21287-0123

**MISCELLANEOUS PROVISIONS.** This Agreement is payable on demand. The inclusion of specific default provisions or rights of Lender shall not preclude Lender's right to declare payment of this Agreement on its demand. If any part of this Agreement cannot be enforced, this fact will not affect the rest of the Agreement. Borrower does not agree or intend to pay, and Lender does not agree or intend to contract for, charge, collect, take, reserve or receive (collectively referred to herein as "charge or collect"), any amount in the nature of interest or in the nature of a fee for this loan, which would in any way or event (including demand, prepayment, or acceleration) cause Lender to charge or collect more for this loan than the maximum Lender would be permitted to charge or collect by federal law or the law of the State of Maryland (as applicable). Any such excess interest or unauthorized fee shall, instead of anything stated to the contrary, be applied first to reduce the principal balance of this loan, and when the principal has been paid in full, be refunded to Borrower. Lender may delay or forgo enforcing any of its rights or remedies under this Agreement without losing them. Borrower and any other person who signs, guarantees or endorses this Agreement, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Agreement, and unless otherwise expressly stated in writing, no party who signs this Agreement, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made.

**APPLICABLE LENDING LAW.** This loan is being made under the terms and provisions of Subtitle 9 of Title 12 of the Maryland Commercial Law Article.

**PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.**

**THIS AGREEMENT IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS AGREEMENT IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.**

CIT SIGNERS:

ETENER PETROU & ASSOCIATES, INC.

By:_____(Seal)
   Marvin M. Meiser, Chairman & CEO of Etener Petrou
   & Associates, Inc.

By:_____(Seal)
   David M. Petrou, President & COO of Etener Petrou
   & Associates, Inc.

LASER PRO Lending, Ver. 5.25.00.003  Copr. Harland Financial Solutions, Inc. 1997, 2003.  All Rights Reserved.  - MD  E:\CFI\WIN\CFI\LPL\D20a2.FC  TR-442  PR-5

TOTAL P.03

# EXHIBIT

# <u>U</u>

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $350,000.00 | 12-31-2003 | | 6002120 | | 3600H401 | JG | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Elsner Petrou & Associates, Inc.
509 South Exeter Street
Baltimore, MD 21201

**Lender:** Carrollton Bank
P.O. Box 24129
Baltimore, MD 21227-0629

**Principal Amount: $350,000.00** **Initial Rate: 5.000%** **Date of Agreement: December 31, 2003**

**DESCRIPTION OF EXISTING INDEBTEDNESS.** Principal outstanding as of 12/31/03 $350,000.00.

**DESCRIPTION OF COLLATERAL.** All Business Assets & Indemnity Deed of Trust on property known as 2810 R. Street Northwest, Washington DC 20007.

**DESCRIPTION OF CHANGE IN TERMS.** Effective date of this Change in Terms Agreement the principal balance is payable on demand. .

**PROMISE TO PAY.** Elsner Petrou & Associates, Inc. ("Borrower") promises to pay to Carrollton Bank ("Lender"), or order, in lawful money of the United States of America, on demand, the principal amount of Three Hundred Fifty Thousand & 00/100 Dollars ($350,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

**PAYMENT.** Borrower will pay this loan immediately upon Lender's demand. Payment in full is due immediately upon Lender's demand. Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning January 31, 2004, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges. Interest on this Agreement is computed on a 365/360 simple interest basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this Agreement is subject to change from time to time based on changes in an independent index which is the Prime Rate as published in the Wall Street Journal. When a range of rates has been published, the lower of the rates will be used. (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notice to Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each month on the first business day of the month. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 4.000% per annum. The interest rate to be applied to the unpaid principal balance of the Note will be at a rate of 1.000 percentage point over the Index, resulting in an initial rate of 5.000% per annum. NOTICE: Under no circumstances will the interest rate on the Note be more than the maximum rate allowed by applicable law.

**PREPAYMENT.** Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Agreement, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Carrollton Bank, 344 N. Charles Street Baltimore, MD 21201.

**LATE CHARGE.** If a regularly scheduled interest payment is 10 days or more late, Borrower will be charged 5.000% of the regularly scheduled payment. If Lender demands payment of this loan, and Borrower does not pay the loan in full within 10 days after Lender's demand, Borrower also will be charged 5.000% of the sum of the unpaid principal plus accrued unpaid interest.

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, Lender, at its option, may, if permitted under applicable law, increase the variable interest rate on this Agreement to 5.250 percentage points over the Index. The interest rate will not exceed the maximum rate permitted by applicable law.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Indebtedness.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, or a trustee or receiver is appointed for Borrower or for all or a substantial portion of the assets of Borrower, or Borrower makes a general assignment for the benefit of Borrower's creditors, or Borrower files for bankruptcy, or an involuntary bankruptcy petition is filed against Borrower and such involuntary petition remains undismissed for sixty (60) days.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness evidenced by this Note. In the event of a death, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

## CHANGE IN TERMS AGREEMENT
### (Continued)

Loan No: 8002120                                                                 Page 2

**Change in Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured (and no event of default will have occurred) if Borrower, after receiving written notice from Lender demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance on this Agreement and all accrued unpaid interest, together with all other applicable fees, costs and charges, if any, immediately due and payable, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Subject to any limits under applicable law, upon default, Borrower agrees to pay Lender's attorneys' fees and all of Lender's other collection expenses, whether or not there is a lawsuit, including without limitation legal expenses for bankruptcy proceedings.

**GOVERNING LAW.** This Agreement will be governed by, construed and enforced in accordance with federal law and the laws of the State of Maryland. This Agreement has been accepted by Lender in the State of Maryland.

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of the City of Baltimore, State of Maryland.

**CONFESSED JUDGMENT.** UPON THE OCCURRENCE OF A DEFAULT, BORROWER HEREBY AUTHORIZES ANY ATTORNEY DESIGNATED BY LENDER OR ANY CLERK OF ANY COURT OF RECORD TO APPEAR FOR BORROWER IN ANY COURT OF RECORD AND CONFESS JUDGMENT WITHOUT PRIOR HEARING AGAINST BORROWER IN FAVOR OF LENDER FOR, AND IN THE AMOUNT OF, THE UNPAID BALANCE OF THE PRINCIPAL AMOUNT OF THIS AGREEMENT, ALL INTEREST ACCRUED AND UNPAID THEREON, ALL OTHER AMOUNTS PAYABLE BY BORROWER TO LENDER UNDER THE TERMS OF THIS AGREEMENT OR ANY OTHER AGREEMENT, DOCUMENTS, INSTRUMENT EVIDENCING, SECURING OR GUARANTYING THE OBLIGATIONS EVIDENCED BY THIS AGREEMENT, COSTS OF SUIT, AND ATTORNEYS' FEES OF FIFTEEN PERCENT (15%) OF THE UNPAID BALANCE OF THE PRINCIPAL AMOUNT OF THIS AGREEMENT AND INTEREST THEN DUE HEREUNDER.

Borrower hereby releases, to the extent permitted by applicable law, all errors and all rights of exemption, appeal, stay of execution, inquisition, and other rights to which Borrower may otherwise be entitled under the laws of the United States or of any state or possession of the United States now in force and which may hereafter be enacted. The authority and power to appear for and enter judgment against Borrower shall not be exhausted by one or more exercises thereof or by any imperfect exercise thereof and shall not be extinguished by any judgment entered pursuant thereto. Such authority may be exercised on one or more occasions or from time to time in the same or different jurisdictions as often as Lender shall deem necessary or desirable, for all of which this Agreement shall be a sufficient warrant.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

**COLLATERAL.** Borrower acknowledges this Agreement is secured by the following collateral described in the security instrument listed herein, all the terms and conditions of which are hereby incorporated and made a part of this Agreement: inventory, chattel paper, accounts, equipment and general intangibles described in a Commercial Security Agreement dated December 31, 2003.

**LINE OF CREDIT.** This Agreement evidences a revolving line of credit. Advances under this Agreement may be requested orally by Borrower or as provided in this paragraph. All oral requests shall be confirmed in writing on the day of the request. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following persons currently are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of their authority: Steven M. Elsner, Chairman & CEO of Elsner Petrou & Associates, Inc.; David M. Petrou, President & COO of Elsner Petrou & Associates, Inc.; and Steven Blum, Chief Financial Officer. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Agreement at any time may be evidenced by endorsements on this Agreement or by Lender's internal records, including daily computer print-outs. Lender will have no obligation to advance funds under this Agreement if: (A) Borrower or any guarantor is in default under the terms of this Agreement or any agreement that Borrower or any guarantor has with Lender, including any agreement made in connection with the signing of this Agreement; (B) Borrower or any guarantor ceases doing business or is insolvent; (C) any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of the Agreement or of any other loan with Lender; (D) Borrower has applied funds provided pursuant to this Agreement for purposes other than those authorized by Lender; or (E) Lender in good faith believes itself insecure.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**CONSENT TO JURISDICTION.** Borrower irrevocably submits to the jurisdiction of any state or federal court sitting in the State of Maryland over any suit, action, or proceeding arising out of or relating to this Agreement. Borrower irrevocably waives, to the fullest extent permitted by law, any objection that Borrower may now or hereafter have to the laying of venue of any such suit, action, or proceeding brought in any such court and any claim that any such suit, action, or proceeding brought in any such court has been brought in an inconvenient forum. Final judgment in any such suit, action, or proceeding brought in any such court shall be conclusive and binding upon Borrower and may be enforced in any court in which Borrower is subject to jurisdiction by a suit upon such judgment provided that service of process is effected upon Borrower as provided in this Agreement or as otherwise permitted by applicable law.

**SUCCESSORS AND ASSIGNS.** Subject to any limitations stated in this Agreement on transfer of Borrower's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their heirs, personal representatives, successors and assigns. If ownership of the Collateral becomes vested in a person other than Borrower, Lender, without notice to Borrower, may deal with Borrower's successors with reference to this Agreement and the indebtedness by way of forbearance or extension without releasing Borrower from the obligations of this Agreement or liability under the

## CHANGE IN TERMS AGREEMENT
(Continued)

Loan No: 5002120                                                                          Page 3

Indebtedness.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Please notify us if we report any inaccurate information about your account(s) to a consumer reporting agency. Your written notice describing the specific inaccuracy(ies) should be sent to us at the following address: Carrollton Bank, P.O. Box 24129, Baltimore, MD 21227-0629

**MISCELLANEOUS PROVISIONS.** This Agreement is payable on demand. The inclusion of specific default provisions or rights of Lender shall not preclude Lender's right to declare payment of this Agreement on its demand. If any part of this Agreement cannot be enforced, this fact will not affect the rest of the Agreement. Borrower does not agree or intend to pay, and Lender does not agree or intend to contract for, charge, collect, take, reserve or receive (collectively referred to herein as "charge or collect"), any amount in the nature of interest or in the nature of a fee for this loan, which would in any way or event (including demand, prepayment, or acceleration) cause Lender to charge or collect more for this loan than the maximum Lender would be permitted to charge or collect by federal law or the law of the State of Maryland (as applicable). Any such excess interest or unauthorized fee shall, instead of anything stated to the contrary, be applied first to reduce the principal balance of this loan, and when the principal has been paid in full, be refunded to Borrower. Lender may delay or forgo enforcing any of its rights or remedies under this Agreement without losing them. Borrower and any other person who signs, guarantees or endorses this Agreement, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Agreement, and unless otherwise expressly stated in writing, no party who signs this Agreement, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made.

**APPLICABLE LENDING LAW.** This loan is being made under the terms and provisions of Subtitle 9 of Title 12 of the Maryland Commercial Law Article.

**PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.**

**THIS AGREEMENT IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS AGREEMENT IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.**

CIT SIGNERS:

EISNER PETROU & ASSOCIATES, INC.

By: _____ (Seal)
Steven N. Eisner, Chairman & CEO of Eisner Petrou
& Associates, Inc.

X _____ (Seal)
David M. Petrou

By: _____ (Seal)
David M. Petrou, President & COO of Eisner Petrou
& Associates, Inc.

X _____ (Seal)
Steven C. Eisner

TOTAL P.04

# EXHIBIT
# V

# ROGERS, MOORE and ROGERS, LLP
*Attorneys at Law*

WILLIAM C. ROGERS (1921-1970)

WILLIAM C. ROGERS JR.
W. CHARLES ROGERS, III

SIX SOUTH CALVERT
BALTIMORE, MD 21202
(410) 727-4456
FAX (443) 524-0835

ROBERT JAMES PARSONS, II
BRIAN N. ROGERS
M. RAMSAY BELL

November 20, 2006

Eisner Petrou & Associates, Inc.
509 S. Exeter Street
Baltimore, MD 21202

RE:  Promissory Note dated October 31, 2002 for
     $350,000.00 from Eisner Petrou & Associates, Inc.
     ("Company") to Carrollton Bank
     Account No. 880001409-2120

Dear Sir or Madam:

     This firm represents Carrollton Bank concerning the
captioned Promissory Note and all Change in Terms Agreements
thereof (collectively "Note"), which Note evidences repayment of
a line of credit loan ("Loan") from Carrollton Bank to the
Company on October 31, 2002 in maximum principal amount of the
Note.

     Pursuant to the terms of the Note and the other documents
concerning the Loan ("Loan Documents"), the Company is notified
that Carrollton demands payment in full of the Loan on or before
noon, December 29, 2006.

     The full amount due, as of November 14, 2006, was
$349,730.51, itemized as follows:

                Principal balance:                  $345,396.25
                Interest to November 14, 2006:         4,171.14
                Late fee:                                133.12
                Pay-off fee:                              30.00

Eisner Petrou & Associates, Inc.
November 20, 2006
Page Two


    The amount due to Carrollton Bank which it must pay will
increase by the per diem interest of $88.7476 from November 14,
2006 through and including the date payment is received by
Carrollton Bank and by any additional late fees which may become
due.

    Payment must be received by Carrollton Bank by noon on
December 29, 2006 ("Payment Deadline"). If payment is not
received by the Payment Deadline, you will be in default under
the Loan Documents and Carrollton Bank will pursue all available
remedies under the Loan Documents.

    Payment must be delivered to:

        Carrollton Bank
        344 N. Charles Street
        Baltimore, MD  21201
        ATTN:  Mark Sergi
               Vice President

    This letter is not intended and shall not be construed as
an election of remedies or a waiver of Carrollton Bank's right
to exercise all other remedies now or in the future available to
it.  No delay by Carrollton Bank in exercising any rights or
remedies shall operate as a waiver of any rights or remedies
available to it.  Any and all rights and remedies available to
Carrollton Bank shall be cumulative and may be exercised
separately, successively, or concurrently in the sole discretion
of Carrollton Bank.

Eisner Petrou & Associates, Inc.
November 20, 2006
Page Three


    Kindly deliver payment in full to Carrollton Bank before
the Payment Deadline since the Company may be responsible for
additional expenses and fees in collecting the same due
Carrollton Bank.  If you have questions concerning the matter,
please contact the undersigned at 410-727-4456, ext. 135.  If
the Company is represented by an attorney, please have the
attorney contact me.

                                   Very truly yours,



                                   W. Charles Rogers, III

WCR,III/mme
cc:  certified mail
cc:  Steven C. Eisner
     207 Longwood Road
     Baltimore, MD 21210
     (regular and certified mail)
cc:  David M. Petrou
     2810 R Street, N.W.
     Washington, DC 20007
     (regular and certified mail)
cc:  Mark Sergi
cc:  Robert A. Altieri

# EXHIBIT
## W



RECORDED 1/29/07

# EXHIBIT

## <u>X</u>

# Carrollton Bank

*We're about people. We're about you.*

## PAYOFF STATEMENT

ACCOUNT NUMBER:            880001409-2120

CUSTOMER NAME(S):          Eisner Petrou and Associates

**PAYOFF GOOD THROUGH:**    **May 2, 2007**

**PER DIEM:**               **88.7476476**

Principal Balance ................................................................$345,396.25

Interest Due ....................................................................$10,169.49

Late Fee...........................................................................$756.97

Pay-off Fee ......................................................................$30.00

Attorney's Fees................................................................

**Total Amount Due**................................................................**$356,352.71**

Please send payoff to my attention at::
Carrollton Bank
344 N. Charles Street, Suite 400
Baltimore, MD 21201

Wire Instructions:
ABA: 052000773
Reference customer name and account number

If you have any questions please call me at 410-536-7352.

Thank you,

Shirley T. Howard
Lending Administration

# EXHIBIT
# Y

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**Office of the Secretary of the District of Columbia**
**Notary Commissions and Authentications Section**



NO. 16425

May 4, 2007

TO WHOM IT MAY CONCERN:

I hereby certify that according to the records of the Notary Public Section of the Office of the Secretary of the District of Columbia, **Sandy R. Gorton** was last commissioned as a Notary Public for the District of Columbia April 15, 2001. Her first commission began April 15, 1996 and expired on April 14, 2001. Her last commission began April 15, 2001 and expired on April 14, 2006.



Stephanie D. Scott
Secretary of the District of Columbia



441 4th Street, N.W., Suite 810 South, Washington, D.C. 20001 (202) 727-3117

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DAVID M. PETROU,                          :
                                          :
          Plaintiff/Counter-Defendant,    :
                                          :
     v.                                   :          1:06-CV-02159-GK
                                          :
CARROLLTON BANK, et al.                   :
                                          :
          Defendants/Counter-Plaintiff/:
          Cross-Plaintiff                 :

ORDER GRANTING MOTION OF DEFENDANT
CARROLLTON BANK FOR SUMMARY JUDGMENT
AS TO ALL COUNTS I, IV, VII, VIII, IX, AND X
OF THE AMENDED COMPLAINT

        The Motion of Defendant Carrollton Bank for Summary Judgment as to All

Counts I, IV, VII, VIII, IX, and X of the Amended Complaint having come before this

Court, [no] opposition thereto having been filed, [the parties having been heard], upon

consideration thereof, it is,

        FOUND, that there is no genuine issue as to any material fact, and it is, therefore,

        ORDERED, that the Motion of Defendant Carrollton Bank for Summary

Judgment as to All Counts I, IV, VII, VIII, IX, and X of the Amended Complaint  be, and

hereby is, GRANTED, and it is,

        FURTHER ORDERED, that judgment be, and hereby is, entered for Defendant

Carrollton Bank as to Counts I, IV, VII, VIII, IX, and X of Plaintiff's Amended

Complaint.


_____, 2007        _____
                                                    JUDGE